543 F.2d 757
 43 A.L.R.Fed. 698, 177 U.S.App.D.C. 272
 PUBLIC SERVICE COMMISSION OF the STATE OF NEW YORK, Petitioner,
v
FEDERAL POWER COMMISSION, Respondent,
Texas Eastern Transmission Corporation et al.
SUN OIL COMPANY, Petitioner,
v
FEDERAL POWER COMMISSION, Respondent,
Texas Eastern Transmission Corporation and Philadelphia Gas
Works Division of UGI Corporation, Intervenors.
GENERAL CRUDE OIL COMPANY, Petitioner,
v
FEDERAL POWER COMMISSION, Respondent,
Texas Eastern Transmission Corporation and Philadelphia Gas
Works Division of UGI Corporation, Intervenors.
M.H. MARR, Petitioner,
v
FEDERAL POWER COMMISSION, Respondent,
Texas Eastern Transmission Corporation and Philadelphia Gas
Works Division of UGI Corporation, Intervenors.
CONTINENTAL OIL COMPANY, Petitioner,
v
FEDERAL POWER COMMISSION, Respondent,
Texas Eastern Transmission Corporation and Philadelphia Gas
Works Division of UGI Corporation, Intervenors.
TEXAS EASTERN TRANSMISSION CORPORATION, Petitioner,
v
FEDERAL POWER COMMISSION, Respondent,
Sun Oil Company et al., Intervenors.
 Nos. 24716, 24823 to 24825, 24836, 24846.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Nov. 8, 1971.
Decided March 25, 1974.
Rehearing Denied Aug. 27, 1975.
 
 Morton L. Simmons, Washington, D.C., for petitioner in No. 24716.
 Bruce R. Merrill, Houston, Tex., with whom Tom Burton, Houston, Tex., Stanley M. Morley, and Francis H. Caskin, Washington, D.C., were on the brief, for petitioners in Nos. 24823, 24824, 24825 and 24836 and intervenors Sun Oil Co., Gen. Crude Oil Co., Continental Oil Co. and M.H. Marr in Nos. 24716 and 24846.
 J. Evans Attwell, Houston, Tex., for petitioner in No. 24846 and intervenor Texas Eastern Transmission Corp.
 Kenneth E. Richardson, Atty., Federal Power Commission, with whom Gordon Gooch, Gen. Counsel, and J. Richard Tiano, Asst. Sol., Federal Power Commission, were on the brief, for respondent. Israel Convisser, Atty., Federal Power Commission at the time the record was filed, also entered an appearance for respondent.
 William T. Coleman, Jr., Philadelphia, Pa., was on the brief for intervenor Philadelphia Gas Works Division of UGI Corporation in Nos. 24823, 24824, 24825, 24836 and 24846.
 Before FAHY, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.
 SPOTTSWOOD, W. ROBINSON, III, Circuit Judge:
 
 
 1
 We are called upon to review three orders promulgated by the Federal Power Commission in lengthy proceedings arising and conducted under the Natural Gas Act.[1] The Commission has granted four producers of natural gas leave to sell their leasehold interests in substantial proven reserves to an interstate pipeline, and the pipeline authority to construct and operate facilities enabling it to take gas therefrom. These grants have, however, been conditioned upon terms which are continuing subjects of complaint by the producers, the pipeline, and others as well.
 
 
 2
 The producers are Sun Oil Company, General Crude Oil Company, M.H. Marr and Continental Oil Company. The pipeline is Texas Eastern Transmission Corporation (Texas Eastern).[2] Other litigants in this court are the Public Service Commission of the State of New York (PSC) and the Philadelphia Gas Works Division of UGI Corporation (PGW).[3]
 
 
 3
 The orders under attack emanate from a series of Commission proceedings extending over a period of more than thirteen years. But notwithstanding its longevity, the controversy arrived here in a posture far from a final resolution. We have painstakingly examined its diffuse history, analyzed its multifaceted issues and pondered the complex problems emerging. Then, finding and identifying error in their administrative treatment, we are led to a disposition which, fortunately, will bring this long-standing litigation to a just and early end.
 
 I. BACKGROUND OF THE LITIGATION
 A. Producer-Pipeline Transactions
 
 4
 By contracts executed on February 1, 1957, the producers agreed to sell, and Texas Eastern to buy, their natural gas production in Rayne Field,[4] in Southern Louisiana, at an initial price of 23.9 cents per Mcf.[5] Shortly thereafter, the producers applied to the Commission for certificates of public convenience and necessity authorizing the sale,[6] and Texas Eastern sought a certificate permitting construction of new pipeline facilities extending its system to Rayne Field.[7] Because the unit price specified by the contract was high,[8] the applications were opposed by PSC and nine distributor intervenors. Hearings were held and on April 15, 1958, the presiding examiner recommended that the sale and construction be unconditionally certificated.[9] Exceptions to the examiner's decision were noted, but before the Commission ruled on them the Court of Appeals for the Third Circuit rendered its decision in the so-called CATCO litigation,[10] reversing an earlier Commission order granting unconditional certification of gas sales at an initial price lower than the 23.9-cent price involved in the pending application.[11] The Third Circuit's decisional ground was that the applicants for certification had not discharged their burden of demonstrating that the sale price they proposed was justified in terms of public convenience and necessity.[12]
 
 
 5
 After that pronouncement, Texas Eastern and the producers renegotiated, and on December 4, 1958, agreed upon another arrangement. Instead of a conventional well-held sale of the gas at a 23.9-cent price, the new plan provided for sales to Texas Eastern of the producers' leasehold interests in the gas reserves in place.[13] The aggregate sale price was some $134 million,[14] which equated during the early years[15] to about 23.5 cents per Mcf for the gas, a figure out of line with prevailing prices.[16] The producers terminated their original contracts with Texas Eastern and withdrew their applications for certification.[17] Texas Eastern moved to amend its certificate application to reflect these developments, and to reopen the administrative hearing.
 
 B.Opinion No. 322 And Its Demise
 
 6
 On June 23, 1959, the Commission overruled objections to the new proposal and, in its Opinion No. 322, awarded Texas Eastern an unconditional certificate to build and operate the facilities needed to effectuate the lease-sale.[18] While the Natural Gas Act gave the Commission regulatory authority over the sales of gas which Texas Eastern's original contracts with the producers had contemplated,[19] the Commission held that it lacked jurisdiction over sales of their gas leases,[20] and that for that reason it was under no obligation to determine, as a precondition to certification of pipeline construction related to those leases, whether the $134 million price was compatible with the public interest.[21] As a result, the producers' gas soon began to flow through Texas Eastern's pipelines for interstate distribution; and over the years ensuing, the flow has continued and the out-of-state prices paid to the producers have, as cost-of-service items, been reflected in the rates Texas Eastern has charged its customers.
 
 
 7
 Opinion Nov. 322 was, however brought to this court for judicial review, and was reversed.[22] Our opinion predated the holding in United Gas Improvement Company v. Continental Oil Company[23] that the Commission possessed jurisdiction over the sale of the leasehold interests.[24] We stated that while the Commission was empowered to certificate the pipeline construction without passing on the financial merits of the lease-sale arrangement, its order indicated general approval of the terms of that arrangement; and that to the extent that the order purported to do so, it was unsupported by substantial evidence in the record.[25] We realized that a determination of the reasonableness of proposed rates is not an express statutory requirement in a proceeding seeking authorization to extend pipeline facilities,[26] but we also recognized that the economic fact of escalating natural gas prices "does make price a consideration of prime importance."[27] We read the Supreme Court's CATCO decision "as holding that where a natural gas company seeks an unconditional certificate to make new sales of natural gas at proposed prices which are 'out of line' with existing prices, or which will tend to have an inflationary impact on the natural gas market, it is under an obligation to demonstrate upon the record the reasons why such increased prices are justified by the 'public convenience and necessary.' "[28] And we held that irrespective of whether the parties' lease-sale was beyond the Commission's regulatory jurisdiction, Texas Eastern's pipeline construction and its sales of Rayne Field gas were jurisdictional matters, and the price paid by Texas Eastern to the producers was a factor demanding consideration since Texas Eastern's acquisition costs would become relevant in the regulation of sales by Texas Eastern to its customers.[29] We remanded the case to the Commission with instructions to either disclaim any approval of the $245 million price or "reopen the record in the certificate proceeding to permit Texas Eastern to establish by adequate evidence that the acquisition costs which it proposed to incur will be consistent with the public convenience and necessity."[30]
 
 Opinion No. 378h
 
 8
 On remand, the Commission took the latter course, and after further hearings, reached two conclusions. On February 6, 1963, in Opinion No. 378,[31] it reversed its earlier position on jurisdiction over the lease-sale and held that it indeed did have jurisdiction.[32] After discovering that power, however, the Commission recognized that the proceeding was not in a posture enabling final disposition. It was essential that the producers, who were not parties to the remanded proceeding, file an application for a certificate of public convenience and necessity for approval of their sale,[33] and the nature of the lease-sale transaction presented novel difficulties in the way of price regulation.[34] The parties were given six months to work out new arrangements and submit new rulings.[35]
 
 
 9
 Opinion No. 378 was subjected to judicial review in the Fifth Circuit, and the Commission's jurisdictional determination was reversed.[36] On further review, however, the Supreme Court, limiting its considerations to that question, reversed the Fifth Circuit and sustained the Commission's jurisdiction over the lease-sale.[37] Since no question as to the propriety of the Commission's disposition was before the Court,[38] its action left Opinion No. 378 intact.
 
 D. Opinion Nov. 565
 
 10
 In March, 1966, in response to Opinion No. 378, the producers filed applications for certificates of public convenience and necessity, and another round of hearings ensued. The presiding examiner split his initial decision into two parts, the first dealing with the question of payments to be remitted to producers in the future, and the second, made necessary by the first, with the question of refunds on account of payments to producers in the past. In his Phase I decision, issued January 23, 1968,[39] the examiner was of the view that the lease-sale did not meet the test of public convenience and necessity because uncertainties as to the volume of gas which would be produced entailed too great a risk for consumers,[40] and because the imbalance in payments during earlier years was not outweighed by countervailing benefits.[41] The examiner recommended modification of the transaction calculated to render it equivalent to a conventional sale of gas at 20 center per Mcf after adjustments reflecting cost incurred and benefits obtained by Texas Eastern which normally would have accrued to producers.[42] The examiner's Phase II decision, issued on September 11, 1968,[43] and utilizing an in-line level of 20 cents per Mcf[44] as the basis for computations, recommended that the producers refund to Texas Eastern, and that Texas Eastern in turn refund to its customers, excess collections estimated at $31.5 million through 1967.[45] The examiner further recommended reduction of Texas Eastern's rates.[46]
 
 
 11
 On August 6, 1969, the Commission issued its Opinion Nov. 565 and an order upholding in the main the examiner's decision on both phases.[47] The Commission found that the lease-sale arrangement as formulated by the parties did not comport with the public convenience and necessity.[48] Even with a producer guaranty alleviating the possibility of payment for gas that did not exist,[49] the Commission concluded that other uncertainties generated too much risk.[50] Had the lease-sale agreement come before it in an unexecuted form, the Commission declared, it might well have been rejected,[51] but since almost half of the total estimated volume of gas had already flowed through Texas Eastern's pipelines, the Commission decided to modify the transaction in order to put it in its most palatable form.[52] The Commission ordered Texas Eastern to limit further payments to producers to amounts not exceeding a just and reasonable rate of 18.5 cents per Mcf[53] or any such superseding just and reasonable rate as might thereafter be established,[54] and to cease payments when the producers received the full $134 million contract price.[55] The Commission ordered the producers to refund to Texas Eastern the excess, after specified adjustments, of payments received above the 20-cent in-line level prior to October 1, 1968, and thereafter above the 18.5-cent or other applicable just and reasonable rate,[56] a total of $31.5 million through 1967.[57] And the Commission directed Texas Eastern to refund about two-thirds of that amount--$19.9 million through 1967--to its customers,[58] and to trim its rates to reflect a cost of 18.5 cents,[59] or a cost at any other area rate thereafter becoming applicable.[60]
 
 
 12
 Opinion No. 565 was not a unanimous decision. Commissioners O'Connor and Bagge subscribed to it fully.[61] In all respects save one, they were joined by Chairman White, who dissented solely as to the use of the 20-cent in-line rate partially, instead of the 18.5-cent just and reasonable rate exclusively, as the basis for computation of producer refunds.[62] Commissioners Carver and Brooke expressed the view "for decisional purposes" that the 20- and 18.5-cent refund bases were correct[63] but, on the grounds that the lease-sale might yet garner approval, they would have remanded for the development of additional data.[64]
 
 E. Opinion No. 565-A
 
 13
 It so happened, however, that Opinion No. 565 and its accompanying order were not effectuated in any meaningful way. Applications for rehearing were presented to the Commission, and by orders entered September 2[65] and 18k[66] 1969, the Commission granted rehearing, and by separate order on the latter date stayed, pending reconsideration, the certificate conditions formulated in Opinion Nov. 565.[67] On September 29, 1970, the Commission issued Opinion No. 565-A,[68] which purported to reaffirm many of the considerations underlying Opinion 565, but also to substantially modify the solution it presented.
 
 
 14
 The modifications proposed by Opinion No. 565-A are directly traceable to significant developments in producer-rate regulation in Southern Louisiana occurring contemporaneously with the proceeding under review. In 1960, the Commission inaugurated a series of proceedings to enable determination of maximum producers' rates for major gas-producing areas and the regulation of such rates on an area-wide basis.[69] Southern Louisiana, in which Rayne Field is situated, was one of those areas. A final order in the Southern Louisiana proceeding--Docket No. AR 61-2--was issued on September 25, 1968,[70] establishing 18.5 cents per Mcf as the just and reasonable rate for gas of the Rayne Field vintage.[71] On the same date, the Commission commenced a new proceeding--Docket No. AR 69-1--to determine whether the Southern Louisiana rates set in Docket No. AR 61-2 needed modification in light of later circumstances. in the meantime, the Court of Appeals for the Fifth Circuit reviewed and sustained the Commission's order in Docket No. AR 61-2,[72] but petitions for writs of certiorari were presented to the Supreme Court.[73] On applications for rehearing, the Fifth Circuit adhered to its holding, but indicated that despite its affirmance the Commission might have power to reconsider the order.[74] The Commission then stayed its order in Docket No. AR 61-2 and consolidated that docket with Docket No. 69-1 for further hearing.[75] Thus, when Opinion No. 565-A was handed down, a Commission order establishing just and reasonable rates for Southern Louisiana gas had been affirmed but was pending application for further review, and from the Commission's viewpoint the matter of rates for gas of Rayne Field vintage was still in flux.
 
 
 15
 Order No. 565-A reflects some shifting of portions among the Commission's members.[76] A majority of the members[77] reaffirmed the basic conclusion that the lease-sale in original form did not serve the public interest.[78] A majority also felt, however, that the modifications imposed by Order No. 565 must undergo some changes.[79] Chairman Nassikas and Commissioner Bagge were of opinion, like Chairman White before them,[80] that the standard for producer refunds to Texas Eastern[81] should be the just and reasonable rate exclusively, rather than a 20-cent in-line rate, partially;[82] but, arguing that a just and reasonable rate had not been finally determined, they voted to defer the question of amount of the refunds.[83] They also were of opinion that Texas Eastern's payments to producers should not be limited to contract price of $134 million,[84] but should continue until the field was exhausted.[85] These views collided with those expressed in Opinion No. 565 by Commissioner O'Connor,[86] who in Opinion No. 565-A adhered to them.[87] Commissioners Carver and Brooke, the dissenters in Opinion No. 565, would have granted the certificate unconditionally on the ground that the lease-sale met the requirements of public convenience and necessity,[88] but as the next best alternative, concurred in deferment of refunds[89] and extension of payments to producers for the life of the field.[90]
 
 
 16
 So it was that the Commission reached no decision as to the refund liability of either Texas Eastern or the producers, and that all issues in that regard were postponed.[91] Thus the provisions of Opinion No. 565 respecting Texas Eastern's prospective payments to producers,[92] the producers' refunds to Texas Eastern,[93] the latter's refunds to customers[94] and its rates for the future,[95] together with the associated escrowing and accounting requirements,[96] were all postponed indefinitely pending a new round of hearings.[97] The certificates sought by Texas Eastern and the producers were issued, conditioned upon payment of an adjusted price of 20 cents per Mcf until such time as the area rate might be established.[98]
 
 
 17
 Petitions seeking rehearing of Opinion No. 565-A were filed,[99] and on November 16, 1970, they were denied,[100] again with shifts in position. Chairman Nassikas and Commissioner Bagge voted for denial without further statement.[101] Commissioner O'Connor voted to deny, but appended a statement arguing that the total to be paid under the lease-sale contract should be adjusted to reflect the time value of money payments to the producers which were delayed by reason of the order requiring refunds.[102] Commissioners Carver and Brooke dissented, and announced withdrawal of their "reluctant concurrence" in Opinion No. 565-A "to the end that the producers can receive" payments "for the life of the field."[103] They reiterated their brief that the lease-sale contract should be approved as originally written.[104] The petitions for review by this court followed.
 
 II. STATUS OF THE COMMISSION'S OPINIONS
 
 18
 The threshold question we confront is the current status of Opinion Nos. 565 and 565-A and the orders respectively accompanying them as exertions of the Commission's adjudicatory authority. No one argues that either of these opinions or orders lacked Commission majority when they issued. No one suggests that Opinion No. 565-A, when announced, did not effectively modify Opinion No. 565. Rather, the dispute relates to the impact upon the substantive and procedural aspects of those decisions which may have been made by the commissioners' subsequent votes on the order denying rehearing of Opinion No. 565-A. The votes which Commissioners Carver and Brooke cast on that order are at the center of the controversy.
 
 A. The Problem and Its Genesis
 
 19
 Opinion No. 565 and its companion order were supported by the majority votes of Chairman White and Commissioners O'Connor and Bagge in every aspect save one.[105] The one divergence was on the question whether the just and reasonable rate was to be utilized retroactively as well as prospectively as the basis for computing producer refunds to Texas Eastern.[106] On that issue, Chairman White took the affirmative[107] and Commissioners O'Connor and Bagge the negative[108] but they were joined by Commissioners Carver and Brooke "for decisional purposes,"[109] although the latter two dissented for other reasons.[110]
 
 
 20
 Similarly, Opinion No. 565-A and the order related to it were sustained, initially at least, by the unqualified votes of Chairman Nassikas and Commissioner Bagge,[111] and by the votes which two of their disagreeing colleagues, Commissioners Carver and Brooke, "reluctantly" contributed to enable the disposition dictated by that opinion and order;[112] only Commissioner O'Connor voted against that disposition.[113] The order denying rehearing of Opinion No. 565-A was backed by a majority consisting of Chairman Nassikas and Commissioners O'Connor and Bagge,[114] with Commissioners Carver and Brooke undertaking to "withdraw [their] reluctant concurrence" in that opinion;[115] and it was the purported withdrawal that bred the first controversy which we consider.
 
 
 21
 PSC,[116] deeming the withdrawal effective, contends that the majority voted originally effectuating Opinion No. 565-A in its modification of Opinion No. 565 evaporated with the vote on the order refusing rehearing of Opinion No. 565-A. In other words, PSC claims that when Commissioners Carver and Brooke retracted their joinder in Opinion No. 565-A, that opinion perished and Opinion No. 565 became automatically reinstated. Texas Easter n argues similarly, though more limitedly, that after the loss--because of t he withdrawal--of a majority of the commissioners for Opinion No. 565-A, the re could no longer be the certificate condition, fashioned in that opinion, converting the responsibility for producers payments from the contract total of $134 million to a liability for continuing payments until cessation o f gas production in the transferred leasehold properties.
 
 
 22
 The Commission, on the other hand, eschewing the withdrawal, asserts that the majority vote for Opinion NO. 565-A when issued was unaffected by the subsequent voting with respect to the applications for rehearing of that opinion, and in that position the producers unite. The issue thus boils down to whether the attempted withdrawal changed the 4-1 vote for Opinion No. 565-A and its suspension of the certificate conditions to a vitiating 3-2 vote against Opinion No. 565-A, thus restoring Opinion No. 565 as the final and only decision of the Commission. It is important to resolve the dispute at the outset so that we may know just what we are legitimately called upon to review.
 
 B. The Governing Principles
 
 23
 The authority to entertain and dispose of applications for rehearing of Commission orders is defined by the Natural Gas Act. "Upon such application," the Act provides, "the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing."[117] This grant, in terms, runs to the Commission is an entity apart from its members, and it is its institutional decisions--none other--that bear legal significance.[118] Only as an entity can the Commission formulate valid original decisions; by the same token, only in that character can it fashion new decisions remaking those which it has already promulgated.[119] Collective action is prerequisite to any alteration of a preexisting order, whether a grant or denial of rehearing,[120] or a total abrogation or partial modification of that order.[121]
 
 
 24
 By institutional decisions, we mean, of course, a decision by a majority vote duly taken. That is the rule of the common law,[122] which we have hitherto applied to administrative action,[123] and the rule by which, we notice judicially, the Commission has regularly functioned. There being no statutory specification to the contrary, we have no difficulty in accepting it as the governing rule here.[124] And since each of the five members of the commission[125] cast a vote toward each of the three decisions relevant here, it follows that a concurrence of at least three votes was essential to constitute any given feature of the voting an aspect of commission action.[126] It follows too, that the efficacy of action taken by majority vote is in no wise affected by the fact that there is also a minority.[127] "[A] dissent no more reduces the legal effect of [an agency's] findings and order than does a dissenting opinion of a member of a court detract from the legal effect of the court's judgment."[128]
 
 
 25
 We perceive no incongruity with logic or precedent in these conclusions. On the contrary, neither the requirement of institutional action which Congress has imposed on the Commission nor the principle of majority rule which the Commission has itself impressed upon its decision-making processes could tolerate any other. Collection action, we repeat, is the only authorized means to a decision, including a decision to undo a prior decision. If an agency proceeding could be reopened by the unilateral action of a member who casts a vote for the majority, then, irrespective of the conviction of remaining members that the interest in repose outweighed their doctrinal differences, a single defection from the majority could thwart may a careful considered resolution, and wreak havoc on the stability of the agency's decision. We have not been referred to nor have we found any authority for such a novel and frightening proposition.
 
 
 26
 We do not mean to suggest that a commissioner's vote, once made, imprisons him in an intellectual strait-jacket. The point is that an individual change of mind cannot change an institutional decision unless it garners a majority vote to do so. Nor is there any requirement, statutory or otherwise, that members of administrative agencies maintain consistent positions throughout the course of lengthy proceedings. Commissioners, no less than judges,[129] may cast their votes solely to void an impasse,[130] or otherwise to draw the administrative phase to a close. Commissioners Carver and Brooke utilized their votes on Opinion No. 565-A to achieve an objective deemed more important than adherence to personal precept.[131] Commissioner O'Connor voted against rehearing of Opinion No. 565-A despite his differences with that opinion because he felt that the litigation was ripe for judicial review.[132] But, in each instance, what counted in the definition of agency action was the vote rather than the individual view.
 
 
 27
 In sum, a change of individual position, to affect the institutional decision, must occur as a part of a collective effort directed toward that decision. Once made, the decision remains the decision of the body, immune from alternation save by another collective effort of that body. Individual endeavor to modify an institutional decision, so long as it is only that, is of no consequence in the administrative process.
 
 C. Application Of Doctrine Here
 
 28
 The petitions for rehearing of Opinion No. 565-A and its related order[133] presented to the Commission the questions whether the petitions should be granted or denied, and whether the Commission should "abrogate" or "modify" that opinion.[134] The Commission plainly decided those questions in the negative. The order on rehearing declares the Commission's "opinion" that "the questions raised by the Applicants are sufficiently covered by or are clear from the language of Opinion No. 565-A and order, so that further discussion is unnecessary."[135] The order also sets forth the Commission's findings that "[t]he assignments of error and grounds for rehearing set forth in the applications for rehearing ... present no facts or legal principles which would warrant any change in or modification of Opinion No. 565-A and" its accompanying order.[136] The sole disposition effected by the order was that "[t]he applications for rehearing ... [and] the motion for reconsideration ... are denied."[137]
 
 
 29
 It is also evident that the Commission's decision to deny rehearing of Order No. 565-A was supported by the votes of a majority of the commissioners. Chairman Nassikas and Commissioner Bagge subscribed fully to the order of denial.[138] Commissioner O'Connor concurred in the denial,[139] and while he filed a statement expressing a change of view as to the amounts which the producers should receive from Texas Eastern,[140] he announced categorically his position that "[t]he granting of rehearing at this time would not serve any constructive purpose,"[141] and that "an additional rehearing would not be fruitful."[142] Only Commissioners Carver and Brooke dissented, adhering to their thesis that the lease-sale transaction should be approved as it was.[143]
 
 
 30
 We hold, then, that Opinion No. 565-A was not abrogated or modified by the vote on the petitions to rehear it.[144] Three commissioners--a commission majority--concurred in refusing rehearing of Opinion No. 565-A, and that was the only action which commanded a majority vote. Although the coalitions spawning Opinion No. 565-A were altered by the poll on the petitions for rehearing, the only proposal garnering a majority was the denial of rehearing; and the vote of the majority was, unequivocally, to leave Opinion No. 565-A intact. It bears repeating that the order recited the decision that "[t]he assignments of error and grounds for rehearing set forth" by the applicants for rehearing "present no facts or legal principles which would warrant any change in or modification of Opinion No. 565-A" or the order effectuating it.[145] Hardly could the Commissioners comprising the majority have made plainer their purpose not to change Opinion No. 565-A in any respect whatsoever.
 
 
 31
 In consequence, the matters before us for review are Opinion No. 565 as modified by Opinion No. 565-A, and Opinion No. 565-A without modification, and the orders respectively accompanying those opinions. To the issues tendered for review we now turn.
 
 III. CONVENTIONALIZATION OF THE LEASE-SALE
 
 32
 Opinions Nos. 565 and 565-A each express the finding of a majority of the Commission[146] that the lease-sale transaction, in the form agreed to by the parties, did not survive the test of pubic convenience and necessity.[147] For that reason the Commission, in awarding the parties the certificates requested, conventionalized some aspects of the lease-sale to more nearly conform it to a normal gas-sale contract.[148] Both the producers and Texas Eastern contend that the Commission's adverse finding on public interest is insufficiently supported by the evidence, and that the administrative record demonstrates that the lease-sale is more favorable to consumers than a conventional sale could be.
 
 
 33
 The Commission faced a novel situation in the lease-sale arrangement presented to it, for the lease-sale was not readily amenable to administrative supervision in the Commission's accustomed mode of regulating prices between producers and pipelines.[149] The problems which the lease-sale presented come into sharper focus when the process of certificating conventional sales for gas is first examined.
 
 
 34
 A. Certification of Conventional Natural Gas Sales
 
 
 35
 A conventional gas-sale contract sets a price for each unit--each Mcf--of gas to be supplied, frequently with a provision escalating the price. When a sale is sought to be certified, the price is subject to scrutiny by the Commission in the exercise of its authority, under Section 7 of the Natural Gas Act,[150] to attach such conditions to the certificate as are necessary in the public interest.[151]
 
 
 36
 The Supreme Court's decision in Phillips Petroleum Company v. Wisconsin[152] opened the door to Commission regulation of sales by producers to interstate pipelines, and Sections 4[153] and 5[154] of the Act armed the Commission with general authority to establish just and reasonable rates for the gas sold. But full-fledged rate proceedings are, by their very nature, unsuited to the needs of price review when a producer seeks certification of a sale.[155] Such proceedings are extraordinarily time-consuming,[156] and any relief from excessive rates emanating from those under Section 5 is prospective only.[157] Consumers were thus exposed to irremediable excessive charging while rate-reform proceedings were pending.[158] Even when area rate proceedings came into vogue as the preferred method of setting producer rates,[159] the exigencies of interim price protection remained.[160]
 
 
 37
 In the CATCO litigation,[161] the Supreme Court focused on the problem, emphasizing the vital importance of price regulation under Section 7:
 
 
 38
 [T]he inordinate delay presently existing in the processing of Sec. 5 proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under Sec. 7 ... The fact that prices have leaped from one plateau to the higher levels of another ... [makes] price a consideration of prime importance. This is the more important during this formative period when the ground rules of producer regulation are being evolved .... The Congress, in Sec. 7(e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require. Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of "favored nation" clauses[162] or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary.[163]
 
 
 39
 Following CATCO, the Commission undertook to assure that the prices at which producer sales were certificated did not exceed in-line prices--the field prices at which the bulk of contemporaneous gas transaction not "suspect" took place.[164] The Supreme Court, in turn, approved the practice as a means of holding the line on prices in the interest of consumer protection until the Commission could determine just and reasonable rates for the gas.[165] This technique streamlined the Section 7 certification process, and the Commission was enabled to certificate sales on the basis of comparative pricing alone, without need to delay the process by indulgence in orthodox rate-making.[166]
 
 
 40
 The Act spells out the processes by which producer rates set at in-line levels may be altered. After Section 7 certification, a producer may, under Section 4, vie for a higher price by the simple expedient of a 30-day notice to the Commission and the public.[167] The Commission may, however, suspend the proposed increase for a maximum period of five months while it investigates and acts on the application.[168] Before it may finally approve the increase, the Commission must find that it does not exceed the just and reasonable rate for gas of its vintage,[169] and the burden of proof on that issue is on the applicant.[170] Pending the outcome of the proceeding, the producer remains under a liability to refund the excess of any increase above the eventual just and reasonable price.[171] And should the Commission see a need to launch its own investigation of a producer's initial rates, it may institute a proceeding for that purpose under Section 5 of the Act.[172]
 
 
 41
 Case-by-case determination of just and reasonable producer rates on the traditional cost-of-service basis, however, proved to be an intractable process which threatened to inundate the Commission's regulatory function.[173] The solution which the Commission eventually devised was the previously-mentioned scheme of area-wide rate determinations.[174] The scheme won Supreme Court approval in the Permian Basin Cases[175] and, in the Court's words, "began a new era in the regulation of natural gas producers."[176] The Commission's regulatory effort with respect to Rayne Field, as we have seen, was destined to reach that era.[177]
 
 B. The Lease-Sale Contrasted
 
 42
 Upon a conventional gas-sale transaction, then, the ratemaking aspect of a Section 7 certification proceeding has as its purpose the fixing of an initial price in line with prices in other jump-free transactions pending the establishment of a just and reasonable rate.[178] The Rayne Field lease-sale transaction, however, could not easily be subjected to the in-line price concept. Although the total price which Texas Eastern was to pay to the producers was fixed by the contract, the eventual volume of gas which the field would produce was necessarily an estimate, and so also any cost per Mcf of the gas which would be extracted. Nonetheless, it was clear that until the late years of production from the producers' holdings in Rayne, Field, the price to be paid would exceed the in-line cost of gas actually delivered.[179] Since the purchase price of $134 million was to be remitted in full by 1975 but production was expected to continue until 1986,[180] the parties and Commission alike were seemingly reconciled to the conclusion that the price of the gas would run considerably higher than the 20-cent in-line price during most of the production period.[181]
 
 
 43
 Adherence to the Supreme Court's CATCO[182] ruling demanded that the Section 7 certification process not develop into a protracted affair bogged down in the mire of intricate cost calculation.[183] The in-line price measure was an available index of price tends, and so a ready reference to a price that might shield consumers against exorbitance.[184] Producers could secure reasonable protection under Section 4 by immediately filing for rate increases, subject to refunds contingent upon the just and reasonable rate ultimately determined.[185] Consumers, on the other hand, got no refund protection under Section 5 against the contingency that the initial price might turn out to be too high.[186] It was against this need to safeguard the interest of consumers that the Commission was summoned to determine whether the lease-sale merited unconditional certification.
 
 C. The Decision to Conventionalize
 
 44
 In reviewing action by the Commission within its jurisdiction under the Natural Gas Act, we exercise an "essentially narrow and circumscribed" function.[187] The Act provides unequivocably that "[a] finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive."[188] And, equally plainly, a Commission ruling on a nonfactual question is to be sustained if there is a rational basis for the conclusion it achieves.[189] It is by these standards that we must test the Commission's decision to condition the certificates of public convenience and necessity awarded Texas Eastern and the producers so as to conventionalize some of the features of the lease-sale.
 
 
 45
 As early as 1963, when Order No. 378[190] addressed the requests for certification of the lease-sale, it was "clear" to the Commission "from the record of this case that it is not in the public interest for this Commission to certificate a transaction such as the one presented to us on this record."[191] And as the presiding examiner observed in his Phase I decision in 1968, "[t]he reason ... was that it would be impossible to regulate, or even ascertain, what the producers were getting for the gas or what the cost to the pipeline would be."[192] For, in the beginning, a major unknowable was the volume of gas which the transferred reserves would ultimately yield, and consequently the eventual unit price which Texas Eastern would pay for the yield.[193]
 
 
 46
 After opinion No. 378 was announced, the producers sought to eliminate the risk of possible over-estimation of the reserves by guaranteeing that they would supply Texas Eastern with a designated minimum volume of gas.[194] With this single change in the transaction, the parties again presented the lease-sale to the Commission with requests for unconditional certification.[195] The examiner decided that certification should be accompanied by an imposition of conditions,[196] and the Commission adopted and has consistently adhered to that position.[197]
 
 
 47
 Like the examiner, the Commission in Opinion No. 565 was of the view that the reserve guaranty did not reduce much of the cost-price hazard inherent in the lease-sale.[198] "[T]here are," the Commission said, "numerous other factors which can have a substantial impact upon the cost of the gas to Texas Eastern and its customers under the lease-sale, such as the value and quantity of the liquids, the rate of production of the gas and liquids, the rate of return Texas Eastern is entitled to throughout the life of the wells, and associated taxes, variations in operating expenses and uncertainty of delivery."[199] So great was the peril that the Commission felt that were the lease-sale still executory, it might well reject it.[200]
 
 
 48
 When, however, the Commission came in Opinion No. 565 to again consider the lease-sale on its merits, it had long since ceased to be entirely executory. By the end of 1968, almost half of the estimated recoverable gas had been taken, and most of the contract price had been paid to the producers.[201] In this milieu, the Commission deemed it "appropriate to compare the estimated cost of the lease-sale as a whole to Texas Eastern and its customers with the cost of a conventional gas purchase arrangement."[202] The Commission admonished that "[i]n making this comparison, however, we must keep in mind the continuing substantial uncertainties as to the lease-sale arrangement and could only find it is required by public convenience and necessity, as contrasted with a conventionalized sale, if the comparison were significantly in its favor."[203] And on scrutiny the Commission found that "the comparison is not favorable to the lease-sale, even without considering the uncertainties thereof."[204]
 
 
 49
 Opinion No. 565, as we read it, predicated that finding on two bases. One was a cost comparison of the lease-sale with a conventional gas-sale, which disclosed a difference of some $6 million in favor of the latter.[205] To the purchase price of $134,395,700 the Commission added Texas Eastern's other net Rayne Field costs and, using the producers' estimates of gas and liquid takes, computed a total cost to Texas Eastern of $168,900,000 over the expected life of the reserves.[206] On the other hand, the Commission ascertained that a conventional sale of the gas priced at 20 cents per Mcf from the start of the flow until October 1, 1968,[207] and at 18.5 cents thereafter, would cost Texas Eastern a total of $186,537,000.[208] But when these two totals were discounted at 5 percent for the time value of Texas Eastern's advances to the producers, the Commission learned that the effective cost was $122,403,000 under the lease-sale and $116,270,000 by a conventional approach.[209] As the Commission noted, the difference would be greater if a discount rate of 6 percent were employed.[210]
 
 
 50
 This difference in cost was not, however, the only consideration motivating the Commission to disapprove the lease-sale as presented. A second factor which loomed large was the Commission's belief that despite the reserve guaranty, the lease-sale was fraught with uncertainties which precluded a confident evaluation of its economic impact, and that the public interest would hardly be served thrusting the risk of an excessive price on consumers. Opinion No. 565 set forth a summary of the uncertainties, to which we have adverted,[211] and the Commission's overall conclusion:
 
 
 51
 [T]he lease-sale arrangement produces a lack of certainty over the life of the field and, as the record indicates, a higher cost than a conventional sale at 20 cents per Mcf. Because of these features of the lease-sale transaction, it is imperative for the Commission to take steps within its jurisdiction, which will protect consumers from paying excessive rates. This can be done, we believe effectively, through regulating the payments made by Texas Eastern to the Producers by conditioning the lease-sale arrangement.[212]
 
 
 52
 The uncertainty factor reappeared as a topic of discussion in Opinion No. 565-A. The producers contended that uncertainty is an element in many projects submitted for Commission approval, and that the uncertainties remaining in the lease-sale transaction after the reserve guaranty was made did not exceed reasonable bounds. The Commission disagreed, responding:
 
 
 53
 While, of course, there is always uncertainty, more is involved here, for the proposal is to commit Texas Eastern to a fixed price of $134,395,000 for the life of the field, and that is not true in the conventional certificate proceeding where the price is subject to regulation. The essence of our objection to the lease-sale transaction is its inflexibility. If the price turns out to be too high in the light of changing circumstances, it fails to protect the consumers; if it is too low the producers will not receive an adequate return and this, in turn, may affect their ability to serve the market.[213]
 
 
 54
 Before the Commission the producers also argued, as they have here, that the advantageous features of the lease-sale demanded consideration conjunctively with cost data in determining whether it was that arrangement or a conventionally-converted sale that best served the public convenience and necessity.[214] We agree that the price of the Rayne Field gas was not the only relevant criterion, and that the Commission was required "to evaluate all factors bearing on the public interest,"[215] but we cannot agree that the Commission was derelict in that duty. On the contrary, the Commission, in both of its opinions on the subject of conventionalization,[216] addressed the noncost factors which the producers advanced and found them insufficient to warrant unconditional approval of the lease-sale.[217] In addition to the reserve guaranty,[218] the producers pointed out that Texas Eastern and its customers obtained a large supply of gas in a single package close by its pipeline, with resultant savings in gathering and transportation costs. The Commission felt that that did not make for a unique situation, since large and well located reserves are features of many conventional sale transactions.[219] The producers pointed to the further fact that Texas Eastern secured the Rayne Field gas at a firm price, and to the potential saving from the absence of price escalations; but, as the Commission responded, the price was in any event subject to the Southern Louisiana area rate.[220] The producers also called attention to the flexibility of operations--another cost saver--which Texas Eastern gained under the lease-sale arrangement. As the Commission responded, however, Texas Eastern was taking the gas at a normal rate, and would be required to continue to do so in the future.[221] "These factors," said the commission, "do not justify the price of gas to Texas Eastern under the contract which may be excessive even on the basis of the entire life of the field."[222]
 
 
 55
 When this litigation was previously before this court, we extended to the Commission the option to "reopen the record in the certificate proceeding to permit Texas Eastern to establish by adequate evidence that the acquisition costs which it proposes to incur will be consistent with the public convenience and necessity."[223] And when the Commission elected to do so and properly asserted jurisdiction over the lease-sale,[224] it concluded that the public interest would be ill-served by certification of a transaction in which the unit cost of the involved gas could not be accurately determined.[225] Conventionalization of the lease-sale developed for the Commission as the appropriate, and we think as a rational, method of enabling the Commission to discharge its statutory responsibilities.
 
 
 56
 In reviewing the Commission's decision to conventionalize, we have remained advertent to the difficulty of the problem which it faced and to the appeal which some of the parties' arguments had for a minority of its members.[226] Those arguments, in large measure, have been repeated here in a forceful effort to persuade us to a result opposite to that thrice reached by a Commission majority.[227] But "Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts."[228] And "[a] presumption of validity ... attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' "[229] We have witnessed ample support in the evidence for the Commission's factual findings,[230] and ample support in reason for its nonfactual conclusions.[231] We hold that the Commission's action on this branch of the litigation must stand.
 
 IV. SALE PRICE OF THE GAS
 A. The Price Adjustments
 
 57
 In Opinion No. 565, the Commission effectuated its decision to equate the lease-sale to a conventional gas sale by attaching to the certificates of public convenience and necessity which it awarded a set of conditions designed to achieve that end.[232] The Commission's central effort in the formulation of the conditions, as it would have been had the gas been conventionally sold, was the setting of an initial unit price which would serve the public interest until such time as a just and reasonable rate might be established.[233] The conditions we consider now are those which concern pricing. We will have occasion to examine others later.
 
 
 58
 Utilizing as a base price the area rate of 18.5 cents per Mcf effective October 1, 1968,[234] which was to remain subject to change in any future area rate proceeding,[235] the Commission subtracted the costs assumed by Texas Eastern which normally are borne by producers and added the economic advantages which normally accrue to producers.[236] Since under the lease-sale arrangement Texas Eastern was paying royalties and state taxes, and was making capital investments and incurring expenses in developing and operating the field,[237] the Commission directed that these outlays be deducted from the 18.5 cent unit price.[238] These adjustments, the Commission ordained, would continue in effect until Texas Eastern paid the $134 million purchase price in full.[239] On the other hand, since producers selling gas conventionally ordinarily realize the benefit of liquid revenues and salvage, which under the lease-sale contract inured to Texas Eastern, the Commission specified that after payment of the purchase price the 18.5 cent price would be increased by those items.[240] The Commission also imposed conditions calculated to afford the producers protections which they would have enjoyed under a conventional arrangement.[241]
 
 
 59
 In conventionalizing the lease-sale, the Commission felt it unnecessary to reject all of its features, some of which the Commission felt had tax advantages for the contracting parties.[242] One of the features retainable, the Commission held, was the $134 million price specified in the lease-sale contract as the total of the consideration to be paid to the producers by Texas Eastern. The Commission proposed, in that connection, to "require that the payments to be made by Texas Eastern for the Rayne Field gas until the purchase price of $134,395,700 has been paid be the equivalent of a purchase of gas under a conventional contract."[243] The Commission elucidated:
 
 
 60
 [We] shall adjust the arrangement so that, up until the entire purchase price of $134,395,700 is paid by Texas Eastern, it will be equivalent in economic effect to a conventional sale at the just and reasonable price of 18.5 cents per Mcf. After that, as proposed by the Applicants, Texas Eastern would make no further payments, for if we required continued payments until the Field was exhausted the lease-sale would be, in effect, converted into a conventional sale, presumably with the corresponding tax consequences. To accomplish these ends will clearly involve a reduction of the payments for gas and an extension of the paying period, but the Producers would eventually receive the full purchase price of $134,395,700, although over a longer period, even after making the refunds which [Opinion No. 565 directed].[244]
 
 And the Commission further explained:
 
 61
 After the end of the production payment until the entire purchase price is paid, the price should continue to be reduced by royalties, state taxes, investments and expenses, but should be increased by liquid revenues and salvage, for the producers in a conventional sale would receive the benefit of both of these items.
 
 
 62
 Eventually, even though the payments are reduced, as long as gas continues to flow from the Rayne Field, Texas Eastern will pay the full purchase price of $134,395,700 albeit over a longer period of time. In our opinion the Producers, providing there is sufficient gas, should receive the full amount for which they contracted even though they have been required to make a refund for the period prior to this order. After the full payment has been completed Texas Eastern will pay the Producers no more for gas taken from the Rayne Field. Since it will then have fully paid for the properties transferred, Texas Eastern, alone, should bear the cost of the royalties, state taxes and costs of operating the Field, but it should receive the benefit of all liquid revenues. Texas Eastern, however, should pay the Producers for any salvage realized on property installed before the purchase price has been fully paid, since the cost of such property under the opinion and order will be deducted from the price of gas of 18.5 cents per Mcf. Of course, salvage realized from property installed after the payments have been completed and not charged against the Producers should benefit Texas Eastern.[245]
 
 
 63
 In Opinion No. 565-A, however, the Commission changed its treatment of the purchase price completely. The producers had contended that Opinion No. 565, in partially conventionalizing the lease-sale, had unfairly and confiscatorily placed burdens on them without conferring the benefits of a conventional sale.[246] Attention was directed particularly to the provision that after Texas Eastern paid the $134 million contract price, it would get any additional gas and liquids free of charge.[247] Attention was also called to the fact that while under the lease-sale agreement the entire purchase price would be remitted during the first 16 years of production, Opinion No. 565 enlarged the payment period to the extent required to absorb the $134 million at the adjusted 18.5 cent rate.[148]
 
 
 64
 The Commission was persuaded by these arguments. In Opinion NO. 565-A, it declared that "while the Producers, under the arrangement we prescribed, [in Opinion No. 565] will be getting the contract price it will not be of the same value because they will receive it over a much longer period, and they will not receive the benefit of all the gas and liquids produced by the Field as they would under a conventional contract."[249] In these circumstances, the Commission felt "that it is only equitable that they be paid for the gas and receive credit for the liquids produced until the Field is exhausted."[250] The Commission added:
 
 
 65
 Texas Eastern will retain the leases conveyed to it, and will continue to be responsible for operating expenses and necessary investments.
 
 
 66
 This means that the conditions prescribed in this Opinion and order with respect to future pricing of the gas from the Rayne Field will be extended until the exhaustion of the field. Thus Texas Eastern shall pay the Producers the appropriate area rate for the gas produced less royalties, state taxes and investments and expenses for the development and operation of the Field. Under the least-sale arrangement before the termination of the production payments revenues from liquids are used to reimburse Taxes Eastern. Therefore, the area price should be reduced only by unreimbursed investments and expenses, and, after the termination of the production payment, the price should be increased by the liquid revenues.[251]
 
 
 67
 This modification of Opinion No. 565 was supported in Opinion No. 565-A by four of the five members of the Commission,[252] and when rehearing of Opinion No. 565-A was sought, the Commission adhered to that position.[253]
 
 
 68
 The Commission's reversal of position as to the continuing efficacy of the $134 million contract price as a ceiling on Texas Eastern's payments to the producers for Rayne Field gas engendered an issue which is hotly contested in this court. Texas Eastern argues that the condition extending its payments over the life of the field will compel an expenditure of many millions of dollars over the maximum price agreed to by the producers, and that the Commission exceeded its authority in imposing that requirement. The producers and the Commission, with equal vigor, defend the requirement as a lawful and appropriate exercise of regulatory power under Section 7 to condition certificates of public convenience and necessity. Our starting point will be a comprehensive analysis of the Natural Gas Act in its relation to the Commission's authority to alter contract prices to which the parties have voluntarily subscribed.[254] The remaining point we will consider is the Commission's power to effect the alteration of which Texas Eastern complains.[255]
 
 B. The Power to Change Contract Prices
 
 69
 Two decisions of the Supreme Court, read conjunctively, make it crystal clear that the commission possesses only limited power to raise prices for natural gas above those contractually fixed by the parties. In United Gas Pipe Line Company v. Mobile Gas Service Corporation,[256] a regulated pipeline supplying natural gas to a distributor filed with the Commission a new rate schedule purporting to increase the price of its gas above that specified in its contract with the distributor. The Commission rejected the latter's complaint but, on review, the Court held that the Act did not empower the pipe line to unilaterally change the contract rate.[257] The Act, the Court stated, "evinces no purpose to abrogate private rate contracts. To the contrary, by requiring contracts to be filed with the Commission,[258] the Act expressly recognizes that rates to particular customers may be set by individual contracts."[259] Rejecting the contention that Sections 4(d) and (e)[260] and 5(a)[261] are alternative rate-changing procedures, the court said:
 
 
 70
 These sections are simply parts of a single statutory scheme under which all rates are established initially by the natural gas companies, by contract or otherwise, and all rates are subject to being modified by the Commission upon a finding that they are unlawful. The Act merely defines the review powers of the commission and imposes such duties on natural gas companies as are necessary to effectuate those powers; it purports neither to grant or to define the initial rate-setting powers of natural gas companies.[262]
 
 
 71
 Section 5(a), authorizing the Commission to set aside or modify any rate found to be "unjust, unreasonable, unduly discriminatory, or preferential[,]" the Court continued, "is neither a 'rate-making' nor a 'rate-changing' procedure. It is simply the power to review rates and contracts made in the first instance by natural gas companies and, if they are determined to be unlawful, to remedy them."[263] And since the Act does not define the power of natural gas companies either to make or change rates and contracts,[264] "[t]he obvious implication is that, except as specifically limited by the Act, the rate-making powers of natural gas companies were to be no different from those they would process in the absence of the Act: to establish ex parte, and change at will, the rates offered to prospective customers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer."[265] So, the Court concluded, "there is nothing in the structure or purpose of the Act from which we can infer the right, not otherwise possessed and nowhere expressly given by the Act, of natural gas companies unilaterally to change their contracts."[266]
 
 
 72
 In Mobile, the Court also noted, however, "that this interpretation, while precluding natural gas companies from unilaterally changing their contracts simply because it is in their private interests to do so, does not deprive them of an avenue of relief when their interests coincide with the public interest."[267] The Court explained:
 
 
 73
 Section 5(a) authorizes the Commission to investigate rates not only "upon complaint of any State, municipality, State Commission, or gas distributing company" but also "upon its own motion." Thus, while natural gas companies are understandably not given the same explicit standing to complain of their own contracts as are those who represent the public interest or those who might be discriminated against, there is nothing to prevent them from furnishing to the Commission any relevant information and requesting it to initiate an investigation on its own motion. And if the Commission, after hearing, determines the contract rate to be so low as to conflict with the public interest, it may under Sec. 5(a) authorize the natural gas company to file a schedule increasing the rate.[268]
 
 
 74
 On the same day Mobile was decided, the Court announced its opinion in FEderal power Commission v. Sierra Pacific Power Company.[269] The question there was whether the Commission could increase the rate specified in a contract by which an electric utility agreed to supply power to a distributor. The Commission allowed the increase solely on the ground that the contract rate yielded less than a fair return on the utility's net invested capital.[270] The asserted basis for the increase was Section 206(a) of the Federal Power Act[271] which, similarly to Section 5 of the Natural Gas Act, authorizes the Commission to fix the just and reasonable rate for electricity if the existing rate is "unjust, unreasonable, unduly discriminatory, or preferential."[272] The Court pointed out that "while it may be that the Commission may not normally impose upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain."[273] "In such circumstances," said the Court, "the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest--as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory."[274] Observing that "the purpose of the power given the Commission by Sec. 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities,"[275] the Court deemed it "clear that a contract may not be said to be either 'unjust' or 'unreasonable' simply because it is unprofitable to the public utility."[276]
 
 
 75
 These decisions furnish the standard by which the administrative action under scrutiny must be gauged. In recent years, the Supreme Court has applied them to uphold the Commission's refusal to fix minimum area rates for producers at levels above their contract prices.[277] "The regulatory system created by the Act" the Court declared, "contemplates abrogation of these agreements only in circumstances of unequivocal public necessity."[278] We ourselves have applied the Mobile-Sierra doctrine,[279] and the Commission has relied on it to justify its refusal to override Southern Louisiana producers' contract prices with higher minimum area rates.[280]
 
 C. The Purchase Price Adjustment
 
 76
 The plan by which the Commission conventionalized the lease-sale arrangement involved contractual deviations of three major types. The first was the substitution of an initial unit price for the original price which the parties had fixed at the lump-sum figure of $134,395,700.[281] The second consisted in a series of requirements, to which the parties had not themselves previously agreed, which implemented the unification of the initial price.[282] The third was the elimination, in Opinion No. 565-A, of the $134 million contract price as the amount to be remitted to the producers by Texas Eastern, and the direction that Texas Eastern pay a to-be-established just and reasonable area rate for all gas realized from the beginning to the end of production.[283] As is evident, each of these changes portended a problem in terms of the Mobile-Sierra doctrine.[284]
 
 
 77
 --The Unit Price
 
 
 78
 We may readily resolve any problem arising from the setting of the initial unit price for the gas. As we have seen, the restriction on contract-alteration by the Commission is not total; the Commission is authorized--indeed, is required--"to review" the parties' "rates and contracts ... and, if they are determined to be unlawful, to remedy them,"[285] and to change them "in circumstances of unequivocal public necessity."[286] This is the power which the Commission exercises when it imposes upon a Section 7 certificate of public convenience and necessity a condition that a designated initial price be observed.
 
 
 79
 As the Supreme Court said in CATCO,
 
 
 80
 The purpose of the Natural Gas Act was to underwrite just and reasonable rates to the consumers of natural gas[287] .... As the original Sec. 7(c) provided, it was "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest[288] .... The Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges. The heart of the Act is found in those provisions requiring initially that any "proposed service, sale, operation, construction, extension, or acquisition ... will be required by the present or future public convenience and necessity,"[289] ... and that all rates and charges "made, demanded, or received" shall be "just and reasonable"[290] .... The Act prohibits such movements unless and until the Commission issues a certificate of public convenience and necessity therefor[291] .... Section 7(e) vests in the Commission control over the conditions under which gas may be initially dedicated to interstate use.[292]
 
 
 81
 Moreover, said the Court in CATCO, "[i]n view of [the statutory] framework in which the Commission is authorized and directed to act, the initial certificating of a proposal under Sec. 7(e) of the Act as being required by the public convenience and necessity becomes crucial."[293] This is partly "because the delay incident to determination in Sec. 5 proceedings through which initial certificated rates are reviewable appears nigh interminable."[294] Undeniably, "the Act does not require a determination of just and reasonable rates in a Sec. 7 proceeding as it does in one under either Sec. 4 or Sec. 5,"[295] nor is "a 'just and reasonable' rate hearing ... a prerequisite to the issuance of producer certificates."[296] But "the inordinate delay presently existing in the processing of Sec. 5 proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under Sec. 7,"[297] and "[t]heir proposals must be supported by evidence showing their necessity to 'the present or future public convenience and necessity' before permanent certificates are issued."[298] And [w]here the application on its face or on presentation of evidence signals the existence of a situation that probably would not be in the public interest, a permanent certificate should not be issued."[299]
 
 
 82
 The certificate-conditioning power of the Commission exercisable upon a Section 7 producer application is the vehicle by which the Commission is summoned and enabled to protect the public interest.[300] It is the "method by which the applicant and the Commission can arrive at a rate that is in keeping with the public convenience and necessity."[301] For "[t]he Congress, in Sec. 7(e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require;"[302] and "[w]here the proposed price is not in keeping with the public interest ... the Commission in the exercise of its discretion might attach such conditions as it believes necessary."[303]
 
 
 83
 From the regulatory scheme, thus analyzed, it is apparent that the establishment of an initial price in a Section 7 certificate proceeding does not ordinarily implicate the Mobile-Sierra rule. As in CATCO the Court explained:
 
 
 84
 This is not an encroachment upon the initial rate-making privileges allowed natural gas companies under the Act, ...[304] but merely the exercise of that duty imposed on the Commission to protect the public interest in determining whether the issuance of the certificate is required by the public convenience and necessity, which is the Act's standard in Sec. 7 applications. In granting such conditional certificates, the Commission does not determine initial prices nor does it overturn those agreed upon by the parties. Rather, it so conditions the certificate that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined under other sections of the Act. Section 7 procedures in such situations thus act to hold the line awaiting adjudication of a just and reasonable rate. Thus the purpose of the Congress "to create a comprehensive and effective regulatory scheme,"[305] ... is given full recognition. And Sec. 7 is given only that scope necessary for "a single statutory scheme under which all rates are established initially by the natural gas companies, by contract or otherwise, and all rates are subject to being modified by the Commission...."[306] .... On the other hand, if unconditional certificates are issued where the rate is not clearly shown to be required by the public convenience and necessity, relief is limited to Sec. 5 proceedings, and ... full protection of the public interest is not afforded.[307]
 
 
 85
 In Opinion No. 565, the Commission found that the lease-sale, even as amended by the reserve guaranty,[308] did not comport with the public convenience and necessity;[309] and that, in order that it might do so, it was essential that it be altered in certain respects.[310] In Opinion No. 565-A, the Commission adhered to that finding.[311] In Opinion No. 465, the Commission fixed as initial price,[312] and in Opinion No. 565-A, though it abrogated that price, it specified that the future area rate would become the initial price between Texas Eastern and the producers.[313] In Opinion No. 565, the commission imposed a set of additional requirements to adjust the lease-sale arrangement to the pricing prescribed.[314] While in Opinion No. 565-A, the Commission suspended some of those requirements, it was not because they lacked an intimate connection with the initial price which Opinion No. 565 had set.[315] To the extent that these specifications changed the parties' lease-sale contract, they were manifestly designed to serve the public convenience and necessity[316]--a necessity born of the great difficulty, if not the impossibility, of otherwise ascertaining and effectuating an initial price for the gas, and consequently of protecting consumers against excessiveness.[317] In these modifications, we perceive no impingement upon the Mobile-Sierra doctrine.
 
 
 86
 --The Total Price
 
 
 87
 As we have stated, Texas Eastern argues strenuously that the Commission's decision to eliminate the $134 million lease-sale contract price as the ceiling of its monetary liability to the producers for their Rayne Field gas stands on entirely different ground. We find, upon careful examination of this particular change, that Texas Eastern's position is well taken. We accordingly hold that the Commission's action in that regard cannot be supported as an appropriate exercise of its contract-revision authority under the narrow exception to the Mobile-Sierra rule.
 
 
 88
 Before elucidating the reasons persuading us to that conclusion, we pause to address two preliminary considerations. The producers and the Commission point to the uncertainties as to the volume of gas in the filed, the quantity and value of liquids that may be extracted, the amount of future state taxes and the size of salvage recoveries; and on that basis they argue that the displacement of the contract price by a unit price payable throughout the life of the field does not absolutely forebode an increase of the cost of the gas to Texas Eastern. In the view of three members of the Commission--a majority in Opinion No. 565-A, in which the displacement was directed--such an increase would indeed follow. Commissioner O'Connor estimated that the producers would gain "an additional $52,141,000."[318] Commissioners Carver and Brooke put the gain in current dollars at between $17,637,000 and $25,912,000.[319] All three commissioners recognized that these figures would go higher if the area rate for Southern Louisiana producers were raised prospectively above 18.5 cents per Mcf.[320] Neither of the two remaining Commission members indicated in Opinion NO. 565-A any belief that the linking of Texas Eastern's payments to the full period of productive activity was not an extracontractual financial boon to the producers.[321] Moreover, the Section 7 certification proceeding does not tolerate the kind of cost figuring which a more solid determination on the matter of increase, if possible at all, would unavoidably necessitate.[322] In these circumstances, we feel bound to accept the premise that the contract price was substantially raised.
 
 
 89
 Beyond that, the fundamental teaching of Mobile and Sierra is that the parties' agreement, and not the Commission's bent, sets the price of gas for purposes of administrative regulation unless overriding considerations of public convenience and necessity unmistakably appear.[323] We deem this the governing rule not only where, in consequence of the Commission's action, a raising of the contract price of gas is evident but also where it is reasonably likely. For it is the prerogative of each contracting party to seek protection in a firm price, and to insist upon it if it becomes a term of the contract. Texas Eastern and the producers stipulated such a price in their lease-sale contract, and Texas Eastern is free to demand the financial security which it provides. Like any other estimate, the views that elimination of the contract price inexorably increased Texas Eastern's gas costs cannot rise to the level of complete certainty. But it cannot be gainsaid that, at the very least, eradication of the contract price poses the serious threat that Texas Eastern may have to pay the producers much more. That, we think, is enough to give substance to Texas Eastern's complaint, and to bring the Mobile-Sierra restriction into play.
 
 
 90
 There is another preliminary matter which the producers' position presents. They contend also that because the applications to the Commission invoked its Section 7 power to confer certification, and not its Section 5 authority to review rates for their reasonableness, the Mobile-Sierra doctrine does not apply. Like the Third Circuit, however, we deem this "an immaterial difference."[324] Mobile and Sierra together ordain that a party to a gas contract may not unilaterally increase the contract price,[325] and they also specify the only condition under which the Commission can elevate that price.[326] We cannot read either of those decisions as a holding that, absent an exigent public interest, the Commission can exercise a prerogative which the parties contractually denied to themselves. Nor do we find in Section7 a grant to the Commission of greater power over contract prices than it possesses under Sections 4 and 5. On the contrary, it is our clear understanding from the Supreme Court's CATCO decision,[327] which we have already extensively analyzed,[328] that the Mobile-Sierra rule applies full force to Section 7 proceedings.[329] We conclude that the Commission was as much bound to preserve the integrity of the contract price in this case as in any other.
 
 
 91
 This brings us to a consideration of the propriety of the Commission's holding in Opinion No. 565-A that instead of discharging the fixed purchase-price obligation defined in the lease-sale contract, Texas Eastern must continue its gas-purchase payments to the producers until the transferred reserves are exhausted. The majority vote[330] to make that change was predicated upon a single ground: that "it appears that while the Producers, under the arrangement we prescribed [in Opinion No. 565], will be getting the contract price it will not be of the same value because they will receive it over a much longer period, and they will not receive the benefit of all the gas and liquids produced by the Field as they would under a conventional contract."[331] For that reason alone, it was concluded "that it is only equitable that they be paid for the gas and receive credit for the liquids produced until the Field is exhausted."[332]
 
 
 92
 We think it clear that the Commission's direction to that end does not survive the Mobile-Sierra test. That test, as we have seen, is not whether a contractual provision seems to be equitable to the contracting parties but whether it is detrimental to the public interest.[333] It bears repeating that "[t]he regulatory system created by the Act is premised on contractual agreements voluntarily devised,"[334] and that "it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity."[335] Unlike the conventionalizing provisions of Opinion No. 565 response to the dire public need to establish an initial unit price for the gas,[336] the Commission's alteration of the stipulated aggregate price has not been shown to serve any facet of the public interest at all.
 
 
 93
 The Commission did not find that the $134 million contract price was "so low as to adversely affect the public interest."[337] It did not find "financial or other difficulties that required the Commission to relieve the producers ... from the burdens of their contractual obligations."[338] Nor did it find that the apparent enlargement of Texas Eastern's ultimate financial liability was essential to conventionalization of the lease-sale arrangements.[339] It simply felt it "only equitable" to lift the $134 million ceiling on the total consideration the producers were to receive in order to adjust the difference in time value of the money and to assure remuneration for all gas and liquids yielded. It may be that, as things turned out, the producers would have been better off had the parties not substituted the lease-sale for the original gas0sale transaction, but "the Commission may not, absent evidence of injury to the public interest, relieve a "contracting party "of 'its improvident bargain' "[340] It follows that the Commission's attempt to extend Texas Eastern's payments over the life of Rayne Field must be set aside.
 
 
 94
 That is not to say, however, that its counterpart in Opinion No. 565 is invulnerable. Except as the exigencies of the public interest demanded, the Commission was no more at liberty to alter the lease-sale contract to the prejudice of the producers than to do so in their favor. Opinion No. 565, by limiting Texas Eastern's financial liability to the contract price and simultaneously spreading its discharge over a longer period of time, would cause the producers to receive less than the quid pro quo for which they contracted. That is because the value to the producers of the money to be paid over the longer time span would be less than its value by the payment schedule embodied in the lease-sale arrangement.[341] The Commission, in conventionalizing the lease-sale in the public interest[342] was virtually compelled to change that schedule, and we have sustained its action in doing so;[343] but in the process the producers were deprived of a party of their bargain.
 
 
 95
 Every member of the Commission has come to recognize the producers' plight demands rectification,[344] but we see no need for a remand to the Commission for its accomplishment. A majority of the commission has held on five occasions that the public convenience and necessity would not be served by certification of the lease-sale as a lease-sale,[345] and on two occasions that conventionalization was necessary in the public interest,[346] with a linking of Texas Eastern's gas-purchase payments to gas deliveries.[347] With these holdings, which the Commission deems unavoidable and which we have no basis for disturbing, the only alternative legally available to the Commission is an increase in Texas Eastern's payments beyond the aggregate $134 million contract price by an amount equal to the time value of the money to be paid on the Commission-rearranged payment schedule.[348] That would confer on the producers the full equivalent of their contract price, and would impose on Texas Eastern no more than the equivalent of its contract cost; and the economic positions of both parties would then be harmonized with Mobile-Sierra requirements.[349] Our judgment on this review will, in lieu of a remand for the purposes, incorporate such a modification in the Commission's disposition.
 
 V. PRODUCER RATES AND REFUNDS
 
 96
 Having decided to conventionalize the lease-sale transaction,[350] with a view to establishment of an initial unit price for the producers' gas as the major product of conventionalization,[351] the Commission then embarked upon achievement of that goal. They task which the Commission understood may be defined quite simply. An initial price for the gas, geared to actual deliveries, would fix a ceiling on the payments which Texas Eastern would thereafter make to the producers. It might also serve as the point of reference for financial adjustments between the parties, which past remittances on the schedule of the lease-sale purchase-price payments would almost certainly make inevitable. In addressing these matters the Commission was, however, to travel a long and tortuous path to an inconclusive end.
 
 
 97
 In Opinion No. 565, a majority of the Commission held that the certificates issued to Texas Eastern and the producers should be conditioned upon an initial price of 20 cents per Mcf for gas delivered to October 1, 1968, and at the price of 18.5 cents on deliveries thereafter.[352] The 20-cent price was the in-line price, as determined by the Commission.[353] The 18.5-cent price was the just and reasonable area rate which the Commission had recently set in the Southern Louisiana Area Rate Proceeding.[354] The changeover date was the date on which the area rate took effect.[355] The order accompanying Opinion No. 565 directed Texas Eastern to make payments to the producers, and the producers to make refunds to Texas Eastern, in accordance with that formula.[356] Chairman White was of the view that the price should have been fixed at the 18.5-cent just and reasonable rate from the time the flow of the gas commenced in 1959.[357]
 
 
 98
 In Opinion No. 565-A, however, this disposition was changed radically. A majority of the Commission rallied to the position expressed earlier by Chairman White,[358] who no longer was a member of the Commission, but concluded that no just and reasonable rate had been finally determined.[359] On that ground, the majority held that Texas Eastern should pay the producers the 20-cent in-line rate on future gas deliveries until a firm area rate was forthcoming.[360] On the same ground and others, the majority also held that producer refunds should be deferred until then.[361] The Commission subsequently denied a rehearing of that decision.[362]
 
 
 99
 We find the resolutions of the Commission majorities in Opinions Nos. 565 and 565-A legally unacceptable. We hold that, as a matter of law, the Commission was compelled to utilize the previously ascertained 18.5-cent just and reasonable area rate both as the unit price for the gas deliveries to be made and as the basis for refunds by the producers on account of deliveries already made. We further hold that the Commission was legally obliged to order the producers to make those refunds to Texas Eastern immediately.
 
 A. The General Standard For Producer Rates
 
 100
 "The purpose of the Natural Gas Act," the Supreme Court instructs, "was to underwrite just and reasonable rates to the consumers of natural gas."[363] Its "primary aim ... was to protect consumers against exploitation at the hands of natural gas companies."[364] Section 4(a) of the Act specifies that "[a]ll rates and charges ... by any natural-gas company"[365] on the "sale of natural gas" regulable by the Commission"shall be just and reasonable";[366] and by that section, "any such rate or charge that is not just and reasonable is declared to be unlawful."[367] Nowhere does the Act in terms condone any rate or charge other than the one that would be just and reasonable. Nowhere does the Act suggest that a rate or charge above that which would be just and reasonable is not unlawfully excessive. Nor can it be gainsaid that "[t]he Act was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges."[368]
 
 
 101
 The Commission's responsibility to hearken to these policies attaches at the very moment it is requested to certificate activities within its regulatory domain. Section 7(e) imposes upon it the duty to determine whether a "proposed service, sale, operation, construction, extension, or acquisition ... will be required by the present or future public convenience and necessity."[369] By the same token, that section "vests in the Commission control over the conditions under which gas may be initially dedicated to interstate use."[370] That authority extends indubitably to a determination as to whether the charges which a producer proposes to make for his gas are in the public interest.[371] Indeed, Section 7(c) of the Act itself originally articulated "the intention of Congress that natural gas shall be sold in interstate commerce for resale for ultimate public consumption ... at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[372] That objective, though no longer expressly stated, stands as a major congressional concern today.[373]
 
 
 102
 To be sure, "the Act does not require a determination of just and reasonable rates in a Sec. 7 proceeding as it does in one under either Sec. 4 or Sec. 5,"[374] nor is "a 'just and reasonable' rate hearing .. a prerequisite to the issuance of producer certificates."[375] The setting of the producer's initial price at the just and reasonable rate, were that course feasible, would, of course, contribute handsomely to the consumer-protection goal of the Act. But as we have seen, the exigencies of prompt initial certification of gas sales and pipeline extensions preclude, within the certification proceedings themselves, fullfledged investigations worthy of a "just and reasonable" appellation.[376] That is not to say that the Commission need not bend its best efforts to achieve an equitable price arrangement when it awards certification under Section 7. On the contrary, the very delay incidental to just-and-reasonable-rate investigations "requires a most careful scrutiny and responsible reaction to initial price proposals of producers under Sec. 7."[377] "[P]rice [is] a consideration or prime importance"[378] in the certification process, and "if unconditional certificates are issued where the rate is not clearly shown to be required by the public convenience and necessity, ... full protection of the public interest is not afforded."[379]
 
 B. The Treatment Of Producer Rates
 
 103
 In the Opinion No. 565, a majority of the Commission decided that the price to be paid to the producers for gas deliveries to Texas Eastern after the effective date of the Commission's decision in Southern Louisiana Area Rat Proceeding[380] should be set at the just and reasonable rate of 18.5 cents ascertained therein.[381] Said the Commission:
 
 
 104
 Here we are issuing a certificate under Section 7 of the Natural Gas Act. Section 7(c) provides that we have power to attach to the certificate "such reasonable terms and conditions as the public convenience and necessity may require."[382] We think it reasonable ... to require that the Producers reduce their rates prospectively to an effective 18.5 cents per Mcf in accordance with [the area rate determination].[383]
 
 
 105
 In Opinion No. 565-A, the Commission majority held similarly the just and reasonable rate should govern the initial price for prospective gas deliveries.[384] The Commission concluded, however, that the area rate for Southern Louisiana producers had not been finally resolved.[385] 5] So, with respect to the future pricing of the gas, the Commission said:
 
 
 106
 Since we have stayed this rate as a result of the court's review of our area decision[386] and the appropriate rate is still subject to further proceedings, we shall require that the producer rate schedule filing be on the basis of 20 cents per Mcf, the in-line price in Southern Louisiana as found in our original opinion. When the Southern Louisiana rate is finally determined, we shall require that this basic producer rate be modified accordingly.[387]
 
 
 107
 The challenge we are now summoned to resolve is to the Commission's substitution by Opinion 565-A of the in-line rate for the just and reasonable rate employed in Opinion No. 565 as the measure of the initial price to be paid by Texas Eastern to the producers for future deliveries of natural gas.
 
 
 108
 --(1) The Choice Of The In-Line Price
 
 
 109
 The unfeasibility of establishing a just and reasonable rate within the framework of a Section 7 certification proceeding[388] off times forces resort to some other means of fixing an initial price for newly certificated gas in the public interest. So it is that the in-line price frequently becomes the criterion--simply because it is the only point of reference extant.[389] Where that is so, it is settled that the in-line price may legitimately be utilized as the initial price imposed as a condition qualifying the certificate issued.[390] The in-line price thus functions as the ceiling on the price at which the gas may be sold pending ascertainment of the just and reasonable rate.[391]
 
 
 110
 It is evidence, however, that use of the in-line price as the yardstick for the initial-price determination on certification cannot be justified in situations where a just and reasonable area rat for gas of the vintage in question has already been established. The goal of gas-pricing to which the Act emphatically speaks is the just and reasonable rate,[392] for which the in-line price is not a reliable substitute. As the Supreme Court has pointed out, where the Commission has decided "to rely solely upon contemporaneous contract prices in setting initial rates, there can be no assurance that an initial price arrived at by the Commission will bear any particular relationship to the just and reasonable rate."[393] Rather, as we have explained, adoption of the in-line price as the initial price is merely an interim measure designed to hold the line until the just and reasonable rate for the gas can be ascertained.[394] If that rate, by reason of a past determination, is already available, its use as the initial price for future gas sales follows logically and, we think, legally as a normal concomitant of certification.
 
 
 111
 Just and reasonable rates for jurisdictional gas, we repeat, are the end and aim of price regulation under the Act.[395] They are the ultimate in the pricing of the natural gas over which the Commission exerts its authority. That the Section 7 proceeding is directed primarily at certification rather than ratemaking does not diminish the Commission's duty to fix initial prices which are calculated to best serve the public weal. The congressional intent underlying Section 7 is that jurisdictional gas shall, from the very beginning, "be sold ... at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[396] Ordinarily that policy is frustrated by selection of an in-line price over a just and reasonable price that is for the asking.
 
 
 112
 As we see it, only the presence of an overriding consideration promoting an identifiably legislative purpose can justify administrative displacement of the just and reasonable rate through approval of another rate for gas to which the Act applies. The need for prompt setting of an initial price in a Section 7 certification proceeding becomes such a consideration where there is no just and reasonable rate as yet.[397] But where, on the other hand, the just and reasonable rate has been established when the Commission comes to fix an initial price for gas, there is simply no need to resort to any other rate.
 
 
 113
 Two courts, for the purpose of computing producer refund liabilities in Section 7 proceedings, have passed over the in-line price for natural gas in favor of the just and reasonable area rate which had become available.[398] It is even plainer to us that, absent unusual circumstances, that course must be pursued when the Commission is called upon to set initial prices prospectively. In our view, the Commission is legally compelled to peg a producer's initial price at a previously ascertained just and reasonable rate unless some consideration effectuating a countervailing congressional policy is shown on balance to outweigh the congressional interest in "just and reasonable rates to the consumers of natural gas."[399]
 
 
 114
 (2) The Status of the Southern Louisiana Area Rate Proceeding
 
 
 115
 On September 25, 1968, the Commission capped a seven-year-old rate investigation with its Opinion No. 546 Docket No. AR61-2--the Southern Louisiana Area Rate Proceeding.[400] The orders effectuating Opinion No. 546 soon came under review in the Fifth Circuit.[402] Producers and pipelines challenged the rates as too low, while consumer interests argued that they were too high. On March 10, 1970, the court sustained the orders "in full".[403]
 
 
 116
 In the meantime, the Commission, on March 20, 1969, had issued its Opinion No. 546-A in response to applications for rehearing of Opinion No. 546.[404] In Opinion No. 546-A, the Commission modified Opinion No. 546 in some respects, but refused to reopen the investigation or to readjust the price levels set.[405] The Commission felt, however, that the importance of an additional supply of gas from the offshore areas of Southern Louisiana warranted the commencement of another proceeding looking forward to possible revision of the area prices for such gas.[406] The Commission rejected suggestions that the new proceeding--Docket No. AR69-1--should embrace a further inquiry into the adequacy of the rates promulgated in Opinion No. 546 for gas produced on shore in the Southern Louisiana area.[407] Within nine months, however, the Commission changed its mind as to the scope of the new investigation. On December 15, 1969, the Commission issued an order enlarging the proceeding to include the entire geographical area of Southern Louisiana, onshore as well as offshore, and to provide for a review of the just and reasonable rates for all vintages of gas therefrom.[408]
 
 
 117
 The order expanding the investigation in Docket No. AR69-1 came shortly prior to oral argument in the Fifth Circuit on its review of Opinion No. 546, the original Southern Louisiana area rate proceeding, occasioning a pause to consider the impact of that investigation on the pending review.[409] The court agreed with the parties that it had no effect,[410] pointing out that
 
 
 118
 The maximum rates that the Commission has set ... are to remain in effect throughout the new proceeding, which may last for years. Moreover, it was never contemplated that there should be a single area proceeding setting rates once and for all; rather the Commission has always made it clear that it intended to review the rates it had set whenever the circumstances made it advisable to do so.[411]
 
 
 119
 And in upholding the orders under review, the court stated:
 
 
 120
 The mandate of this Court should not, however, be interpreted to interfere with Commission action that would change the rates we have approved here. We specifically and emphatically reject the contention ... that the Commission has no power to set aside rates once determined by it to be just and reasonable when it has reason to believe its determinations may have been erroneous.[412] In fact, the existence of the new proceedings, which as we understand will take into account many of the issues whose absence has concerned us here, has been one of the factors we have considered in deciding to affirm the Commission's decisions.[413]
 
 
 121
 Such was the history of the Southern Louisiana area rate inquiry at the time the Commission handed down Opinion No. 565-A. We cannot agree with the Commission that the events we have recited rendered Opinion No. 546 so tentative in character as to support the Commission's refusal in Opinion No. 565-A to employ the 18.5-cent just and reasonable rate as the initial price to be paid to the producers for gas delivered after the effective date of that rate. By Opinion No. 565-A, the Commission had fixed the just and reasonable rate for Southern Louisiana gas of the Rayne Field vintage at 18.5 cents per Mcf. On review of that rate and others promulgated in Docket No. AR61-2, the Fifth Circuit had affirmed the Commission's orders.[414] In the process of doing so, the court had ruled that the reviewability of the orders accompanying Opinion No. 546 were unaffected by the pendency of Docket No. AR69-1--the new Southern Louisiana area rate investigation.[415] We think that the 18.5-cent rate established by those orders was no less definitive and definite in its role as the legally appropriate criterion for the initial price which Rayne Field producers would be permitted to charge.
 
 
 122
 It is true that the Fifth Circuit, in affirming Opinion No. 546, spoke to the Commission's authority to reopen the orders accompanying it. We read that reference as no more than a recognition of the Commission's prerogative-and duty-to revise rates when they are found to be inconsistent with the public interest. Section 16 of the Act expressly empowers the Commission to "amend[] and rescind ... orders ... as it may find necessary or appropriate to carry out the provisions of this [Act]".[416] That power undoubtedly extends to alteration of an existing rate upon a determination that it does not subserve the legislative objective of fair and equitable charges for natural gas.[417] But surely a rate is no less final, in terms of its operating capability, merely be-because it is subject to future revision. A fundamental precept of ratemaking is that rates may and should be changed whenever the exigencies of the public interest demand. And a vital function delegated to the Commission by the Natural Gas Act is the maintenance of the balance between producer, pipeline and consumer interests at the point of just and reasonable rates.[418] If the view espoused by the Commission in Opinion No. 565-A[419] were carried to its logical end, no rate set by the Commission could ever attain finality.
 
 
 123
 The 18.5-cent just and reasonable rate was established in Opinion No. 546 after a long and comprehensive exploration.[420] It earned, as we have said, full judicial approval.[421] Neither in Opinion No. 546-A nor in Opinion No. 565-A did the Commission find that the 18.5-cent area rate arrived at in Opinion 546 was unjust or unreasonable, or gravely doubtful in that respect. Rather, the investigation set in motion by Opinion 546-A and subsequently enlarged sought simply to determine what the just and reasonably test might require, if anything, in the way of modification of that rate.
 
 
 124
 In sum, the 18.5-cent rate differs little in any from any other rate that is inherently subject to change upon a suitable showing. The Commission's authority to alter or discard its prior rate orders is limited to changes which "it may find necessary or appropriate to carry out the provisions of" the Act.[422] In our view, the Commission is not free to disregard a rate competently determined in the past to be just and reasonable unless and until it finds that the rate is unjust or unreasonable in the present, or seriously suspect on that score. The Commission's revision power enables no more, and the legislative mandate for just and reasonable pricing[423] demands no less. We hold that neither the susceptibility of the 18.5-cent area rate to modification upon such a finding nor the ongoing administrative inquiry into the propriety of such a finding was adequate justification for the Commission's decision in Opinion No. 565-A to ignore it.
 
 AC. The Standard For Producer Refunds
 
 125
 In 1959, after the Commission announced its ill-fated Opinion No. 322 certificating the extension of Texas Eastern's pipeline to Rayne Field,[424] deliveries of gas from the producers' holdings therein commenced, and Texas Eastern began the purchase-price payments called for by the lease-sale contract. This court set Opinion No. 322 and its accompanying order aside in 1960,[425] and in Opinion No. 378 in 1963, the Commission asserted jurisdiction over the producers' sale.[426] In Opinion No. 565 in 1968, the Commission conventionalized the sale and directed producer refunds,[427] and in Opinion No. 565-A in 1969, the Commission deferred the refunds for an indefinite period.[428]
 
 
 126
 Throughout this lengthy period--a decade--the gas continued to flow through Texas Eastern's pipeline en route to consumers, and Texas Eastern continued its payments to producers on the schedule specified by the lease-sale contract. Since those remittances, as the Commission found in Opinion No. 565, greatly exceeded the amounts which Texas Eastern would have paid for the gas had it been delivered pursuant to a conventional sale arrangement,[429] the Commission's power to order producer refunds was incontestable. We realize, of course, that the early administrative treatment of the parties' transaction contributed to the occasion for financial adjustments between Texas Eastern and the producers, but the Commission's authority to require them nonetheless remained unimpaired.[430] "An agency, like a court, can undo what is wrongfully done by virtue of its order,"[431] and "the Commission could properly conclude that the public interest required the producers to make refunds for the period in which they sold their gas at prices exceeding those properly determined to be in the public interest."[432] The problem for the Commission, rather, was the standard by which the amounts of the refunds were properly to be fixed, and that we must first define.
 
 
 127
 The Natural Gas Act, we have noted, mandates just and reasonable rates for jurisdictional gas and declares that any other rate is unlawful.[433] As the Supreme Court has said,
 
 
 128
 Logically, this would seem to imply that to assure the "complete, permanent and effective bond of protection" [which the Act affords consumers "From excessive rates and charges"],[434] any rate permitted to be charged during the interim period before a just and reasonable rate can be determined must be accompanied by a condition rendering the producer liable for refunds down to the just and reasonable rate, should that rate prove lower than the initial rate specified in the certificate.[435]
 
 
 129
 Although, as the Court acknowledged, the Commission apparently does not impose such a condition and reviewing courts have not insisted that it do so,[436] the need for a comparable course here seems irrefutable. If, at the time the refunds are to be made, the just and reasonable rate is readily available, there is hardly room for argument that some other criterion is ordinarily to be taken as the basis for computing the refunds. We have reasoned that absent an extraordinary situation, the in-line price cannot be utilized consistently with the Act as the initial price on a certificated sale when the just and reasonable rate for the gas has already been ascertained.[437] Since refunds serve the purpose of correcting prices which were too high, it follows that the excess over a predetermined just and reasonable rate is normally to be refunded. Only in the most unusual situation could a departure from that course be logically or legally justified.[438]
 
 
 130
 We are mindful of considerations which superficially might indicate a preference for the in-line price over the just and reasonable rate as the predicate for calculating refunds, but on analysis they do not support such a preference. Refunds must be made on the basis of the in-line price in lieu of a wait for the just and reasonable rate,[439] but because the consumer's interest in speedy refunding--possible only on the basis of the in-line rate--predominates.[440] Initial pricing permissibly done at the in-line figure sets that figure as the refund base,[441] but because that is the preferred interpretation of the Act.[442] The use of inline prices for purposes of refunds has been judicially approved, but in cases where no just and reasonable rate was extant.[443] On the other hand, where the just and reasonable rate has already been found, two courts have held that it might be employed.[444]
 
 
 131
 We have concluded that only a consideration subserving an overriding aspect of legislative policy affords adequate justification for a selection of the in-line price over an existing just and reasonable rate as the initial price at which a proposed gas sale is to be certificated.[445] 5] No more can lesser considerations justify a refund base at the in-line price where the just and reasonable rate is at hand. We hold that an already established just and reasonable rate must be accepted as the foundation for producer refunds in the absence of paramount countervailing circumstances.
 
 D. The Treatment of Producer Refunds
 
 132
 In Opinion No. 565, a majority of the Commission decided that the 18.5-cent rate set in the Southern Louisiana Area Rate Proceeding[446] should serve as the basis for refunds by the producers on account of payments made to them by Texas Eastern after the date on which that rate went into effect.[447] The Commission majority further decided that the foundation for producer refunds to Texas Eastern because of deliveries prior to the effective date of the area rate should be the 1959 in-line price of 20 cents[448]--the price in vogue at the commencement of the deliveries.[449] The Commission reasoned:
 
 
 133
 [U]nless we are to treat the present sale in the same manner as those contemporaneously contracted for and certificated at the in-line price of 20 cents per Mcf, we will in effect be punishing the producers for litigating their by no means frivolous legal and policy claims in the courts and before this Commission. This in our view would not only be inequitable, but would necessarily lead to unnecessary producer uncertainty when they choose to dedicate gas to the interstate market. Obviously, where their claims to special consideration are rejected they should not benefit by the passage of time in the course of their litigation. But where contemporary sales in the same area have been permanently certificated at in-line prices, approved by the courts, and used for both in-line and refund purposes, we do not believe that the exigencies of the timing of litigation on similar sales should lead to a different result.[450]
 
 
 134
 In Opinion No. 565-A, however, the majority position of the Commission shifted; all payments above the just and reasonable rate, that opinion held, should be refunded.[451] But on the premise that the rate promulgated in the Southern Louisiana Area Rate Proceeding remained open to change, the Commission deferred producer refunds pending the establishment of a firm area rate.[452]
 
 The Commission explained:
 
 135
 [T]he just and reasonable rates applicable to the Southern Louisiana area in which the Rayne Field is situated have not been fully determined, nor has it been determined whether refunds should be made by the producers in that area either for the periods before or after October 1, 1968. In these circumstances it is our opinion that the public interest precludes our ordering refunds to be paid by the Rayne Field producers at this time. The myriad problems confronting the Commission in coping with producer regulation render our task difficult and complex, at best. However, the one objective that must always be kept in sight is the need to provide fair and equal treatment for all of those regulated. It is essential, therefore, this proceeding should be afforded the same treatment as will be given to all other producers in Southern Louisiana. In this regard, we believe that the just and reasonable rates which ultimately flow out of any settlement, or any further proceedings in [the Southern Louisiana Area Rate Proceeding ], should govern the level of payments in this case prior to October 1, 1968, as well as after that date.[453]
 
 
 136
 We cannot embrace fully the course of reasoning which the Commission majorities pursued in either if two opinions. The standard for producer refunds we have said, is the just and reasonable rate where that rate is available and use of another rate is not vindicated by some overriding facet of congressional policy.[454] Consequently, we have no difficulty with the holding in Opinion No. 565 that the producers must refund the excess of the Texas Eastern's future payments over and above the just and reasonable rate determined in the Southern Louisiana Area Rate Proceedings[455] nor with so much of the holding in Opinion No. 565-A as would constitute an established just and reasonable rate the basis for any and all producer refunds.[456] Since, however, as we have held, the Commission is not at liberty to discard the just and reasonable rate promulgated in the Southern Louisiana Area Rate Proceedings,[457] and as well for other reasons to be discussed,[458] we cannot accept the Commission's decision in Opinion No. 565-A to postpone refunding to such time as the area rate for Southern Louisiana producers might be reformulated. We conclude, too, that the considerations advanced in Opinions Nos. 565 and 565-A are legally insufficient to justify a refusal to employ the existing just and reasonable rate as the predicate for the producer's refunds.[459]
 
 
 137
 (1) The Deferral of Producer Refunds
 
 
 138
 Even assuming the nonexistence of any just and reasonable rate which might function as the basis for immediate refunds by the producers, that office could readily have been performed by the in-line price, which the Commission ascertained in its very proceeding.[460] The Supreme Court has made plain the Commission's authority to direct refunds predicated on the in-line price pending determinations of the just and reasonable rate for the gas in question.[461] The Court has also made it clear that producer refunds, when found due, are to be ordered promptly, and are not to be postponed for a retroactive application of a just and reasonable rate yet to be determined.
 
 
 139
 In the United Gas Improvement Company v. Callery Properties,[462] the Commission ordered producers to refund the difference between prices they charged and in-line prices at which the sales should originally have been conditioned. On review, the Fifth Circuit held, just as the Commission did in Opinion No. 565-A, that the measure of the refunds should have been the difference between the contract price and the just and reasonable rate subsequently to be fixed, and that refunds should be delayed until the latter was fixed.[463] The Supreme Court reversed the Fifth Circuit, stating:
 
 
 140
 We have said elsewhere that it is the duty of the Commission, "where refunds are found due, to direct their payment at the earliest possible moment consistent with due process."[464] ... These excessive rates have been collected since 1958; under the circumstances, the Commission was not required to delay this refund further.[465]
 
 
 141
 The considerably longer period over which the producers here have collected above the in-line price can hardly escape notice.[466]
 
 
 142
 We are mindful of the fact that in Callery and other cases it was the Commission that ordered refunds based on the in-line price, while in Opinion No. 565-A the Commission did just the opposite: It reversed the direction in Opinion No. 565 to that effect. We deem this difference insufficient to remove the case from the purview of the Callery ruling. The Commission was not merely at liberty to require immediate refunds but, where refunds are due, it also had "the duty ... to direct their payment at the earliest possible moment consistent with due process."[467] That duty charts the only course in keeping with the purpose of the Act "to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges."[468] No more than the Fifth Circuit in Callery could the Commission defer refunds demanded in the public interest to the uncertain time at which a just and reasonable rate might for forthcoming.
 
 
 143
 In his Phase II decision, the presiding examiner found the through 1967 Texas Eastern had paid the producers $21.8 million more than gas deliveries at the in-line price would have brought--a figure which with interest increased to $31.4 million.[469] In Opinion No. 565, the Commission Adopted the examiner's finding and directed refunds,[470] and nothing in Opinion No. 565-A is at variance with that finding. Beyond that, the refund liability ascertained in Opinion No. 565 had endured, on a gradually increasing scale, over an eight-year period during which Texas Eastern had passed the greater portion of the price excesses on to consumers at a part of its cost of service.[471] These circumstances support vividly the Commission's resolve in Opinion No. 565 to direct refunds, and point convincingly to the error in the Commission's decision in Opinion No. 565-A to postpone the long overdue refunds even longer.
 
 
 144
 The Commission assigned two reasons for its decision to put off all producer refunds while the area rate for Southern Louisiana was undergoing further investigation. The first was the recurring thesis that the 18.5-cent area rate for Rayne Field gas had not been finally determined.[472] We have already examined that premise and found it to be erroneous.[473] And with the just and reasonable area rate--at least for the time being--available, and the gross excess in producer receipts above that rate evident,[474] it is clear enough that the Commission's concern that the producers might not have to make refunds[475] was unfounded.
 
 
 145
 The Commission's second reason was that a deferral of refunds would foster equality of treatment among the Southern Louisiana producer,[476] presumably because all producers under an obligation to refund would do so on the basis of the area rate which the Commission would eventually formulate. But, obviously, with a just and reasonable rate of 18.5 cents already in being,[477] the highly desirable goal of equal treatment could have been achieved simply by enforcing at uniformly among the producers.[478] Moreover, we can perceive no significant difference between the Commission's action here and the Fifth Circuit's postponement of producer refunds in Callery[479] to the day that a just and reasonable rate would become established.[480] Such a postponement might give the assurance the Commission sought,[481] but sacrifices the superior interest of consumers in prompt refunds.[482] By its decision to delay refunds here, the Commission misconceived its consumer-protection functions under Section 7 as enunciated by the Supreme Court in CATCO.[483] We can no more condone the deferral here than the Supreme Court could in Callery.[484]
 
 
 146
 481. The extent to which it could do so might depend in part upon whether initial prices allowed producers were all fixed at the same level, since those prices established refund floors. See note 171, supra.
 
 
 147
 (2) The Amounts Of Producer Refunds
 
 
 148
 The Commission the, should have directed immediate producer rate refunds in Opinion No. 565-A, as it had earlier done in Opinion No. 565. That is not to say that Opinion No. 565 employed the correct standard for measuring the amounts of the refunds. We are not satisfied that in part it did not.[485]
 
 
 149
 It will be recalled that in Opinion No.565 the Commission selected the 20-cent in-line price as the foundation for refunds on payments to producers prior to October 1, 1968, the effective date of the 18.5-cent rate on payments made thereafter.[486] The problem, as we see it, is with the use of the in-line rate at all. As we have said, an existent just and reasonable rate furnishes the exclusive basis for producer refunds unless the use of another basis is indicated by some overriding consideration of legislative policy.[487] The Commission endeavored to justify utilization of the in-line rate for the period prior to establishment of the just and reasonable rate on the ground that it would enable an equitable treatment of all Southern Louisiana producers and promote certainty as to the initial price at which they might dedicate their gas to the interstate market.[488] But as we have previously pointed out, equality of treatment among producers could have been achieved as readily by uniform application of the just and reasonable rate to Southern Louisiana producers.[489] And to the extent that stability of the initial price obtainable by producers pondering a choice between interstate and intra-state markets was legitimately a competing consideration,[490] it would have been as fully assured by adoption of the just and reasonable rate as the initial price payable on certification.[491]
 
 
 150
 We cannot accept the grounds the Commission put forth in Opinion No. 565 as considerations of a caliber sufficient to outweigh the clear congressional preference for just and reasonable rates when available as indices for initial pricing in Section 7 certification proceedings. Nor can we accept the reasons advanced in Opinion No. 565-A as adequate justification for the Commissions' decision to defer refunding by the producers. We hold that the Commission was legally bound to order the refunds forthwith, and to predicate them upon the just and reasonable rate of 18.5 cents previously established in the Southern Louisiana Area Rate Proceeding.
 
 
 151
 VI. FLOW-THROUGH OF RATE REDUCTIONS AND REFUNDS
 
 
 152
 The issues remaining for our determination concern the extent to which rate reductions and refunds required of the producers in Texas Eastern's favor should be passed on to its customers,[492] including the treatment, in relation to refunds, that should be given to Texas Eastern's investment in Rayne Field.[493] The Commission's dealt with and disposed of these matters in Opinion No. 565,[494] but by Opinion No. 565-A deferred them for future consideration because their decision depended both upon the fact and the size of producer reductions and refunds which Opinion No. 565-A left unsettled.[495] We have discussed and resolved the latter problems, concluding that the producers must reduce their rates for the future and must refund the amounts charged above just and reasonable rates in the past.[496] The flow-through question thus returns to the fore.
 
 
 153
 In his Phase II decision, the presiding examiner directed Texas Eastern to deposit the customer refunds which he ordered[497] in escrow pending their disposition by the Commission in a later proceeding.[498] In consequence of the reduction of producer rates,[499] the examiner also directed Texas Eastern to lower the commodity charge in its systemwide rates by 0.2 cents per Mcf.[500] In Opinion No. 565, the Commission deviated from the examiner on both counts, or grounds now to be discussed.
 
 
 154
 A. The Treatment of Rate Reductions in Opinion No. 565
 
 
 155
 Before the Commission, Texas Eastern argued that the Commission had not authority under Section 7 of the Act[501] to revise system wide rates which previously had been found to be just and reasonable.[502] The Commission deemed it unnecessary to address that contention. Texas Eastern had filed in another docket, under section 4(a),[503] a rate increase which included as a predicate its Rayne Field costs and that filing was then in hearing before an examiner.[504] The Commission felt that in those circumstances Opinion No. 565 "may properly provide the basis for interim action in" the other docket.[505] Accordingly, the Commission ordered "Texas Eastern to file substitute rates to reflect any reduction in costs arising from these proceedings and in accordance with this opinion"[506] The Commission specified that
 
 
 156
 As long as Texas Eastern is paying the producers for the gas and until the purchase price of $134,395,700 has been paid, and from then until complete amortization of the Rayne Field balances on Texas Eastern's books,[507] Texas Eastern's rates shall continue to reflect the cost of the Rayne Field gas at the applicable area rate, now 18.5 cents per Mcf. However, when the amortization of the Rayne Field balances has been completed, Texas Eastern, providing it is still selling gas from Rayne Field, shall file new rates to reflect the fact that it is not longer paying the producers but is merely paying royalties and other expenses.[508]
 
 
 157
 B. The Treatment of Refunds in Opinion No. 565
 
 
 158
 On the subject of producer refunds, the examiner had felt bound by the Commission's Opinion NOs. 540 and 540-A, rendered in earlier litigation involving Texas Eastern.[509] Producers had collected rate increases from Texas Eastern but they were subsequently disallowed by the Commission, and a producer refund of some $10 million was generated as a result. Texas Eastern had not passed the increases on to its customers in the form of higher rates of its own. Texas Eastern sought the refund for itself, but he Commission held that the refund should flow through to Texas Eastern's distributor-customers for the ultimate benefit of the consuming public.[510] Reversing past practice,[511] the Commission established prospectively the principle that unless a pipeline filed a rate increase[512] tracking a supplier increase, it could not later assert a claim to a refund created by disallowance of the supplier increase.[513] Because of the prospectivity of this new requirement, it did not apply to Texas Eastern; but because Texas Eastern had nonetheless earned more than a reasonable margin of return,[514] the Commission directed a flow-through of the entire $10 million to its customers.[515]
 
 
 159
 In the proceeding now before us, Texas Eastern did not file a tracking rate increase. The examiner found that Texas Eastern "earned a fair return despite having paid too much for Rayne Field gas,"[516] and held that "[t]he reduction in its cost of gas should go to its customers."[517] The examiner further concluded that Texas Eastern's net investment of more than $20 million in Rayne Field[518] should be charged off to surplus.[519] In Opinion No. 565, however, the Commission deemed Opinions Nos. 540 and 540-A distinguishable:
 
 
 160
 There is no supplier rate increase involved here, the annual expense of which Texas Eastern could have passed on to its customers through a rate increase filing, had it believed the rate increase could be justified. Instead, under the lease-sale (which will remain in existence, though gas payments therefrom are conventionalized,), the down payment, note payments and most of the other capital expenditures were reasonably treated by Texas Eastern as a capital investment, and as such in any rate case Texas Eastern could not have recovered anything more than the approved rate of annual return on such expenditures, depreciation, depletion and amortization, and certain expenses and taxes.[520]
 
 
 161
 In consequence, the Commission held that it "should not prescribe a complete flow-through by Texas Eastern of the refunds from the Producers."[521] On the other hand, to the Commission it was "clear that Texas eastern could have filed rates including Rayne Field costs on the above basis[522] for the entire refund period."[523] The Commission reasoned:
 
 
 162
 A complete flow-through of the producer refunds would put Texas Eastern in the position of paying too much for part of the Rayne Field gas without any relief and then paying the just and reasonable price for additional gas until the Producers shall have received the full purchase price of $134,395,700, so that Texas Eastern would end up paying some $21,000,000 more than it had originally contacted to pay. However, to the extent the excessive payments in the years from 1959 to the present have fallen on its customers, Texas Eastern has already been reimbursed and the customers should receive a flow-through refund of that amount.[524]
 
 
 163
 Looking then to the evidence, the Commission found that, on the basis of the excess of the actual per-Mcf cost of the gas, by virtue of the lease-sale arrangement, over an in-line price of 20 cents per Mcf,[525] Texas Eastern's customers had paid $23,848.919 of its Rayne Field costs through 1967.[526] To this the Commission added 46,080,371, representing an allocable part of the interest which the producers were to pay Texas Eastern,[527] making a refund to its customers of $19,929, 290 as of the end of 1967.[528] The amount of the refund, the Commission ruled, was to be brought up to date on the basis of 20 cents per Mcf of gas to October 1, 1968, and 18.5 cents thereafter, together with added interest.[529] The Commission directed Texas Eastern to calculate the total amount of the refund, subject to its approval, and to hold that amount for flow-through on the Commission's further order.[530]
 
 
 164
 Thus the Commission arrived at he point at which it was able to address the investment which Texas eastern had made in Rayne Field while the lease-sale arrangement was in vogue. At the end of 1967, the net investment was $20,882,-996,[531] which Texas Eastern proposed to recoup in its entirety from the amount of the producers' refund.[532] The Commission accepted neither this proposal nor the examiner's conclusion that Texas Eastern should lose the whole investment through a charge-off to surplus.[533] Instead, the Commission took the view that the balance of the refund remaining after customer flow-through should be used to reduce the investment on Texas Eastern's books.[534] After flow-through to customers of $19.929,290[535] of the $31,449,000 refund, principal and interest,[536] there remained $11,519,710[537] for that application, with a consequent reduction of the net investment to $9,303.286.[538] That amount, the Commission said, Texas Eastern might keep on its books, other than as a rate-base asset,[539] for amortization from the Rayne Field gas sales to the extent possible after Texas Eastern completes payment to the producers of the $134 million contract price.[540]
 
 C. The Impact of Opinion No. 565-A
 
 165
 Such was the Commission's analysis and disposition of the flow-through issue in Opinion No. 565, but in Opinion No. 565-A it was completely discarded. Since, in the latter opinion, a 4-1 majority of the Commission ruled that no rate reduction or refund by the producers to Texas Eastern should be ordered before the rate for Southern Louisiana underwent further consideration,[541] There was, of course, no reduction or refund to be passed along.[542] For the same reason, neither a decision on flow-through nor a concomitant ruling on the investment balance was deemed possible.[543] So, over Commissioner O'Connor's dissent,[544] definitive action on these matters was deferred,[545] and the deferral was left standing by the order denying rehearing of Opinion No. 565-A.[546]
 
 D. The Present Problems
 
 166
 There is, in the litigation before us, no demurrer to the Commission's jurisdiction to deal, as between Texas Eastern and the customers to which Opinion No. 565 applies, with any rate reductions or refunds receivable by Texas Eastern from the producers.[547] The gas in question entered Texas Eastern's pipeline at Rayne Field in Louisiana, and was transmitted and sold to distributors in other states for purposes of resale to the public.[548] No less than the producer's sales of the gas to Texas Eastern[549] were Texas Eastern's sales of the gas to those distributors activities within the regulatory domain of the Commission.[550] No narrower than the Commission's jurisdiction to prescribe rate reductions and refunds in the one case[551] was its jurisdiction to allocate the resulting benefits in the other.[552] And not less potent than the Commission's authority to allocate such benefits in ratemaking proceedings[553] was its authority to do so in section 7 proceedings.[554] The questions we encounter in connection with such allocations are not questions of Commission power, but are of an entirely different order.
 
 
 167
 We have held that the Commission cannot defer longer the rate reductions and refunds by the producers of Texas Eastern which conventionalization of the parties' lease-sale agreement demands.[555] In consequence, we have rejected the directives of Opinion No. 565-A and its accompanying order that disposition of reduction and refund issues be postponed.[556] We have also held that the producer refunds are to be computed on the basis of the just and reasonable rate of 18.5 cents per Mcf from the time at which Texas Eastern began to transmit the gas it drew from Rayne Field.[557] For that reason, we have disapproved so much of Opinion No. 565 as would have predicated the refunds on the 20-cent in-line price for slightly more than the first nine years of the production period.[558] These adjudications necessitate resolution of the problems related to allocation of the benefits of the rate reductions and refunds as between Texas Eastern and its customers.
 
 
 168
 We do not approach these problems on the broad premise that invalidity of an administrative decision undertaking to change an earlier administrative decision invariably reinstates the earlier decision. We realize that the agency may legally have a choice as to the action it will take in the matter, and that a court may not be able to say that the agency, had it known that the later decision would not pass judicial muster, would have left the earlier decision as its final action. On the other hand, it is obviously unnecessary to indulge further administrative consideration of problems as to which but one solution is legally open.
 
 
 169
 The Commission's power to modify its prior orders, we have said, is confined to changes which "it may find necessary or appropriate to carry out the provisions" of the Act.[559] Save as to the amounts of the allocations,[560] Opinion No. 565's treatment of flow-through of the rate reductions and refunds, we find, is fully consistent with policies fundamental to the Act.[561] On the other hand, deferment of flow-through issues--like deferment of the rate-reduction and refund issues themselves--which the Commission majority decreed in Opinion No. 565-A, we further find, in no way serves to foster the provisions or purposes of the Act.[562] We ultimately conclude, then, that Opinion No. 565, insofar as it effectuates legal mandates, is to be sustained as the Commission for further consideration in accordance with this opinion.
 
 
 170
 E. The Standards for Flow-Through of Rate Reductions and
 
 Refunds
 
 171
 The principles governing flow-through by a pipeline of rate reductions and refunds by its suppliers trace their origin to policy ingrained in the regulatory scheme of the Natural Gas Act. Since we have already had occasion to discuss that topic in another context,[563] a brief highlighting will suffice here. The great objective of the Act was the underwriting of "just and reasonable rates to the consumers of natural gas."[564] The clear "intention of Congress' was "that natural gas shall be sold in interstate commerce for resale for ultimate public consumption ... at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[565] The design of the Act is to "afford consumers a complete, permanent and effective bond of protection from excessive rates and charges"[566] It is the Commission's responsibility in Section 7 proceedings to exercise "control over the conditions under which has may be initially dedicated to interstate use."[567] to the end that "full protection of the public interest"[568] will be afforded.
 
 
 172
 The import of these considerations for flow-through of rate reductions and refunds to pipelines is evident. The rightful beneficiaries of such reductions are consumers when the prices they pay reflect excessive prices paid suppliers by the pipeline. To be sure, pipelines are entitled to charge their customers just and reasonable rates for gas sold them.[569] and a pipeline has a legitimate claim to retention of a rate reduction where it is absorbing excessive supplier-charges from revenues generated by just and reasonable rates of its own;[570] but no more than other natural gas entities subject to the Act can pipelines exact from their customers rates which are either unjust or unreasonable.[571] Retention by a pipeline of supplier-rate reductions is tantamount to overcharging customers when the pipeline is already a fair margin of return.
 
 
 173
 The Commission possesses Section 7 authority to condition any certificate of public convenience and necessity which a pipeline seeks by an imposition of requirements designed to serve the public interest.[572] A requirement that a pipeline flow through reductions in its suppliers' rates, certainly where the pipeline does not claim that it own rates are too low, is an eminently reasonable condition in the public interest. Should either the pipeline or the Commission feel a need to reexamine the pipeline's rates, the remedies conferred by Sections 4 and 5 are available.[573] In the meantime, the flow-through gives consumers the protection which the Section 7 certification process is designed to extend.p4
 
 
 174
 Entitlement to refunds of excessive rates charged pipelines by suppliers rests upon similar considerations. The only real difference in principle results from the difference in character of a rate reduction as remediation for the future and a rate refund as restitution for the past. A pipeline does not merit a supplier refund rectifying exorbitance in a supplier rate simply because it was the pipeline that directly paid the supplier that rate.[575] "The aim of the Act was to protect ultimate consumers of natural gas from excessive charges.... They were the intended beneficiaries of rate reductions ordered by the federal commission, though state machinery might have to be invoked to obtain lower rates at the consumer level."[576] If the pipeline's rates to its customers were pushed below a just and reasonable level by the pipeline's absorption of the supplier's excessive rates the pipeline's claim, of course, commands respect.[577] But, when, on the other hand, the supplier's overcharge has already been recouped by the pipeline through higher charges to customers, there is no foundation upon which such a claim can validly be asserted. In sum, the responsibility to dispose of a refund "plainly cannot be discharged by payment of the fund to those who show no loss.[578]
 
 F. Slow-Through of Rate Reductions
 
 175
 The presiding examiner concluded that in consequence of the reduction, through conventionalization of the lease-sale, of the rate which producers could obtain from Texas Eastern, the commodity charge in the latter's systemwide rates should be lowered.[579] In Opinion No. 565, the Commission did not reach Texas Eastern's contention that Section 7 did not authorize the course because it felt that another treatment would in any event be appropriate.[580] Since Texas eastern had pending before the Commission a Section 4 proceeding for a rate increase, sought partly on the basis of its Rayne Field costs, the Commission settled on a reduction of Texas Eastern's rates as an iterim step for the Section 4 proceeding.[581] Accordingly, the Commission ordered Texas Eastern to file substitute rates reflecting cost shrinkage arising from the instant proceeding, and to continue in effect rates reflecting costs at the applicable area rate until full payment to producers of the $134 million purchase price and amortization of the balance of the Rayne Field investment on its books, and thereafter to file new rates.[582]
 
 
 176
 The Commission's general authority to issue interim rate orders is beyond question.[583] And indubitably, an interim order may decrease existing rates which are excessive.[584] The Commission might have entered an interim rate-reduction order in Texas Eastern's pending Section 4 proceedings on a finding that its rates were too high.[585] We see no infirmity in the action here arising simply from the fact that the Commission chose to promulgate such an order, on such a finding in the Section 7 proceeding as a step promoting the public interest in the Section 4l proceeding.[586] We accordingly accept the Commission's rate-reduction order for what it purports to be.
 
 
 177
 We hasten to add, however, that the Commission might also have passed the order as an exertion of its Section 7 authority.[587] Texas Eastern's sole challenge before the Commission to the examiner's method of rate-reduction flow-through was that the Commission lacked power in a Section 7 proceeding to revise systemwide rates previously found to be just and reasonable.[588] The Commission met that objection by issuance, for Texas Eastern's rate-increase proceeding, of the order on an interim basis upon a finding essentially that without flow-through of the reductions Texas Eastern's charges to customers would not remain reasonable. The Commission was equally free to flow through the reductions by an exercise of its Section 7 powers without encountering the criticism Texas Eastern offered. The methodology of Section 7 flow-through is an imposition of certification conditions pending any formal rate investigation that might be in order.[589] The very purpose of Section 7 certificate conditions is protection of consumers while the normally lengthy rate investigation is proceeding.[590] The mechanism of Section 7 condition-imposition is not ratemaking; indeed, ratemaking incidental to a levy of such conditions is unnecessary and inappropriate.[591] Texas Eastern's point fails both as to the avenue the Commission took and the one it could have taken.
 
 
 178
 The woes of rate-reduction flow-through do not end at this point, however, for the disposition ordained in Opinion No. 565 was soon cast aside. In Opinion No. 565-A, the Commission substituted the 20-cents in-line price for the 18.5-cent area rate as the basis for a producer rate-schedule filing to reflect what the Commission then deemed the appropriate producer reduction.[592] The Commission also concluded that "it would not be in the public interest to require" a new rate filing by Texas Eastern to track the 20-cent producer rate for the stated reason that such a filing "might result in only a temporary reduction to its customers, and thus would bring about only a condition of instability without commensurate benefits."[593] Instead, the Commission levied on Texas Eastern a contingent liability to make refunds in the future to the extent that its actual rates exceed rates reflecting a 20-cent producer rate.[594]
 
 
 179
 We have seen that the objective of initial gas-pricing in Section 7 certification proceedings must constantly be protection of consumers against exorbitance during the period prior to establishment of of firm prices by the ratemaking process.[595] We have held that the initial price which Texas Eastern should have been directed to pay its Rayne Field producers was the 18.5-cent rate by the 20-cent rate are totally at war with these vital considerations. Leaving Texas Eastern's too-high rates operative obviously sacrifices the interest of its customers in "the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest," which was, we have said their due.[597] No more with respect to Texas Eastern than to the producers was the Commission's apprehension of "a condition of instability" sufficient justification for diluting that interest.[598] Nor is a refund liability an adequate substitute for the rate reduction which the Commission spurned.[599]
 
 
 180
 In this posture of the case, it is clear that as a matter of law Opinion No. 565-A is erroneous and Opinion No. 565 is right in its treatment of rate-reduction by Texas Eastern. We must, then, set Opinion No. 565-A aside on that score. By the same token, since the Commission had no perceivable legal alternative to the disposition it assigned that matter in Opinion No. 565, we sustain the Commission's position in that respect.
 
 G. Flow-Through of Rate Refunds
 
 181
 For some time the Commission appears to have allocated supplier refunds between pipelines and their customers by application of a simple principle. Entitlement depended upon whether the pipeline had increased its rates to accommodate the increase in the supplier rates. If it had, customers got the refund; if it had not, the pipeline was preferred.[600] That rule, so far as it goes, plainly harmonizes with the aims and philosophy of the Act,[601] and we encounter no difficulty in sustaining it as a major thesis in the allocative process.
 
 
 182
 In 1968, in its Opinions Nos. 540 and 540-A, as we have explained, the Commission superimposed upon that principle the requirement that a pipeline contending for a refund resulting from a supplier-rate increase later disallowed must have filed a tracking rate increase of its own.[602] The justification for this requirement is that the effect of absorption of the supplier increase on the pipeline's earnings position, and consequently on the relative equities of the pipeline and its customers in respect to the refund, can be suitably ascertained only when subjected to close scrutiny.[603] The Commission held that Texas Eastern, the pipeline there involved, could not retain a supplier refund where it had not filed a tracking rate increase and did not show that it had earned less than a reasonable margin of return during the period in question.[604]
 
 
 183
 On review of that ruling in the Fifth Circuit, the Commission was sustained.[605] The court rejected Texas Eastern's primary argument that it was entitled to the refund as restitution for the sum it paid, as an increased cost, to its suppliers without passing that cost on to its customers:
 
 
 184
 Our view is that the Commission was authorized to see to disposition of the refunds in question on the basis of the purpose of the Act to protect ultimate consumers of natural gas. It must be borne in mind that the Commission created the refunds by disallowing supplier rate increases and by requiring that the sums in question be retained by the suppliers pending determination of entitlement. Texas Eastern could have filed rate increases to track the supplier increases. It chose not to do so for reasons of its own. One reason, no doubt, was that the Commission could have investigated the rates in the light of Texas Eastern's earnings.
 
 
 185
 Here the Commission afforded Texas Eastern the opportunity to justifying its entitlement to the refunds on a earnings basis without the concomitant risk of an investigation of its rates as would have been the case in the event of rate filings. This procedure was adopted to protect Texas Eastern in the face of the change in Commission policy as to disposition of refunds. This was a fair approach from the standpoint of protecting the interest of Texas Eastern and the consumer. To adopt Texas Eastern's position that it is, ipso facto, entitled to the refunds by virtue of having paid and absorbed them would be to countenance rate making by the producer-suppliers and Texas Eastern outside the protective ambit of Sec. 4(e). This approach would do violence to the statutory scheme by avoiding, to the extent the refunds exceed a fair return to Texas Eastern, any rate regulation whatever except under Sec. 5 of the Act.[606]
 
 
 186
 We agree with the Fifth Circuit that the requirement of a tracking rate increase is amply supported by the goals sought by the Act. In Opinion No. 565, however, the Commission held that the fact that Texas Eastern did not file such an increase did not totally bar it from sharing in the refunds ordered by the producers. Disagreeing with the examiner, the Commission distinguished Opinions Nos. 540 and 540-A on grounds hardly characterizable as irrational. Instead of a supplier-rate increase which might have been tracked by a pipeline increase filing, there was a lease-sale transaction involving a large capital investment which was not itself susceptible of tracking.[607] The conventionalization of the lease-sale upon which the Commission decided was partial only--for purposes related to payment for Rayne Field gas, but not for all others.[608] With the Rayne Field investment remaining a capital item because unconventionalized, Texas Eastern could have tracked only the expense by-products of the investment--depreciation, depletion and amortization--together with Rayne Field expenses and taxes which were not capitalized.[609] Beyond that, the evidence, by the Commission's appraisal, established that Texas Eastern had passed on to its customers less than $14 million of some $76 million in Rayne Field expenditures--the excess of the actual per-Mcf cost of the gas under the lease-sale formula over a 20-cent in-line unit price.[610]
 
 
 187
 On this analysis, the Commission in Opinion No. 565, required Texas Eastern to flow through nearly $14 million of the producers' refund, together with an aliquot portion of the interest thereon charged the producers,[611] and permitted Texas Eastern to apply the remainder of the refund in reduction of its investment.[612] This disposition of the refund issue encounters opposition from both pipeline and consumer viewpoints, and on divergent grounds. Texas Eastern, claiming the entire refund, asserts that capitalization of the bulk of its Rayne Field expenditures was not only a prudent decision[613] but also a sound accounting practice, particularly because of the resemblance of those expenditures to prepayments for gas in conventional purchases,[614] and that no part of the investment could have been passed on to customers through the medium of a tracking rate increase. PSC, on the other hand, claiming all of the refund for consumers, argues that as a matter of accounting capitalization of the expenditures was unauthorized by the Commission's regulations,[615] and that the Commission's computation of the amount of the customer overcharge was of dubious validity because no cost of service for the period in question was ever found.[616]
 
 
 188
 By our assessment, we cannot compel the Commission to accept any of these claims. The question is not how we ourselves would dispose of these arguments but whether the disposition the Commission chooses is arbitrary or otherwise inconsistent with law.[617] Factual findings by the Commission, when supported by substantial evidence on the record as a whole, are conclusive upon the courts.[618] And "[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."[619] We see nothing that would exempt this case from those rules.
 
 
 189
 Looking first to Texas Eastern's contentions, we start from the premise that a public utility's investors have a general right to recoup from consumers the full amount of the capital outlay they have devoted to the public service.[620] But investors have no right to a second recovery of so much of their investment as consumers have already repaid.[621] Here the Commission, in Opinion No. 565, found that Texas Eastern's customers had been charged nearly $14 million of its net investment balance of some $20 million through rates that were higher than they should have been.[622] The Commission also found that some of Texas Eastern's expenditures were expense items[623]--and not prepayments treatable as capital items[624]--for which a tracking rate increase might have been sought,[625] and allowed if the sought-after increase survived the test of reasonableness.[626]
 
 
 190
 Our examination of the administrative record convinces us that these facts, upon which the Commission mainly rested the refund flow-through framed in Opinion No. 565, are well supported. Our appraisal of the conclusion which the Commission drew from those facts is that they are neither arbitrary nor unreasonable. We therefore are not at liberty to direct action which is at variance with the Commission's decision in Opinion No. 565 to require Texas Eastern to flow through to its customers a portion of the refund equal to the amount of Texas Eastern's investment recovery in the form of customer charges which were higher than they otherwise would have been. We recognize, of course, that the refunding aspects of Opinion No. 565 may have lost their vitality by reason of supersession by the suspension provisions of Opinion No. 565-A, notwithstanding the invalidity of the latter.[627] But the fact remains that as a court we cannot assume the Commission's prerogatives by ordering a course of action it is not legally obliged to take.[628]
 
 
 191
 For similar reasons, and contrary to PSC's position, we cannot disregard the Commission's determination in Opinion No. 565 that the residue of the refund should be applied to reduce the net balance of Texas Eastern's investment in Rayne Field. Given the breadth of administrative authority to set practices which are matters purely of desirable accounting,[629] we perceive no basis for disturbing the Commission's conclusion that some $20 million of Texas Eastern's unrecovered Rayne Field expenditures have been properly capitalized. And given the expert testimony underlying the Commission's finding that a substantial portion of those expenditures had not been passed on to Texas Eastern's customers,[630] we are unable to say that ascertainment of Texas Eastern's cost of service was prerequisite to allocation to it of an equitable share of the refund.[631] As Commissioner O'Connor was later to observe,"[t]o flow through the entire amount of the refund would preclude Texas Eastern from recovering its costs,"[632] and "[t]he effect would be that consumers for the past ten years would receive gas at a price below its cost to the pipeline and below the just and reasonable rate."[633] "This," he declared, "to me is unconscionable,"[634] and it may well be to other commissioners too.
 
 
 192
 Were the only issue emerging the legal vulnerability of Opinion No. 565, we would affirm its treatment of refund flow-through. The litigation, however, is further complicated by the course the Commission subsequently took in Opinion No. 565-A. Producer refunds were deferred pending reconsideration of the area rate for Southern Louisiana, leaving nothing to flow through to Texas Eastern's customers.[635] The legal effect of that action is our final inquiry.
 
 
 193
 As we have previously ruled, the Commission erred in postponing refunds by the producers to Texas Eastern.[636] We need not duplicate our earlier analysis and discussion of relevant legislative policy, or of the substantial body of judicial precedent, demanding speedy refunding by natural gas companies for the protection of consumers. It suffices to point simply to the Supreme Court's admonition, specifically referable to customer refunding, that the Commission had the duty, "where refunds are found due, to direct their payment at the earliest possible moment consistent with due process.[637] The postponement of producer refunds and, in consequence, of refund flow-through by Opinion No. 565-A was plainly a default in that responsibility and it follows that the facet of Opinion No. 565-A must be disapproved. In the case at bar, there must be producer refunds;[638] and with no apparent justification for total retention by Texas Eastern, its customers must share in them.
 
 
 194
 But notwithstanding that, and though we leave untouched the flow-through principles which the Commission applied in Opinion No. 565, we must reject the amounts which that opinion would have respectively allotted to Texas Eastern and its customers from the producer refund. The Commission, for part of the relevant period, calculated the refund on the basis of the in-line unit price of the gas delivered to Texas Eastern.[639] Since we have held that the proper basis for computation was the just and reasonable rate throughout that period,[640] the refund will be larger than the Commission believed it to be.[641] We must, then, remand the case to the Commission in order that the amount of the producers' refund and the portions thereof to be retained and to be flowed through by Texas Eastern, may be recalculated.
 
 
 195
 VII. THE SECOND SOUTHERN LOUISIANA AREA RATE PROCEEDING
 
 
 196
 After this litigation made its appearance in this court, the Commission announced Opinion No. 598 and an effectuating order, by which the maximum rates chargeable for gas produced in the Southern Louisiana area were revised upward.[642] That decision does not, however, alter the conclusions we have expressed as to the basis for computation of producer refunds due Texas Eastern,[643] and of flow-through of those refunds by Texas Eastern,[644] prior to August 1, 1971, the effective date of the increases permitted by Opinion No. 598.[645] In that view, this latest promulgation of area rates for Southern Louisiana does not affect our ruling respecting the treatment of those matters in the Commission's pre-1971 Opinion Nos. 565 and 565-A.
 
 
 197
 Of course, by the terms of Opinion No. 565, the maximum price which Texas Eastern could pay the producers for gas extracted from Rayne Field rose to the applicable new area rate on the date it took effect.[646] That rise, in turn, had obvious implications, from that time onward, for the rates which Texas Eastern could charge its customers,[647] for refunds by the producers to Texas Eastern,[648] and for flow-through of such refunds by Teas Eastern,[649] matters as to which we are not now summoned to express any opinion. We think, however, as we have held,[650] that producer refunds and pipeline flow-through up to the operative date of the new area rates must be calculated on the basis of the original 18.5-cent just and reasonable area rate established in the Commission's first Southern Louisiana Area Rate Proceeding.[651]
 
 
 198
 During the pendency of the proceeding leading to Opinion No. 598, a settlement conference was convened by the Commission, and eventually a settlement proposal was submitted by 32 major producing companies.[652] The proposal envisioned higher ceiling prices for gas whether sold under contracts dated before or after October 1, 1968,[653] and a total of $150 million in refunds--a reduction from $375 million--from sales subject to scrutiny in specified Commission dockets.[654] The Commission approved the proposal,[655] and adopted for the Southern Louisiana area the price ceilings and refund bases which it advanced.[656]
 
 
 199
 Very importantly, however, neither the settlement proposal nor Opinion No. 598 or its related order embraced the refund questions presented in the case at bar. The settlement proposal explicitly admonished that '[t]he terms hereof do not dispose of any issues in the Rayne Field (Docket no. G-12446, et al.) ... proceedings"[657]--the litigation now before us--and its refund provisions were expressly made subject to that exclusion.[658] In turn, the Commission, in its words in Opinion No. 598, "adopt[ed] those provisions of the settlement proposal which prescribe[d] the ... refund provision for deliveries made."[659] And just as the settlement proposal defined the transactions subject to refund in terms excluding the gas sales involved here, so did the order accompanying Opinion No. 598.[660]
 
 
 200
 We need not, in these circumstances, consider whether Opinion No. 598 could in any event affect the refund and flow-through issues which the Commission was called on to resolve several years previous to its promulgation. The critical fact is that Opinion No. 598 left those issues untouched. For that reason, we have concluded that our disposition of the refund and flow-through questions presented on this review must remain uninfluenced by Opinion No. 598.
 
 VIII. SUMMARY AND DISPOSITION
 
 201
 The Commission's action in the controversy we have reviewed is incorporated in Opinion No. 565 as changed by Opinion No. 565-A, in Opinion No. 565-A, and in the orders emanating from those opinions.[661] We sustain (a) the Commission's decision, in both opinions, to conventionalize some features of the lease-sale arrangement in the public interest;[662] and (b) the Commission's authority, exercised in the two opinions, to displace the lump-sum lease-sale contract price with an initial unit price for the gas sold Texas Eastern by the producers, and to appropriately implement that unification.[663] We accordingly affirm these aspects of Opinions Nos. 565 and 565-A and their accompanying orders.
 
 
 202
 We hold, however, that the Commission erred (a) in eliminating, by Opinion No. 565-A, the lease-sale contract price as the ceiling for the aggregate of Texas Eastern's payments to the producers;[664] (b) in adopting, at least to some extent by both opinions, the 20-cent in-line price as the initial unit price for gas delivered prior to August 1, 1971;[665] and (c) in deferring, by Opinion No. 565-A, rate reductions[666] and refunds[667] by producers to Texas Eastern, and flow-through of the reductions[668] and refunds[669] by Texas Eastern after taking into consideration its investment in Rayne Field.[670] We reverse Opinion No. 565 and its companion order in these respects.
 
 
 203
 Our rulings necessitate a remand of the cases under review to the Commission. We instruct the Commission, on remand, (a) to increase, beyond the lease-sale contract price, the aggregate amount which Texas Eastern is to pay the producers by a sum equal to the time value of the monies otherwise to be paid;[671] (b) to compute, utilizing the then existing 18.5-cent just and reasonable area rate as the basis, refunds by the producers to Texas Eastern on account of gas deliver is prior to August 1, 1971;[672] (c) to compute, after due regard for Texas Eastern's Rayne Field investment,[673] the amount to be flowed through by Texas Eastern, on account of producer refunds prior to August 1, 1971, on the basis of the 18.5-cent just and reasonable area rate in operation during the period;[674] (d) to suitably update all rate-reduction, refund and flow-through computations;[675] and (e) to order all proper rate reductions and refunds to be made and flowed through at the earliest practicable times.[676] It goes without saying that the Commission will conduct all further proceedings consistently with the holdings and principles articulated in this opinion.
 
 
 204
 So ordered.
 
 ORDER
 
 205
 PER CURIAM.
 
 
 206
 Upon consideration of the petitions of the Federal Power Commission, Continental Oil Company, Sun Oil Company, M.H. Marr and General Crude Oil Company for rehearing, it is
 
 
 207
 Ordered by the Court unanimously that the petitions be and hereby are denied.
 
 
 208
 Before FAHY, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.
 
 
 209
 Opinion for the Court filed by Circuit Judge ROBINSON.
 
 
 210
 SUPPLEMENTAL OPINION ON PETITIONS FOR REHEARING
 
 
 211
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge, with whom TAMM, Circuit Judge, joins:
 
 
 212
 The Commission and the producers petition for rehearing and modification of our decision[1] in several of its more important aspects. In substantial degree, their contentions merely echo arguments which have already been dealt with, and which we find upon reconsideration to merit no further discussion. There is however, a recurring challenge which might be thought to draw support from a decision of the Supreme Court[2] announced after rendition of our prior opinion, and to that we now give primary attention. There are, too, several points on which brief additional explanation is apt to promote clearer understanding of the scope and basis of particular holdings, and these we also address.[3] Doing so, and concluding that no change in our original determination is warranted, we deny the petitions.
 
 
 213
 * In Mobile Oil Corporation v. Federal Power Commission,[4] the Supreme Court reviewed and sustained the order effectuating the Commission's Opinion No. 598,[5] the second of two major pronouncements in the proceeding to set area rates for natural gas produced in Southern Louisiana. Mobile followed by more than two months our earlier opinion in the case at bar. Since the events leading to Mobile, and the decision itself, introduce and define the principal matter we now speak to, we pause momentarily to summarize them.[6]
 
 
 214
 On September 25, 1968, a seven-year investigation by the Commission culminated in Opinion No. 546[7] which, inter alia, established 18.5 cents per Mcf as the just and reasonable area rate, effective October 1, 1968, for onshore natural gas of the Rayne Field vintage,[8] and directed refunds for gas sold subject to a refunding obligation during pendency of the investigation at prices exceeding the newly-fixed ceilings.[9] On appeal, the Fifth Circuit affirmed,[10] but authorized the Commission to reopen the proceeding and to readjust, retroactively as well as prospectively, the rate and refund provisions of its order should the public interest so require.[11] The Commission formally reopened[12] and, by adoption of the terms of a settlement proposal found to be supported by substantial evidence, promulgated a new rate order.[13] That order, delineated in Opinion No. 598, set a maximum price of 22.375 cents per Mcf for "flowing gas"--gas delivered after August 1, 1971, the effective date of the new order, under contracts predating October 1, 1968[14]--and provided for escalation of the price contingent upon new dedications of gas to the interstate market.[15] The new order also specified a formula for refunds, aggregating about $150 million,[16] with a provision for work-off credits based on commitments of additional gas reserves to that market.[17] The Fifth Circuit,[18] and in turn the Supreme Court in Mobil,[19] affirmed the order.
 
 
 215
 During most of the period covered by area ratemaking in Southern Louisiana, the Commission continued its quest for initial pricing of the Rayne Field gas, in suit, which had been certified in 1959 and flowing through Texas Eastern's pipeline system since then.[20] On August 6, 1969, the Commission issued its Opinion No. 565[21] wherein it found that the public interest demanded conventionalization of some aspects of the parties' lease-sale agreement to more nearly conform the transaction to an orthodox gas-sale contract.[22] The Commission then fixed initial prices for the gas at 20 cents per Mcf--the in-line price--until October 1, 1968, the operative date of Opinion No. 546, and thereafter at the 18.5-cent just and reasonable area rate prescribed by Opinion No. 546,[23] and directed producer refunds and pipeline flow-through on that basis.[24] On rehearing, the Commission, in Opinion No. 565-A,[25] reaffirmed the need to conventionalize[26] but in other critical respects changed its course. It held that the criterion for producer refunding, from certification onward, was the applicable area rate,[27] but felt that because the probe for area rates had been reopened, initial pricing and refunding should be deferred pending its outcome.[28] On further rehearing, the Commission adhered to those conclusions.[29]
 
 
 216
 In that posture, the litigation arrived in this court. We affirmed the Commission's decision, reached in each of the opinions, to conventionalize the transaction.[30] We agreed that a just and reasonable area rate in existence, rather than the in-line price in that instance, was the proper measure both of initial prices prospectively[31] and of refunds and refund flow-through occasioned by collections above that rate in the past,[32] and to that extent we sustained Opinion No. 565-A.
 
 
 217
 We differed with that opinion, however, as to the deferral of refunds which it undertook to make. We concluded that the postponement could not be justified by the Commission's desire to await finalization of just and reasonable rates for Southern Louisiana.[33] We also concluded that the 18.5-cent area rate established in Opinion No. 546, though subject to possible revision, was the legally required basis for the Commission's initial pricing activities--for charging in the future and, as well, for refunding on account of the past.[34] We remanded to the Commission with instructions to proceed accordingly.[35]
 
 
 218
 These petitions for rehearing followed. In its petition, the Commission requested alternatively that we withhold our ruling pending the Supreme Court's action in mobil. That we have done, and since have given the petitions the most careful consideration in light of the Mobil decision. We perceive no reason justifying change in our original disposition, and accordingly we deny the petitions.
 
 
 219
 Lest, in traversing the maze of problems bred by this litigation, its main bearings have become obscured, we reiterate several important considerations to be borne in mind. The central questions are prices, refunds and refund flow-through, not as terminal determinations, but as arrangements, pending finalization of the financial rights and obligations of the parties.[36] The duration and intensity of the instant controversy notwithstanding, the case has not advanced beyond certification--under Section 7 of the Natural Gas Act[37]--of the sale of the gas in question for the interstate market, or beyond the occasion for financial relationships simply for that purpose.[38] There has been no specific inquiry into rates or refunds under Sections 4 or 5 of the Act,[39] nor yet any determination as to permissible departures, by way of contingent price escalation or refund workoff, from the base rate fixed in Opinion No. 598.[40] All that has been done, and can be done at this stage, is of an interim nature.
 
 
 220
 Our decision calls for prompt refunds by the producers and flow-through by the pipeline, subject not only to any unrealized offsets occasioned by the new area rate effective on and after August 1, 1971,[41] but also to any other adjustments which further proceedings in this matter may indicate. The maximum effect of our decision is a present refund benefit to consumers for deliveries prior to that date, which in any event will be returned to the producers, up to the $134 million contract ceiling,[42] through collections at just and reasonable rates for deliveries after that date.[43] It may be that when all is said and done about Rayne Field gas, the return will be faster.
 
 II
 
 221
 Irrespective of the status of the Southern Louisiana area rate investigation and of just and reasonable rates for that area when the Commission promulgated Order No. 565-A, by our lights it was clear error to delay the matter of producer refunds to the conclusion of the reopened rate proceeding. In Opinion No. 565, a Commission majority ordered refunds on a finding that the producers had been greatly overpaid for gas deliveries made through 1967.[44] The majority in Opinion No. 565-A did not dispute that finding, but postponed all refunds on the theory that they should be predicated on whatever just and reasonable rate for Rayne Field gas eventuated from the reopened inquiry as to appropriate rates for the area.[45]
 
 
 222
 In our earlier opinion, we deemed that action a disregard of the Supreme Court's admonition that "it is the duty of the Commission, 'where refunds are found due, to direct their payment at the earliest possible moment consistent with due process.' "[46] We were unable to distinguish the refund deferral ordained by Opinion No. 565-A from the deferral which the Court had previously condemned in its Callery decision.[47] We pointed out that "[e]ven assuming the nonexistence of any just and reasonable rate which might function as the basis for immediate refunds by the producers, that office could readily have been performed by the in-line price which the Commission ascertained in this very proceeding.[48] As we read the Court's Mobil opinion,[49] it does not overrule Callery, or affect our application of Callery in this case.
 
 
 223
 The Commission and the producers still urge nonetheless the propriety of the postponement on the ground, advanced in Opinion No. 565-A, that it promoted equality of treatment vis-a-vis other producers in Southern Louisiana.[50] We rejected that argument in our previous opinion,[51] and for even stronger reasons we do so again. The deferral discountenanced in Callery presumably would in similar degree have served the cause of producer equality, but in neither case could deferrals have done so without completely sacrificing the interest of consumers in prompt refunds for excessive initial prices.[52] In each case that interest complements the consumers' statutory entitlement to "the lowest possible rate consistent with maintenance of adequate service in the public interest,"[53] a matter with which Section 7 historically has maintained a vital concern.[54] Moreover, the Supreme Court's Mobil decision confirms our earlier suspicion[55] that equality in refunding among Southern Louisiana producers might be an illusory goal.[56] No more now than when we originally decided this case can we condone the refund deferral which the Commission indulged.
 
 III
 
 224
 Beyond the delay in refunding commanded by Opinion No. 565-A is the problem of the rate therein selected as the basis for refunds. All are agreed that the applicable area rate ultimately upheld in Mobil controls the parties' financial relationships after August 1, 1971, the date the rate became operative. For Opinion No. 565 and its accompanying order specified that pipeline-producer payments would rise prospectively to the area rate, and to levels fixed by subsequent revisions thereof,[57] and the theory underlying the majority's disposition in Opinion No. 565-A was to the same effect.[58] 8] By the same token, all pipeline charges, producer refunds and flow-through of those refunds became similarly affected from that point onward.[59] The issue was and is the rate appropriate for computation of producer refunds and pipeline flow-through on account of gas deliveries prior to the effective date of the 1971 rate order.
 
 
 225
 We concluded in our original opinion that neither Opinion No. 598 nor its related order itself undertook to extend the Commission's retroactive refund formula[60] toward resolution of that question.[61] We pointed out that the settlement agreement underlying Opinion No. 598 stated unequivocally that its provisions would not dispose of any issue confronting us in this litigation;[62] that the refund provisions of the settlement agreement were expressly made subject to that exclusion;[63] that Opinion No. 598 expressly adopted the refund provisions of the settlement agreement as written;[64] and that the order accompanying Opinion No. 598 defined the transactions subject to refund in terms excluding the gas deliveries involved here.[65] We said that "[w]e need not, in these circumstances, consider whether opinion No. 598 could in any event affect the refund and flow-through issues which [in the instant case] the Commission was called on to resolve several years previous to its promulgation,"[66] for "[t]he critical fact is that Opinion No. 598 left those issues untouched."[67] All applicants for rehearing seem to concede the validity of that conclusion, and we continue our alliance with it.
 
 
 226
 The controversy now before us arose, it will be recalled, from administrative proceedings conducted under Section 7 of the Natural Gas Act.[68] Section 7 mirrors the will of Congress "that natural gas shall be sold in interstate commerce for resale for ultimate public consumption ... at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[69] This objective crowns the Act's mandate that "[a]ll rates and charges" for such gas "shall be just and reasonable,"[70] and that "any such rate or charge that is not just and reasonable is declared to be unlawful."[71] The just and reasonable rate is the one and only price standard set by the Act for the gas it governs, a standard which all charges must ultimately meet.
 
 
 227
 To be sure, at least before the advent of area[72] and national[73] gas-pricing, the Commission, very properly, certificated sales of gas for which no just and reasonable rate was extant, and utilized in-line prices as initial prices pending establishment of just and reasonable rates.[74] The justification for that methodology was the unfeasibility of determining just and reasonable rates within the framework of a Section 7 certification proceeding,[75] and the consequent need for some other pricing arrangement while the usually protracted rate investigation moved forward toward ascertainment of precisely what rate would be just and reasonable.[76] The initial price in such circumstances thus functioned simply as an interim price, enduring only until the just and reasonable rate could be set and appropriate adjustments between suppliers and consumers for interim deliveries could be made.[77]
 
 
 228
 As we stated in our first opinion, however, "[i]t is evident ... that use of the in-line price as the yardstick for the initial-price determination on certification cannot be justified in situations where a just and reasonable area rate for gas of the vintage in question has already been established."[78] We said that while the in-line price could properly be adopted as the initial price when no just and reasonable rate had been promulgated,[79] "only the presence of an overriding consideration promoting an identifiable legislative purpose can justify administrative displacement of the just and reasonable rate through approval of another rate for gas to which the Act applies."[80] We concluded that "the Commission is legally compelled to peg a producer's initial price at a previously ascertained just and reasonable rate unless some consideration effectuating a countervailing congressional policy is shown on balance to outweigh the congressional interest in "just and reasonable rates to the consumers of the natural gas.' "[81] In sum, it was and still is our view that absent justification of that caliber, a just and reasonable rate is to be preferred over an in-line rate as the measure of the producer's charge for gas sales authorized by a Section 7 certification.
 
 
 229
 With this position the Commission has manifested full agreement in other cases,[82] as ultimately it did in the case at bar. True it is that a majority of the Commission in Opinion No. 565 ruled that the certification should be conditioned upon an initial price geared to the in-line price for gas delivered prior to October 1, 1968, the date on which the just and reasonable rate set by Opinion No. 546 for gas of Rayne Field vintage was to take effect.[83] but a majority in opinion No. 565-A held supersessively that the initial price should be fixed at the 1968 just and reasonable rate from the time a gas began to flow in 1959,[84] a stand wholly consistent with our own. The difficulty was that in the latter opinion the Commission also concluded that Opinion No. 546 did not represent a final determination of just and reasonable area rates,[85] and that payments to producers should continue at the in-line price and producer refunds should be deferred until a firm area rate was forthcoming.[86]
 
 
 230
 In our previous opinion we disagreed with the Commission that the accompanying circumstances "rendered Opinion No. 546 so tentatively in character as to support the Commission's refusal in Opinion No. 565-A to employ the 18.5-cent just and reasonable rate as the initial price to be paid to the producers for gas delivered after the effective date of that rate."[87] On the same ground, we disagreed with the position that that rate could not serve as the predicate for refunds by the producers on account of deliveries before that date at higher prices.[88] Our disagreement continues for the reasons which we then detailed,[89] and which now we may briefly highlight.[90] The 18.5-cent just and reasonable rate was established in a full-blown rate investigation extending over a period of seven years.[91] On applications for rehearing, the Commission again approved that rate,[92] although later it prepared to take another look at it.[93] On appeal to the Fifth Circuit, the rate determinations in Opinion No. 546 were "sustained in full,"[94] through with leave to the Commission to reopen its order and revise the rates in light of new evidence.[95]
 
 
 231
 That was the situation when the Commission issued Opinion No. 565-A.[96] It seemed to us that the 18.5-cent rate differed insufficiently from any other rate--which inherently would be subject to change in the public interest--to lose its character as the legally appropriate criterion for the initial price which the producers in suit thenceforth would be allowed to exact,[97] and for the measurement of refunds occasioned by past exactions.[98] We accordingly held "that neither the susceptibility of the 18.5-cent area rate to modification upon [an appropriate] finding nor the ongoing administrative inquiry into the propriety of such a finding was adequate justification for the Commission's decision in Opinion No. 565-A to ignore it."[99]
 
 
 232
 We recognize that in consequence of administrative and judicial stays the 18.5-cent rate never went into general operation[100] but that, we think, is immaterial. The question was not whether Rayne Field producers were limited in their charges by the rate per se, but whether their initial prices should have been fixed and their refunds calculated in accordance with that rate pending either its reaffirmation or promulgation of a new rate. The fact that producers selling gas at previously Commission-approved prices were unaffected by the stayed 18.5-cent rate did not answer the question whether that rate, in lieu of the in-line price, should have been taken as the point of reference for initial prices and refund obligations for producers whose sales until then were entirely unregulated. While, when Opinion No. 565-A was announced, the 18.5-cent rate was in suspension as an operative price ceiling, it nonetheless represented the Commission's considered and best judgment as to what a just and reasonable charge for Rayne Field gas should be.
 
 
 233
 The same could not be said for the in-line price--the going field price[101]--for which the Commission opted instead. As we said in our first opinion, the Supreme Court has warned that where the Commission has decided "to rely solely upon contemporaneous contract prices in setting initial rates, there can be no assurance that an initial price arrived at by the Commission will bear any particular relationship to the just and reasonable rate."[102] And even subsequent to announcement of our opinion, the Court has similarly declared that "the prevailing price in the market place cannot be the final measure of 'just and reasonable' rates mandated by the Act."[103] We reiterate that the in-line price for Rayne Field gas would have been the legitimate benchmark for the initial producer-price and for the initial producer-refund had the Commission been unable to more closely approximate the just and reasonable rate.[104] We remain of the view, however, that with the still unrevised 18.5-cent just and reasonable area rate available, the Commission was legally obligated to give it preference. It bears repeating that Congress has specified that "[a]ll rates and charges" for jurisdictional gas "shall be just and reasonable,"[105] that "any" other such rate is unlawful,[106] and that the Commission's duty was to fix the producers' initial price "at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest."[107] We think these provisions preclude the Commission, when setting initial rates and computing initial refunds, from settling for second best.[108]
 
 
 234
 Petitions denied.
 
 
 
 [1]
 Act of June 21, 1938, ch. 556, 52 Stat. 831, as amended, 15 U.S.C. Sec. 717 et seq. (1970)
 
 
 [2]
 Texas Eastern operates a pipeline system extending from Texas to the Northeast. Its principal markets are in New England and the Middle Atlantic region
 
 
 [3]
 PGW, a customer of Texas Eastern, operates under contract the municipally-owned gas facilities serving some 600,000 consumers in Philadelphia
 
 
 [4]
 At the time, Rayne Field was a large and fully developed gas reserve uncommitted to serving a market. It was only 22 miles distant from one of Texas Eastern's major pipeline systems, with which it could be connected at relatively small cost
 
 
 [5]
 The price included 1.3 cents for reimbursement of state taxes. The contracts provided for escalations during future years
 
 
 [6]
 See Natural GAs Act Sec. 7(c), 15 U.S.C. Sec. 717f(c) (1970); Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed.2d 1035 (1954)
 
 
 [7]
 See Natural Gas Act Sec. 7(a), 15 U.S.C. Sec. 717(a) (1970); Ohio Fuel Gas Co. v. FPC, 111 U.S.App.D.C. 337, 296 F.2d 594 (1961)
 
 
 [8]
 See text infra at note 11
 
 
 [9]
 Texas Eastern Transmission Corp., 21 F.P.C. 869 (1959) (examiner's decision)
 
 
 [10]
 Public Serv. Comm'n v. FPC, 257 F.2d 717 (3d Cir.1958), aff'd sub nom., Atlantic Ref. Co. v. Public Serv. Comm'n, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959)
 
 
 [11]
 The CATCO initial price was 22.4 cents per Mcf, including tax
 
 
 [12]
 Public Serv. Comm'n v. FPC, supra note 10, 257 F.2d at 722-723
 
 
 [13]
 By that agreement,Texas Eastern acquired the producers' entire working interest in Rayne Field gas, with an exception not here material. Assignment and conveyance of the leasehold interests was expressly made subject to four conditions. See Texas Eastern Transmission Corp. (Opinion No. 322), 21 F.P.C. 860, 864 & n. 5, 865 & n. 6 (1959). For a succinct summary of other salient features of the lease-sale arrangement, see Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 396-397 & n. 5, 79 S.Ct. 1246
 The lease-sale agreement was made between the producers and Louisiana Gas Corporation, a subsidiary of Texas Eastern incorporated for the purpose of transacting the sale. See Texas Eastern Transmission Corp. (Opinion No. 322), supra, 21 F.P.C. at 864, 865. The Commission has consistently recognized Texas Eastern as the real party in interest, and has treated the agreement as though Texas Eastern was the direct purchaser thereunder. We do the same.
 
 
 [14]
 The exact price was $134,395,700. Of that sum, $12,420,500 was to be paid in cash and the balance in installments spread over a 16-year period ending in 1975, notwithstanding an anticipated lifetime of the field to 1986. After 1975, Texas Eastern would obtain the gas by payment of royalties, severance taxes and operating expenses. Texas Eastern was also required to remit to the producers, until production of some 600 million Mcf of gas, the proceeds of condensate liquids less costs for operating the field
 
 
 [15]
 The years 1959-67. The equated per-Mcf cost stated in text includes only the $134 million purchase price, and not other costs falling upon Texas Eastern
 
 
 [16]
 The in-line price, see note 44, infra, for gas sold under 1958 contracts was 20 cents per Mcf, as the Commission was later to determine. Texas Eastern Transmission Corp. (Opinion No. 565), 42 F.P.C. 376, 384 (1968). See also Texas Eastern Transmission Corp., 42 F.P.C. 446,-49 (1968) (examiner's initial decision)
 
 
 [17]
 Three of the producers did so promptly, and the fourth somewhat later. The producers' theory was that, with a sale of the gas leases rather than the gas itself, Commission approval of the sale, as distinguished from Texas Eastern's proposed construction, was unnecessary. But see text infra at notes 22-29
 
 
 [18]
 Texas Eastern Transmission Corp. (Opinion No. 322), supra note 13. An application by PSC for rehearing was subsequently denied. Texas Eastern Transmission Corp., 22 F.P.C. 451 (1959) (order denying rehearing)
 
 
 [19]
 Natural Gas Act Secs. 4, 5, 15 U.S.C. Secs. 717c, 717d (1970). In Phillips Petroleum Co. v. Wisconsin, supra note 6, 347 U.S. at 676-685, 74 S.Ct. 794, the Court held that the Commission had jurisdiction over well-head sales of natural gas to interstate pipelines for resale in interstate commerce
 
 
 [20]
 Texas Eastern Transmission Corp. (Opinion No. 322), supra note 13, 21 F.P.C. at 864. The Commission relied on FPC v. Panhandle Eastern Pipe Line co., 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499 (1949), wherein it was held that a transfer of undeveloped leases of gas reserves by an interstate pipeline to a production company fell within the provision of Sec. 1(b) of the Act, 15 U.S.C. Sec. 717(b) (1970), excluding "[the] production or gathering of natural gas" from the jurisdiction of the Commission."
 
 
 [21]
 Texas Eastern Transmission Corp. (Opinion No. 322), supra note 13, 21 F.P.C. at 864
 
 
 [22]
 Public Serv. Comm'n v. FPC, 109 U.S.App.D.C. 289, 287 F.2d 143 (1960)
 
 
 [23]
 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965)
 
 
 [24]
 See text infra at note 37
 
 
 [25]
 Public Serv. Comm'n v. FPC, supra note 22, 109 U.S.App.D.C. at 291, 287 F.2d at 145
 
 
 [26]
 Id. See Natural Gas Act Sec. 7, 15 U.S.C. Sec. 717f (1970)
 
 
 [27]
 Public Serv. Comm'n v. FPC, supra note 22, 109 U.S.App.D.C. at 291, 287 F.2d at 145
 
 
 [28]
 Id
 
 
 [29]
 Id. at 292, 287 F.2d at 146. The producers had "insist[ed] that their gas ha[d] only been committed to Texas Eastern on the basis of the proposed rates and state[d] that, if conditions are attached, consideration will be given to the disposition of he Rayne Field gas in markets not subject to th[e] Commission's jurisdiction." Texas Eastern Transmission Corp. (Opinion No. 322), supra note 13, 21 F.P.C. at 874. We held that the Commission could not "abdicate its responsibilities simply because the parties tell it that the whole transaction will collapse unless the full price asked is approved." Public Serv. Comm'n v. FPC, supra note 22, 109 U.S.App.D.C. at 291, 287 F.2d at 145. Accord, Public Serv. Comm'n v. FPC, supra note 10, 257 F.2d at 722-723
 
 
 [30]
 Public Serv. Comm'n v. FPC, supra note 22, 109 U.S.App.D.C. at 292, 287 F.2d at 146
 
 
 [31]
 Texas Eastern Transmission Corp. (Opinion Nov. 378), 29 F.P.C. 249 (1963)
 
 
 [32]
 Id. at 252-56
 
 
 [33]
 Id. at 256
 
 
 [34]
 Id. at 256-57
 
 
 [35]
 Id. at 257, 258. By Opinion No. 378-A, the Commission denied rehearing of Opinion No. 378, Texas Eastern Transmission Corp. (Opinion No. 378-A), 30 F.P.C. 153 (1963), with a modification extending the filing period for producers to six months after completion of any judicial review, id. at 157
 
 
 [36]
 Marr v. FPC, 336 F.2d 320 (5th Cir.1964), rev'd sub nom., United Gas Improvement Co. v. Continental Oil Co., supra note 23, 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965)
 
 
 [37]
 United Gas Improvement Co. v. Continental Oil Co., supra note 23. The Court distinguished FPC v. Panhandle Eastern Pipe Line Co., supra note 20, on the grounds that in the latter the transferred leases were undeveloped, and he transfer was to a production company in contemplation of sales of gas in intrastate commerce. Id. at 403-404, 85 S.Ct. 1517
 
 
 [38]
 Id. at 399, 85 S.Ct. 1517
 
 
 [39]
 Reported at 42 F.P.C. 446
 
 
 [40]
 Id. at 451
 In March, 1967, while the applications were pending, Texas Eastern and the producers formalized an agreement obligating the latter to reimburse Texas Eastern at the rate of 20.625 cents per Mcf for any amount beneath 814,339,00 Mcf that their holdings in Rayne Field might fail to produce. This guaranty was deemed insufficient to dispel the uncertainty because reliance on it depended on other assumptions which were equally risky: the ability of producers individually to meet the financial demands in the future; the cost to Texas Eastern of realizing upon it; and the estimates as to production of liquids, the revenues from which would accrue to Texas Eastern and would be unaffected by any deficiency in gas output. Id.
 
 
 [41]
 Id. at 453
 
 
 [42]
 Id. at 448-52
 
 
 [43]
 Reported at 42 F.P.C. 455 (examiner's Phase II decision)
 
 
 [44]
 The in-line price is the field price in a given time period at which the bulk of proper sales of gas have been made. We have already noted that the in-line price was 20 cents per Mcf when the lease-sale agreement was made. See note 16, supra. The examiner recommended that the in-line price be supplanted by just and reasonable prices as they become available Id. at 458, 461, 467. See note 53, infra, and accompanying text
 
 
 [45]
 Id. at 461, 463, 464
 
 
 [46]
 Id. at 466
 
 
 [47]
 Texas Eastern Transmission Corp. (Opinion Nov. 565), supra note 16. The principal difference between the Commission and the examiner related to the amount of producer refunds which Texas Eastern should immediately flow through to its customers. Compare text supra at note 45 and infra at note 58. See also Part VI, infra
 
 
 [48]
 Id. at 382-90
 
 
 [49]
 See note 40, supra
 
 
 [50]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 382-83. See note 40, supra
 
 
 [51]
 Id. at 383
 
 
 [52]
 Id
 
 
 [53]
 After issuance of the examiner's Phase II decision but before rendition of Opinion No. 565, the Commission had set a just and reasonable rate of 18.5 cents per Mcf for Southern Louisiana gas of the Rayne Field vintage. Southern Louisiana Area Rate Proceeding (Opinion No. 546), 40 F.P.C. 530 1968), on rehearing, (Opinion No. 456-A), 41 F.P.C. 301 (1969), aff'd sub nom., Austral Oil Co. v. FPC, 428 F.2d 407 (5th Cir.), on rehearing, 444 F.2d 125, cert. denied, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970). See text infra at notes 69-75
 
 
 [54]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 390, 403. The figure derived by application of this formula would be increased by the addition of Texas Eastern's net receipts from sales of liquids after completion of the producer payments, and by the addition of salvage realized by Texas Eastern under certain conditions, and decreased by the amounts of royalties, state taxes and specified development and operating expenses. Id. at 403
 
 
 [55]
 Id. at 404. Producers would, however, receive additionally the amount of any salvage which Texas Eastern might realize from investments made before the final payment. Id
 
 
 [56]
 Id. at 404-05
 
 
 [57]
 Id
 
 
 [58]
 Id. at 398-99, 405. The Commission also required Texas Eastern to compute and escrow the amount of customer refunds, id. at 405-06, to shape its accounting practices to exclude the producer refunds from its rate base, id. at 406-07, and to amend its rates to reflect reductions in costs made possible by Opinion No. 565, id
 
 
 [59]
 Id. at 401, 407
 
 
 [60]
 Id. at 401
 
 
 [61]
 Id. at 354, 407
 
 
 [62]
 Id. at 417
 
 
 [63]
 Id. at 438
 
 
 [64]
 Id. at 422-23
 
 
 [65]
 Texas Eastern Transmission Corp. (F.P.C. Sept. 2, 1969) (unreported)
 
 
 [66]
 Texas Eastern Transmission Corp. (F.P.C. Sept. 18, 1969) (unreported)
 
 
 [67]
 Texas Eastern Transmission Corp., 42 F.P.C. 684 (1969) (order granting stay)
 
 
 [68]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), 44 F.P.C 1079 (1970)
 
 
 [69]
 Phillips Petroleum Co., 24 F.P.C. 537, 547 (1960); Statement of General Policy no. 61-1, 24 F.P.C. 818 (1960). See also Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968)
 
 
 [70]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53. Docket No. AR 61-2 awaited developments in Docket No. AR 61-1, related to the Permian Basin in Texas. See Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 758-760, 88 S.Ct. 1344
 
 
 [71]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53, 40 F.P.C. at 648. 72. Austral Oil Co. v. FPC supra note 53
 
 
 [72]
 Austral Oil Co. v. FPC supra note 53
 
 
 [73]
 The petitions were denied, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970), but more than two months after Opinion No. 565-A was issued
 
 
 [74]
 Austral Oil Co. v. FPC, supra note 53, 444 F.2d at 126-127
 
 
 [75]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53
 
 
 [76]
 Chairman Nassikas and Commissioner Bagge joined positions. Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1080-89. Commissioners Carver and Brooke joined in different positions, but voted with Chairman Nassikas and Commissioner Bagge to enable a disposition. Id. at 1098. Commissioner O'Connor stood on his position in Opinion No. 565. Id. at 1092. Chairman White had left the Commission
 
 
 [77]
 Chairman Nassikas and Commissioners O'Connor and Bagge
 
 
 [78]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-86, 1092)
 
 
 [79]
 See text and notes infra this part
 
 
 [80]
 See text supra at note 62
 
 
 [81]
 See text supra at noes 48-57
 
 
 [82]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1084, 1088
 
 
 [83]
 Id. at 1087-88
 
 
 [84]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1081
 
 
 [85]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1081
 
 
 [86]
 See text supra note 68, 44 F.P.C. at 1081
 
 
 [87]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1098-1107). 88. Id. at 1097
 
 
 [88]
 Id. at 1097
 
 
 [89]
 Id. at 1098
 
 
 [90]
 Id
 
 
 [91]
 Id. at 1081, 1087-88, 1089, 1097-98
 
 
 [92]
 See text supra at notes 53-55
 
 
 [93]
 See text supra at notes 56-57
 
 
 [94]
 See text supra at note 58
 
 
 [95]
 See text supra at notes 59-60
 
 
 [96]
 See note 58, supra
 
 
 [97]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1091
 
 
 [98]
 Id. at 1089-90
 
 
 [99]
 The applicants for a rehearing of Opinion No. 565-A were Texas Eastern and three of the four producers. PGW, the intervenor here, submitted an application for rehearing which the Commission rejected as untimely by one day, but accepted it as a motion for reconsideration. Texas Eastern Transmission Corp., 44 F.P.C. 1471 (1970) (order denying rehearing). PSC, a petitioner here, did not seek rehearing of Opinion No. 565-A. See note 116, infra
 
 
 [100]
 Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471 (order denying rehearing)
 
 
 [101]
 Id. at 1471
 
 
 [102]
 Id. at 1472
 
 
 [103]
 Id. at 1474
 
 
 [104]
 Id
 
 
 [105]
 See text supra at notes 61-62
 
 
 [106]
 See text supra at note 62
 
 
 [107]
 See text supra at note 62
 
 
 [108]
 See text supra at notes 56-57, 61
 
 
 [109]
 See text supra at note 63
 
 
 [110]
 See text supra at note 64
 
 
 [111]
 See text supra at notes 80-85
 
 
 [112]
 See text supra at notes 88-90
 
 
 [113]
 See text supra at notes 86-87
 
 
 [114]
 See text supra at notes 101-102
 
 
 [115]
 See text supra at notes 103-104
 
 
 [116]
 PSC sought rehearing of Opinion No. 565 but not Opinion No. 565-A, and on that account Texas Eastern and Continental have moved to dismiss PSC's petition for review to the extent that it complains of the order accompanying Opinion 565-A. Texas Eastern contends that Opinion No. 565 was so drastically altered by Opinion No. 565-A that an application for a rehearing of the latter opinion was prerequisite to judicial review. Continental argues additionally that in Opinion No. 565-A the commission met the objections PSC registered against Opinion No. 565, and that in consequence PSC is no longer aggrieved thereby. For reasons following, we deny the motions to dismiss
 Section 19(a) of the Natural Gas Act, 15 U.S.C. Sec. 717r(a) (1970), provides that "[n]o proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon." Thus an application for rehearing is a jurisdictional prerequisite to judicial review. Dayton Power & Light Co. v. FPC, 102 U.S.App.D.C. 164, 165, 251 F.2d 875, 876 (1958); Michigan Consolidated Gas Co. v. FPC, 83 U.S.App.D.C. 395, 167 F.2d 264 (1948); Pan American Petroleum Corp. v. FPC, 268 F.2d 827 (10th Cir.1959). Moreover, Sec. 19(b) of the Act provides that "[n]o objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." See also, e. g., FPC v. Colorado Interstate Gas Co., 348 U.S. 492, 497-501, 75 S.Ct. 467, 99 L.Ed. 583 (1955); Panhandle Eastern Pipe Line Co. v. FPC, 324 U.S. 635, 649, 65 S.Ct. 821, 89 L.Ed. 1241 (1945). We find, however, that PSC satisfied these demands.
 The obvious purpose of the statutory requirements is to afford the Commission the first opportunity to consider, and perhaps dissipate, issues which are headed for the courts. See Dayton Power & Light Co. v. FPC, supra, 102 U.S.App.D.C. at 165, 251 F.2d at 876; City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 121, 237 F.2d 741, 749 (1956). We have consistently held that our authority to review actions of the Commission is unaffected by events--even irregularities--which do not hamper attainment of that objective. See Michigan Consolidated Gas Co. v. FPC, 108 U.S.App.D.C. 409, 430-431, 283 F.2d 204, 225-226 (1960); Dayton Power & Light Co. v. FPC, supra, 102 U.S.App.D.C. at 165-166, 251 F.2d at 876-877; City of Pittsburgh v. FPC, supra, 99 U.S.App.D.C. at 121, 237 F.2d at 749. Surely a modification of a prior administrative decision or rehearing does not generate a need to request another rehearing where the litigant has already presented his point to the Commission for decision. Here PSC submitted an application for rehearing of Opinion No. 565 on specified grounds, and in Opinion No. 565-A the Commission disdained PSC's positions and denied the application. The grounds which PSC advanced to the Commission match or subsume the contentions PSC now wishes to litigate in this court with respect to both opinions. We cannot say that PSC was obliged to do more before the Commission than it did.
 As Continental says, judicial review is reserved by Sec. 19(b), 15 U.S.C. Sec. 717r(b) (1970), to a "party to a proceeding under [the Act] aggrieved by an order issued by the Commission in such proceeding...." But contrary to Continental's assessment, we are satisfied that the effect of Opinion No. 565-A was to intensify rather than ameliorate PSC's complaints as to Opinion No. 565. Put another way, PSC remains "aggrieved"--as much by the one decision as by the other.
 
 
 [117]
 Natural Gas Act Sec. 19, 15 U.S.C. Sec. 717r (1970)
 
 
 [118]
 See Braniff Airways v. CAB, 126 U.S.App.D.C. 399, 405-406, 410-411, 379 F.2d 453, 459-460, 464-465 (1967). See also WIBC v. FCC, 104 U.S. App.D.C. 126, 127-128, 259 F.2d 941, 942-943 (en banc), cert. denied, 358 U.S. 920, 79 S.Ct. 290, 3 L.Ed.2d 239 (1958); Olsen Co. v. State Tax Comm'n, 109 Utah 563, 168 P.2d 324, 328 (1946); Dkins v. Citizens' Bd., 112 W.Va. 171, 163 S.E. 853, 854 (1932)
 
 
 [119]
 In Braniff Airways v. CBA, supra note 188, three members of the five-member Civil Aeronautics Board participated in and agreed unanimously upon a decision, but on a motion for reconsideration two of four participating members voted to deny and the remaining two to grant. The two members voting to grant filed a statement which contained findings additional to the earlier findings of the board. We held that the additional findings could not validly supplement or buttress the original findings because
 ... they were the findings of only two out of four members. Even though these two members were among the three who concurred in the [earlier] decision, we are concerned with reviewing institutional decisions. Despite their personal connection with that opinion the statement of two members of an equally divided regulatory agency possessed not authoritative significance.
 126 U.S.App.D.C. at 411, 379 F.2d at 465. See also Sperry Gyroscope Co. v. NLRB, 129 F.2d 922, 924 (2d Cir.1942).
 
 
 [120]
 See test supra at note 117
 
 
 [121]
 See text supra at note 117
 
 
 [122]
 Baltimore & O. R.R. v. United States, 298 U.S. 349, 362, 56 S.Ct. 797, 80 L.Ed. 1209 (1936); Plymouth Coal Co. v. Pennsylvania, 232 U.S. 531, 547, 34 S.Ct. 359, 58 L.Ed. 713 (1914); ICC v. Delaware, L. & W. R.R., 220 U.S. 235, 248-251, 31 S.Ct. 392, 55 L.Ed. 448 (1911); Brown v. District of Columbia, 127 U.S. 579, 586, 8 S.Ct. 1314, 32 L.Ed. 262 (1888); Cooley v. O'Connor, 79 U.S. (12 Wall.) 391, 398, 20 L.Ed. 446 (1871) Railroad Comm'n v. Louisville & N.R.R., 140 Ga. 817, 80 S.E. 327, 335-336 (1913); Codman v. Crocker, 203 Mass. 146, 89 N.E. 177, 180 (1909); Re State Treasurer's Settlement (Bartley v. Meserve), 51 Neb. 116, 70 N.W. 532, 534-536 (1897); State ex rel. Clausen v. Hartley, 144 Wash. 135, 257 P. 396, 400 (1927)
 
 
 [123]
 In WIBC v. FCC, supra note 188, where the votes of six of seven members of the Federal Communications Commission present were equally divided, we rejected the contention that the vote of the seventh commissioner, which broke the tie, was not decisive. 104 U.S.App.D.C. at 128, 259 F.2d at 943. It was argued that since by statute four members of the Commission constituted a quorum, 47 U.S.C. Sec. 154(h) (1970), three votes would control irrespective of the number present and voting. Id. at 127-128, 259 F.2d at 942-943. We said that "[w]hen a quorum is present, the ... Commission may act, but only on the vote of a majority of those present," id. at 128, 259 F.2d at 943, and, quoting Adkins v. Citizens Bd. supra note 188, 163 S.E. at 854, that "[i]t is the common law that where joint authority is involved, a quorum being present, legal action can be taken by a majority and by none less," id. We concluded that "when six voted, it took four to control, id., and that when the seventh commissioner voted, "there were seven participants and it still took four to control; hence his vote was decisive." id. Se also Greater Boston Television Corp. v. FCC , 143 U.S.App.D.C. 383, 403, 444 F.2d 841, 861 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971)
 
 
 [124]
 FTC v. Flotill Prods., Inc., 389 U.S. 179, 183-185, 88 S.Ct. 401, 19 L.Ed.2d 398 (1967)
 
 
 [125]
 See 16 U.S.C. Sec. 792 (1970)
 
 
 [126]
 In this view, we have no occasion to consider whether action of a majority of a quorum of three commissioners, see 16 U.S.C. Sec. 792 (1970), as distinguished from a majority of the full Commission, is prerequisite to the promulgation or modification of an opinion or order. See FTC v. Flotill Prods., Inc., supra note 124, 389 U.S. at 181-186 & nn. 4, 9, 88 S.Ct. 401, and cases there cited
 
 
 [127]
 Sperry Gyrospcope Co. v. NLRB, supra note 119, 129 F.2d at 924
 
 
 [128]
 Id
 
 
 [129]
 Compare Screws v. United States, 325 U.S. 91, 113, 134, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (concurring opinion of Justice Rutledge)
 
 
 [130]
 Compare Greater Boston Television Corp. v. FCC, supra note 123, 143 U.S.App.D.C. at 403, 444 F.2d at 861
 
 
 [131]
 See text supra at notes 88-90
 
 
 [132]
 Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471-73 (order denying rehearing)
 
 
 [133]
 These included applications for rehearing by Texas Eastern and the producers and a motion for reconsideration by PGW. PSC did not seek rehearing or reconsideration of Opinion No. 565-A. See notes 99, 116, supra
 
 
 [134]
 See text supra at note 117
 
 
 [135]
 Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471 (order denying rehearing)
 
 
 [136]
 Id
 
 
 [137]
 Id
 
 
 [138]
 Id
 
 
 [139]
 Id. at 1471-73
 
 
 [140]
 Id. at 1471
 
 
 [141]
 Id. at 1471
 
 
 [142]
 Id. at 1472
 
 
 [143]
 Id. at 1473-74
 
 
 [144]
 So concluding, we do not reach the question whether an agency opinion or order can be rescinded or amended without a prior vote to reconsider it
 
 
 [145]
 Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471 (order denying rehearing)
 
 
 [146]
 As to Opinion No. 565, Chairman White and Commissioners O'Connor and Bagge; as to Opinion No. 565-A, Chairman Nassikas and Commissioners O'Connor and Bagge. See text supra at notes 61-62, 78-79, 86-87
 
 
 [147]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 382-90; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-85
 
 
 [148]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 390-93; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085-87
 
 
 [149]
 See Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 380; Texas Eastern Transmission Corp. (Opinion No. 378-A), supra note 35, 30 F.P.C. at 256; Texas Eastern Transmission Corp. (Opinion No. 378), supra note 31, 29 F.P.C. at 156
 
 
 [150]
 15 U.S.C. Sec. 717f (1970)
 
 
 [151]
 Natural gas companies must obtain certificates of public convenience and necessity prior to engaging in sales of natural gas subject to the Commission's jurisdiction. Natural Gas Act Sec. 7(c), 15 U.S.C. Sec. 717f(c) (1970). Notice to interested parties and hearing are prerequisite to the issuance of a permanent certificate, but not to the issuance in a case of emergency of a temporary certificate pending application for a permanent certificate. Id. Another prerequisite to issuance of a permanent certificate is a finding by the Commission that the sale "is or will be required by the present or future public convenience or necessity," id. Sec. 7(e), 15 U.S.C. Sec. 717f(e) (1970), and the Commission may qualify the certificate by "such reasonable terms and conditions as the pubic convenience and necessity may require." Id. See FPC v. Sunray DX Oil Co., 391 U.S. 9, 16-19, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968); United Gas Improvement Co. v. Callery Properties, 382 U.S. 223, 227-229, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965); Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391-392, 79 S.Ct. 1246
 
 
 [152]
 Supra note 6
 
 
 [153]
 15 U.S.C. Sec. 717c (1970)
 
 
 [154]
 15 U.S.C. Sec. 717d (1970)
 
 
 [155]
 See the discussion in FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 16-20, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 277-228, 86 S.Ct. 360; Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388-391, 79 S.Ct. 1246
 
 
 [156]
 See Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 389-391, 79 S.Ct. 1246. See also FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 17-18, 88 S.Ct. 1526
 
 
 [157]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 389, 79 S.Ct. 1246. See also FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 17, 88 S.Ct. 1526
 
 
 [158]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 389, 79 S.Ct. 1246. See also FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 17, 88 S.Ct. 1526
 
 
 [159]
 See text supra at notes 69-75
 
 
 [160]
 FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 16-19, 88 S.Ct. 1526
 
 
 [161]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10
 
 
 [162]
 "Favored nation" clauses assure producers that they will receive the highest price currently being paid in the same area by their own purchasers or, as it may be provided, by any purchaser. See FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 18 n. 2, 88 S.Ct. 1526
 
 
 [163]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391, 79 S.Ct. at 1255. See also FPC v. Hunt, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964)
 
 
 [164]
 In ascertaining the in-line price, the Commission and the courts have usually excluded or discounted certain prices which for one reason or another might reflect impermissible price jumps. See FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 19, 88 S.Ct. 1526
 
 
 [165]
 Id. at 21-36, 88 S.Ct. 1526. See also United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 226-229, 86 S.Ct. 360
 
 
 [166]
 United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 327-328, 86 S.Ct. 360
 
 
 [167]
 Natural Gas Act Sec. 4(d), 15 U.S.C. Sec. 717c(d) (1970). The notice is given by filing with the Commission and keeping open for public inspection new schedules specifying the rate changes and the time they are to go into the effect. Id
 
 
 [168]
 Natural Gas Act Sec. 4(e), 15 U.S.C. Sec. 717c(e) (1970)
 
 
 [169]
 Id
 
 
 [170]
 Id
 
 
 [171]
 Id. But the initial rate established by an unconditional permanent certificate issued under Sec. 7 represents a firm floor below which refunds cannot subsequently be required. FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 23-24, 88 S.Ct. 1526
 See also United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 227, 86 S.Ct. 360. The Court has indicated, however, that the Commission might, as a condition to certification, require the producers to assume liability for refunds measured by the difference between the inline price and the just and reasonable rate subsequently established should the latter subsequently established should the latter prove to be lower. FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 36-37, 88 S.Ct. 1526.
 
 
 [172]
 15 U.S.C. Sec. 717d (1970)
 
 
 [173]
 See Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 755-758, 88 S.Ct. 1344
 
 
 [174]
 See text supra at notes 69-75
 
 
 [175]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69
 
 
 [176]
 Id. at 755, 88 S.Ct. at 1353
 
 
 [177]
 See text supra at notes 69-75
 
 
 [178]
 See Sunray DX Oil Co. v. FPC, supra note 151, 391 U.S. at 25-26, 88 S.Ct. 1526
 
 
 [179]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 380
 
 
 [180]
 Id. at 379
 
 
 [181]
 Id. at 380
 
 
 [182]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10
 
 
 [183]
 360 U.S. at 389-391, 79 S.Ct. 1246. Accord, FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 17-18, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 227-228, 86 S.Ct. 360
 
 
 [184]
 FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 25-26, 88 S.Ct. 1526
 
 
 [185]
 See text supra at notes 167-172
 
 
 [186]
 See note 171, supra, and accompanying text
 
 
 [187]
 Permian Basin Area Rate Cases (Continental oil Co. v. FPC), supra note 69, 390 U.S. at 766, 88 S.Ct. 1344
 
 
 [188]
 Natural Gas Act Sec. 19(b), as amended, 15 U.S.C. Sec. 717r(b)(1970)
 
 
 [189]
 Atlantic Ref. Co. v. FTC, 381 U.S. 357, 367, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965); Gilbertville Trucking Co. v. United States, 371 U.S. 115, 126, 83 S.Ct. 217, 9 L.Ed.2d 177 (1962); Rochester Tel. Corp. v. United States, 307 U.S. 125, 146, 59 S.Ct. 754, 83 L.Ed. 1147 (1939); Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286-287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); Brotherhood of Ry. Clerks, Freight Handlers, Express & Station Employees v. Railroad Retirement Bd., 99 U.S.App.D.C. 217, 224, 239 F.2d 37, 44 (1966); American Airlines v. CAB, 97 U.S.App.D.C. 324, 327, 231 F.2d 483, 486 (1956); Namekagon Hydro Co. v. FPC, 216 F.2d 509, 512 (7th Cir.1954)
 
 
 [190]
 Texas Eastern Transmission Corp. (Opinion No. 378), supra note 31
 
 
 [191]
 29 F.P.C. at 256
 
 
 [192]
 Texas Eastern Transmission Corp., supra note 16, 42 F.P.C. at 447 (examiner's decision)
 
 
 [193]
 Texas Eastern Transmission Corp. (Opinion No. 378), supra note 31, 29 F.P.C. at 256-57
 
 
 [194]
 See note 40, supra
 
 
 [195]
 Texas Eastern Transmission Corp., supra note 16, 42 F.P.C. at 447 (examiner's decision)
 
 
 [196]
 Id. at 447-53
 
 
 [197]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 382-90; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-85; Texas Eastern Transmission Corp., supra note 99 (order denying rehearing)
 
 
 [198]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 383
 
 
 [199]
 Id
 
 
 [200]
 Id
 
 
 [201]
 Id
 
 
 [202]
 Id
 
 
 [203]
 Id
 
 
 [204]
 Id
 
 
 [205]
 Id. at 387
 
 
 [206]
 Id
 
 
 [207]
 This was the effective date of the Commission's decision in the Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53
 
 
 [208]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 387
 
 
 [209]
 Id
 
 
 [210]
 Id
 
 
 [211]
 See text supra at notes 190-200
 
 
 [212]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 389
 
 
 [213]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083
 
 
 [214]
 The producers also contend that one of the modifications effected by Opinion No. 565-A so undermined one of the assumptions underlying the decision in Opinion No. 565 to conventionalize as to leave it without sufficient evidentiary support. As we have seen, one of the factors contributing to that conclusion in Opinion No. 565 was the Commission's finding that the lease-sale would ultimately involve a cost of some $6 million more than a conventional sale of the Rayne Field gas. See text supra at notes 205-210. In so finding, the Commission calculated gas costs at the in-line price of 20 cents per Mcf to October 1, 1968, and at the just and reasonable rate of 18.5 cents thereafter. See text supra at notes 207-208. In Opinion No. 565-A, however, the Commission held that producer refunds should be computed from the beginning on the basis of the just and reasonable rate to be established in the ongoing investigation in the Southern Louisiana area. See text supra at notes 80-83. The producers argue that this change of position upset the earlier position on conventionalization. We think it does not
 The higher cost of lease-sale gas which the Commission found in Opinion No. 565 was not the only reason for the Commission's refusal to unconditionally certificate the arrangement; another was the grave uncertainty as to just what the gas would eventually cost under that arrangement. See text supra at notes 211-213. Whatever may be said as to the effect on Opinion No. 565 of the refund-base change made in Opinion No. 565-A, it is clear that the Commission had no intention of altering its decision on conventionalization. Opinion No. 565-A not only confirms the Commission's resolve in Opinion No. 565 to conventionalize, but also modified Opinion No. 565 in several particulars "so as to bring it closer to a conventional sale." Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1081. We have no warrant to set aside a Commission determination simply on the thesis that it rests on one valid ground instead of two.
 
 
 [215]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391, 79 S.Ct. at 1255
 
 
 [216]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 382-90; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-85
 
 
 [217]
 In so concluding, the Commission discounted testimony by three witnesses offered by the producers in an attempt to demonstrate financial advantages for the lease-sale. Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 388; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1084-85. The Commission pointed out that one of the witnesses failed to take into account about $18 million in severance taxes which Texas Eastern would pay over the life of the field, Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 388; that another failed to take into account the time value of Texas Eastern's advance payments to producers, id.; and that the third omitted that factor and other costs to Texas Eastern as well, id.; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085. In these circumstances, we have no occasion to disturb the Commission's action in that respect
 
 
 [218]
 As we have stated, the Commission in Opinion No. 565 concluded that the reserve guaranty, standing alone, did not eliminate the objectionable uncertainty in the lease-sale arrangement. See text supra at notes 194-200. And in Opinion No. 565-A, the Commission expressed the view that the guaranty "should not be considered of much weight for it guarantees the amount of the reserves, but not the rate at which the gas may be taken and therefore takes no account of the time value of money." Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1084
 
 
 [219]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 389
 
 
 [220]
 Id.; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1084
 
 
 [221]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 389. See note 241, infra. And in Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-84, the Commission stated that "[i]t is impossible on this record, and it would be extremely difficult on any record, to appraise the advantage to Texas Eastern of large daily swings," and that in any event that opinion would require a take at a lower level and limits on downward swings. Compare Phillips Petroleum Co. v. FPC, 405 F.2d 6, 9-10 (10th Cir.1969)
 
 
 [222]
 See Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 389-90 (footnote omitted)
 
 
 [223]
 See text supra at note 30
 
 
 [224]
 See text supra at notes 31-35
 
 
 [225]
 See text supra at notes 194-200
 
 
 [226]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 435-38, 439-40; Texas Eastern Transmission corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1097-99, 1102-09; Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1473-74 (order denying rehearing)
 
 
 [227]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 382-90; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-84; Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471 (order denying rehearing)
 
 
 [228]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 767, 88 S.Ct. at 1360. For the same reason, we put aside the suggestion of Commissioners Carver and Brooke that "[i]f the Court of Appeals decided [that the lease-sale] must be rewritten in some fashion, it may tell us how it believes it should be done." Texas Eastern Transmission Corp., supra note 99, 44 F.P.C at 1474 (order denying rehearing)
 
 
 [229]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 767, 88 S.Ct. at 1360, quoting FPC v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944)
 
 
 [230]
 See text supra at notes 198-225
 
 
 [231]
 See text supra at notes 198-225
 
 
 [232]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 390-407
 
 
 [233]
 Id. at 390-93
 
 
 [234]
 See text supra at notes 69-75
 
 
 [235]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 390
 
 
 [236]
 Id. at 390-93
 
 
 [237]
 Id. at 390. The lease-sale contract provided that until 613,406,700 Mcfs of gas were produced, revenues from liquids would be used to reimburse Texas Eastern for part of the production investments and expenses. The reduction of the 18.5 cent price on account of these items was accordingly limited to the amount of unreimbursed investments and expenses. Id
 
 
 [238]
 Id
 
 
 [239]
 This aspect of the matter will shortly be addressed extensively
 
 
 [240]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 390-91
 
 
 [241]
 These included a requirement that Texas Eastern remove the gas at a specified minimum pace over a 20-year maximum period, id. at 391; and a provision giving the producers the right of prior approval of Texas Eastern's expenditures for royalties and developmental expenses, id. at 392
 
 
 [242]
 Id. at 389. So, in addition to the total price ceiling soon to be discussed, the Commission decided not to amend the notes evidencing the unpaid installments of purchase price, and observed that any change as to them should be made by the parties or other holders. Id. at 391. The Commission also declined to make provision for periodic price increases, reimbursement for new taxes, take-or-pay or the buyer's bearing cost of compression, stating "that if the Producers for their own purposes including possible tax advantages, entered into a lease-sale arrangement, they are not entitled to claim the benefit of provisions found in a conventional sale." Id. at 393
 
 
 [243]
 Id. at 390
 
 
 [244]
 Id. at 389
 
 
 [245]
 Id. at 390-91 (footnote omitted)
 
 
 [246]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085
 
 
 [247]
 Id
 
 
 [248]
 Id
 
 
 [249]
 Id
 
 
 [250]
 Id
 
 
 [251]
 Id. at 1085-86
 
 
 [252]
 Chairman Nassikas and Commissioners Bagge, Carver and Brooke. Id. at 1081, 1098
 
 
 [253]
 Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471 (order denying rehearing)
 
 
 [254]
 Part IV(B), infra
 
 
 [255]
 Part IV(C), infra
 
 
 [256]
 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956)
 
 
 [257]
 Id. at 344, 76 S.Ct. 373
 
 
 [258]
 See Natural Gas Act Sec. 4(d), 15 U.S.C. Sec. 717c(d) (1970)
 
 
 [259]
 United Gas Pipe Line Co. v. Mobile Gas Serv. corp., supra note 256, 350 U.S. at 338, 76 S.Ct. at 378
 
 
 [260]
 15 U.S.C. Sec. 717c(d) and (e) (1970)
 
 
 [261]
 15 U.S.C. Sec. 717(a) (1970)
 
 
 [262]
 United Gas Pipe LIne Co. v. Mobile gas Serv. Corp., supra note 256, 350 U.S. at 341, 76 S.Ct. at 379
 
 
 [263]
 Id
 
 
 [264]
 Id. at 343, 76 S.Ct. 373
 
 
 [265]
 Id. (emphasis in original)
 
 
 [266]
 Id. at 343-344, 76 S.Ct. at 380
 
 
 [267]
 Id. at 344, 76 S.Ct. at 381
 
 
 [268]
 Id. at 344-345, 76 S.Ct. at 381 (footnote omitted). Compare, however, United Gas Pipe Line Co. v. Memphis Light, Gas & Water Div., 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958), where a pipeline's service agreements with distributors were construed as fixing, not a single specified rate, but rather the going rate as periodically established through proceedings under the Act, with the result that Mobile was inapplicable to an increase effected unilaterally by the pipeline's filing of new rate schedules under Sec. 4(d), subject to commission review under Sec. 4(e). There the pipeline sought "simply to assert, in accordance with the procedures specified by the Act, rights expressly reserved to it by contract." Id. at 112, 79 S.Ct. at 199
 
 
 [269]
 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956)
 
 
 [270]
 Id. at 354-355, 76 S.Ct. 368
 
 
 [271]
 16 U.S.C. Sec. 824e (1970)
 
 
 [272]
 FPC v. Sierra Pac. Power Co., supra note 269, 350 U.S. at 353, 76 S.Ct. at 372
 
 
 [273]
 Id. at 355, 76 S.Ct. at 372 (emphasis in original)
 
 
 [274]
 Id
 
 
 [275]
 Id
 
 
 [276]
 Id
 
 
 [277]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 820-822, 88 S.Ct. 1344
 
 
 [278]
 "The regulatory system created by the Act is premised on contractual agreements voluntarily devised by the regulated companies; it contemplates abrogation of these agreements only in circumstances of unequivocal public necessity." Id. at 822, 88 S.Ct. at 1388 (citation omitted)
 
 
 [279]
 See Portsmouth Gas Co. v. FPC, 101 U.S.App.D.C. 99, 102-103, 247 F.2d 90, 93-94 (1957); Cincinnati Gas and Elec. Co. v. FPC, 101 U.S. App.D.C. 1, 6, 246 F.2d 688, 693 (1957). See also Richmond Power & Light v. FPC, 156 U.S.App.D.C. 315, 481 F.2d 490, cert. denied, sub nom., Indiana & Michigan Elec. Co. v. Anderson Power & Light Co., 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973)
 
 
 [280]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53, 40 F.P.C. at 624
 
 
 [281]
 See text supra at notes 53-55, 80-83, 232-241
 
 
 [282]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 398-400, 404-07
 
 
 [283]
 See text supra at notes 84-87, 242-253
 
 
 [284]
 See Part IV(B), supra
 
 
 [285]
 See text supra at note 263
 
 
 [286]
 See text supra at note 278
 
 
 [287]
 Citing FPC v. Hope Natural Gas Co., supra note 229
 
 
 [288]
 Citing 52 Stat. 725 (1938). In its footnote to text at this point, the Court observed:
 The 1942 amendments to Sec. 7, 56 Stat. 83, were not intended to change this declaration of purpose. See Hearings, House Interstate and Foreign Commerce Committee, on H.,R. 5249, 77th Cong., 1st Sess. 18-19; H.R.Rep. No. 1290, 77th Cong., 1st Sess.; S.Rep. No. 948, 77th Cong., 2d Sess.
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388 n. 7, 79 S.Ct. at 1253.
 
 
 [289]
 Citing Natural Gas Act Sec. 7(e), as amended, 15 U.S.C. Sec. 717f(e) (1970)
 
 
 [290]
 Citing Natural Gas Act Sec. 4, 15 U.S.C. Sec. 717c (1970)
 
 
 [291]
 Citing Natural Gas Act Sec. 7(c), 15 U.S.C. Sec. 717f(c) (1970)
 
 
 [292]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388-389, 79 S.Ct. at 1253
 
 
 [293]
 Id. at 389, 79 S.Ct. at 1254
 
 
 [294]
 Id. The Court pointed out that "long delay, without the protection of a refund, as is possible in a Sec. 4 proceeding, would provide a windfall for the natural gas company with a consequent squall for the consumers," id. at 390, 79 S.Ct. at 1254, and that "the fact that the Commission was not given the power to suspend initial rates under Sec. 7 makes it the more important, as the Commission itself says, that 'this crucial sale should not be permanently certificated unless the rate level has been shown to be in the public interest.' " Id., citing Continental Oil Co. v. FPC, 17 F.P.C. 563, 575 (1957)
 
 
 [295]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 390, 79 S.Ct. at 1254
 
 
 [296]
 Id. at 390-391, 79 S.Ct. at 1255
 
 
 [297]
 Id. at 391, 79 S.Ct. at 1255
 
 
 [298]
 Id. See also text supra at notes 162-163
 
 
 [299]
 Id
 
 
 [300]
 See text supra at notes 150-163
 
 
 [301]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391, 79 S.Ct. at 1255
 
 
 [302]
 Id
 
 
 [303]
 Id
 
 
 [304]
 Citing United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 256
 
 
 [305]
 Quoting Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n,, 332 U.S. 507, 520, 68 S.Ct. 190, 92 L.Ed. 128 (1947)
 
 
 [306]
 Quoting United Gas Pipe Line Co. v. Mobile Gas Serv. Corp., supra note 256, 350 U.S. at 341, 76 S.Ct. 373
 
 
 [307]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391-392, 79 S.Ct. at 1255
 
 
 [308]
 See note 40, supra
 
 
 [309]
 Texas Eastern Transmission Corp. (Opinion NO. 565), supra note 16, 42 F.P.C. at 382-90. See also Part III(C), supra
 
 
 [310]
 Id
 
 
 [311]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1081, 1083-85. See also text supra at note 213
 
 
 [312]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.c. at 383-87
 
 
 [313]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085-87
 
 
 [314]
 Texas Eastern Transmission Corp. (Opinion NO. 565), supra note 16, 42 F.P.C. at 390-400
 
 
 [315]
 Texas Eastern Transmission Corp. (Opinion NO. 565-A), supra note 68, 44 F.P.C. at 1085-89
 
 
 [316]
 See text supra at notes 285-307
 
 
 [317]
 Texas Eastern Transmission Corp. (Opinion NO. 565), supra note 16, 42 F.P.C.at 389; Texas Eastern Transmission Corp. (Opinion NO. 565-A), supra note 68, 44 F.P.C. at 1083
 
 
 [318]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1096
 
 
 [319]
 Id. at 1103
 
 
 [320]
 Id. at 1096, n. 11, 1103
 
 
 [321]
 See id. at 1085-1086
 
 
 [322]
 Compare United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 226-228, 86 S.Ct. 360. There the Court reversed a holding that the Commission could not utilize the in-line price as the initial price in a Section 7 certification proceeding without canvassing evidence as to what a just and reasonable price would be. "To consider in this Sec. 7 proceeding the mass of evidence relevant to the fixing of just and reasonable rates under Sec. 5 might in practical effect render nugatory any effort to fix initial prices." Id. at 227-228, 86 S.Ct. at 363. See also text supra at notes 155-163
 
 
 [323]
 See Part IV(B), supra
 
 
 [324]
 Natural Gas Pipeline Co. v. FPC, 253 F.2d 3, 7 (3d Cir.), cert. denied, 357 U.S. 927, 78 S.Ct. 1372, 2 L.Ed.2d 1370 (1958)
 
 
 [325]
 See Part IV(B), supra
 
 
 [326]
 See Part IV(B), supra
 
 
 [327]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10
 
 
 [328]
 See notes 161-163, 304-307, supra
 
 
 [329]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391-392, 79 S.Ct. 1246, quoted in text supra at notes 304-307
 
 
 [330]
 We remind that Opinion No. 565-A gained a majority only because Commissioners Carver and Brooke joined Chairman Nassikas and Commissioner Bagge to make possible a disposition more palatable to them than the disposition proposed in Opinion No. 565. See text supra at notes 76-90, 111-113
 
 
 [331]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 63, 44 F.P.C. at 1985
 
 
 [332]
 Id
 
 
 [333]
 See Part IV(B), supra
 
 
 [334]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 822, 88 S.Ct.at 1388
 
 
 [335]
 Id
 
 
 [336]
 See text supra at notes 285-317
 
 
 [337]
 FPC v. Sierra Pac. Power Co., supra note 269, 350 U.S. at 355, 76 S.Ct. at 372
 
 
 [338]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 822, 88 S.Ct. at 1389
 
 
 [339]
 Counsel for the Commission argue that the scrapping of the $134 million contract price was a necessary step in conventionalization of the lease-sale so as to make it regulable. The Commission, however, did not rely on that ground, see Part III(C) supra, and rationalizations by counsel which were not reasons for the agency decision are unacceptable on judicial review. Burlington Truck Lines v. Unites States, 371 U.S. 156, 168-169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); Texas Gas Transmission Corp. v. shell Oil Co., 363 U.S. 263, 270, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960); SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Furthermore, the transaction could readily have been conventionalized without elevation of the contract price. SEe text supra at notes 242-245, 246-249
 
 
 [340]
 Permian Basin Area Rate Cases (Continental Oil Co. v. FPC), supra note 69, 390 U.S. at 821, 88 S.Ct. at 1388, quoting FPC v. Sierra Pac. Power Co., supra note 269, 350 U.S. at 355, 76 S.Ct. 368
 
 
 [341]
 See, e.g., the discussion in Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471-73 (separate opinion of Commissioner O'Connor) (order denying rehearing)
 
 
 [342]
 See Part III(C), supra
 
 
 [343]
 See text supra at notes 308-317
 
 
 [344]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 436 (Commissioners Carver and Brooke; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085 (Chairman Nassikas and Commissioner Bagge); d., at 1098 (Commissioners Carver and Brooke); Texas EAstern Transmission Crop., supra note 99, 44 F.P.C. at 1472 (Commissioner O'Connor) (order denying rehearing); id. at 1473 (Commissioners Carver and Brooke)
 
 
 [345]
 Texas Eastern Transmission Corp. (Opinion NO. 378), supra note 31,20 F.P.C. at 256-57; Texas Eastern Transmission Corp. (Opinion No. 378-A), supra note 35, 30 F.P.C. at 156; Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16 42 F.P.C. at 382-83, 387-90; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-85; Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471 (order denying rehearing)
 
 
 [346]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 389-90; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1083-85
 
 
 [347]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 390-91; Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085-86
 
 
 [348]
 Texas Eastern seems also to recognize the need for this adjustment. In its reply brief (p. 11), it agreed that the elimination in Opinion No. 565-A of the $134 million price ceiling was unnecessary since, as an alternative its payments to producers could be adjusted upward to take account of the time value of the money paid on the plan of conventionalization set forth in Opinion NO. 565, and the producers would thereby realize the same consideration as they would have under the lease-sale contract
 
 
 [349]
 We disagree with the Commission's conclusion in Opinion No. 565-A that the $134 million price ceiling could be dissolved in order to require Texas Eastern to pay for all of the gas and liquids produced over the life of the field. See text supra at notes 250-251. By the parties' contract, payment of the $134 million purchase price entitled Texas Eastern to all of the gas in place in the producers' Rayne Field holdings and to all liquids extracted from the gas. In no way did Opinion No. 565 undertake to change this feature of the contract, see text supra at note 245, nor was the commission free to do so in Opinion No. 565-A. The Commission has pointed to no "circumstances of unequivocal public necessity," see text supra at note 335, which would warrant that treatment consistently with the Mobile-Sierra rule
 
 
 [350]
 See part III(C), supra
 
 
 [351]
 See Part IV(A), (C), (2), supra
 
 
 [352]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 383-93
 
 
 [353]
 Id. at 384. See also Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1086-87
 
 
 [354]
 (Opinion No. 546), supra note 53
 
 
 [355]
 See Southern Louisiana Area Rate Proceeding (Opinion No. 546-A), supra note 53, 41 F.P.C. at 309, 341
 
 
 [356]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 403-05
 
 
 [357]
 Id. at 417-22
 
 
 [358]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085-86
 
 
 [359]
 Id. at 1086
 
 
 [360]
 Id. at 1087
 
 
 [361]
 Id. at 1087-88
 
 
 [362]
 Texas Eastern Transmission Corp., supra note 99, 44 F.P.C. at 1471 (order denying rehearing)
 
 
 [363]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388, 79 S.Ct. at 1253
 
 
 [364]
 FPC v. Hope Natural Gas Co., supra note 229, 320 U.S. at 610, 64 S.Ct. at 291
 
 
 [365]
 The producers are "natural gas compan[ies]" within the meaning of the Act. Natural Gas Act Sec. 2(g), 15 U.S.C. Sec. 717a(6) (1970); Phillips Petroleum Co. v. Wisconsin, supra note 6, 347 U.S. at 676-677, 74 S.Ct. 794
 
 
 [366]
 "All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful." Natural Gas Act Sec. 4(a), 15 U.S.C. Sec. 717c(a) (1970)
 
 
 [367]
 See note 366, supra
 
 
 [368]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388, 79 S.Ct. at 1253
 
 
 [369]
 Natural Gas Act Sec. 7(e), 15 U.S.C. Sec. 717f(e) (1970). See also Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388, 79 S.Ct. 1246
 
 
 [370]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 389, 79 S.Ct. at 1254
 
 
 [371]
 See text supra at notes 263, 278, and Part IV(C)(1), supra
 
 
 [372]
 52 Stat. 825 (1938)
 
 
 [373]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388, 79 S.Ct. 1246
 
 
 [374]
 Id. at 390, 79 S.Ct. at 1254 (emphasis supplied). See Natural Gas Act Secs. 4, 5, 15 U.S.C. Secs. 717c, 717d (1970)
 
 
 [375]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 390-391, 79 S.Ct. at 1255
 
 
 [376]
 Se Part III(A) supra
 
 
 [377]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391, 79 S.Ct. at 1255. See also FPC v Sunray DX Oil Co., supra note 151, 391 U.S. at 17-18, 88 S.Ct. 1536
 
 
 [378]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 391, 79 S.Ct. at 1255
 
 
 [379]
 Id. at 392, 79 S.Ct. at 1255
 
 
 [380]
 (Opinion No. 546), supra note 53. See text supra at notes 69-75
 
 
 [381]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 383-93
 
 
 [382]
 15 U.S.C. Sec. 717f(c) (1970)
 
 
 [383]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 383-93
 
 
 [384]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1085-86
 
 
 [385]
 Id
 
 
 [386]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53. See text supra at notes 69-75
 
 
 [387]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1086 (Footnote omitted)
 
 
 [388]
 See Part III(A), supra
 
 
 [389]
 See FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 18-20, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 226-228, 86 S.Ct. 360
 
 
 [390]
 FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 18-20, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 226-228, 86 S.Ct. 360
 
 
 [391]
 F.P.C. v. Sunray DX Oil Co., supra not 151, 391 U.S. at 21-22, 25-26, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 226-228, 86 S.Ct. 360
 
 
 [392]
 See Part V(A), supra
 
 
 [393]
 FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 25, 88 S.Ct. at 1535. The Court added:
 Any such assurance would necessarily be based on a belief that the current contract prices in an area approximate closely the "true" market price--the just and reasonable rate. Although there is doubtless some relationship, and some economists have argued that it is intimate, such a belief would contradict the basic assumption that has caused natural gas production to be subjected to regulation and which must have underlain this Court's CATCO decision--namely, that the purchasing pipeline, whose cost of purchase is a current operating expense which the pipeline is entitled to pass on to its customers as part of its rates, lacks sufficient incentive to bargain prices down.
 
 
 [391]
 U.S. at 25-26, 88 S.Ct. at 1535 (footnotes omitted)
 
 
 [394]
 See text supra at notes 388-391
 
 
 [395]
 See Part V(A), supra
 
 
 [396]
 See text supra at note 372 (emphasis supplied)
 
 
 [397]
 See FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 25-26, 88 S.Ct. 1526
 
 
 [398]
 Hunt Oil Co. v. FPC, 424 F.2d 982, 986 (5th Cir.1970); Phillips Petroleum Co. v. FPC, supra note 221, 405 F.2d at 9. See also Part V(C), infra
 
 
 [399]
 See text supra at note 363
 
 
 [400]
 (Opinion No. 546), supra note 53. The proceeding had been instituted by an order issued May 10, 1961. Southern Louisiana Area Rate Proceeding, 25 F.P.C. 942 (1961) (order instituting proceeding)
 
 
 [401]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53, 40 F.P.C. at 544, 636, 648
 
 
 [402]
 Southern Louisiana Area Rat Cases, (Austral Oil Co. v. FPC), supra note 53
 
 
 [403]
 428 F.2d at 444
 
 
 [404]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546-A), supra note 53
 
 
 [405]
 Id. at 306-42
 
 
 [406]
 Id. at 306-07. The new investigation, Docket No. AR69-1, was launched immediately. Southern Louisiana Area Rate Proceeding, 41 F.P.C. 378 (969) (order instituting proceeding)
 
 
 [407]
 Id. at 307-08
 
 
 [408]
 Southern Louisiana Area Rate Proceeding, 42 F.P.C. 1110, 1111, 1113 (1969) (order enlarging proceeding)
 
 
 [409]
 Southern Louisiana Area Rate Cases (Austral Oil Co. v. FPC), supra note 53, 428 F.2d at 421
 
 
 [410]
 Id
 
 
 [411]
 Id. at 421 n. 27. In the Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 53, 40 F.P.C. at 644, the Commission had stated that area rates "will be modified if a showing is made that unit costs--reflecting amounts spent and reserves found--have increased to such an extent that an increase in area rates is required."
 
 
 [412]
 In a footnote at this point, the court noted that "Section 16 of the National Gas Act, 15 U.S.C. Sec. 717o (1963), gives the Commission power to 'perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders as it may find necessary or appropriate to carry out the provisions of this chapter'." Southern Louisiana Area Rate Cases (Austral Oil Co. v. FPC), supra note 53, 428 F.2d at 445 n. 445 n. 124 (emphasis added)
 
 
 [413]
 Id. at 444-445. Subsequently, on rehearing, the court further explained:
 At the same time, we emphasize that our judgment is an affirmance and not a remand. The appropriate place for originally considering what parts of the orders must be reopened in light of new evidence is before the Commission. It may be that the Commission will decide that the refunds it has ordered are just and reasonable or at least that their significance to the public interest is outweighed by the confusion and delay that would result from their reopening. In this event, the Commission, will allow its refund orders to stand as they are. Or it may be that the refunds are too burdensome in light of new evidence to be in the public interest. In that case, it is our judgment that the Commission shall have the power and the duty to remedy the situation by changing its orders.
 Southern Louisiana Area Rate Cases (Austral Oil Co. v. FPC), supra note 53, 444 F.2d at 127.
 
 
 [414]
 And the Supreme Court subsequently denied all applications for review of Opinion No. 546 on certiorari. See note 53, supra
 
 
 [415]
 See text supra at notes 409-415
 The act does not expressly confined judicial review in natural gas cases to final orders. Rather, it provides that "[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order. ..." Natural Gas Act Sec. 19(b), U.S.C. Sec. 717r(b) (1970). Construed in context, however, that provision requires a substantial degree of finality in an order of which review is sought. Its exact counterpart in the Federal Power Act "relates to orders of a definitive character dealing with the merits of a proceeding before the Commission and resulting from a hearing upon evidence and supported by findings appropriate to the case." FPC v. Metropolitan Edison Co., 304 U.S. 375, 384, 58 S.Ct. 963, 967, 82 L.Ed. 1408 (1938). We have given the review provision in the Natural Gas Act the very same constructions. Texas Gas Corp. v. FPC, 102 U.S.App.D.C. 59, 61-62, 250 F.2d 27, 29-30 (1957); United Gas Pipe Line Co. v. FPC, 86 U.S.App.D.C. 314, 316-317, 181 F.2d 796, 798-799, cert. denied, 340 U.S. 827, 71 S.Ct. 63, 95 L.Ed. 607 (1950); see also City of Chicago v. FPC, 147 U.S.App.D.C. 312, 321-333, 458 F.2d 731, 740-741 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808 (1972). Other courts have done so as well. Algonquin Gas Transmission Co. v. FPC, 201 F.2d 334, 337-338 (1st Cir.1953); United Gas Pipe Line Co. v. FPC, 206 F.2d 842, 844-845 (3d Cir.1953); Amerada Petroleum Corp. v. FPC, 285, F.2d 737, 739 (10th Cir.1960).
 In the Southern Louisiana Area Rate Cases, the Fifth Circuit, with the concurrence of all parties, concluded that the area rates fixed by Opinion No. 546 and its related orders were reviewable notwithstanding that the rate investigation in Docket No. AR69-1 "will probably result in substantial modifications on the rates set in this case," 428 F.2d at 421, that it "may affect rates for all vintages," id., and that "the data the Commission has called for reflects the possibility of a radical change in approach," id. We accept that conclusion as a holding that, despite the susceptibility of the area rates to change, they retained a good deal of finality, for such an "order to be reviewable must be administrative action of a substantial character approaching some degree of finality." Algonquin Gas Transmission Co. v. FPC, supra, 201 F.2d at 337.
 
 
 [416]
 Natural Gas Act Sec. 16, 15 U.S.C. Sec. 717o (1970)
 
 
 [417]
 See Part III(A), supra
 
 
 [418]
 See Part III(A), supra
 
 
 [419]
 See text supra at notes 385-387
 
 
 [420]
 Compare City of Chicago v. FPC, supra note 415, 147 U.S.App.D.C. at 321-322, 458 F.2d at 740-741
 
 
 [421]
 See Text supra at notes 400-403
 
 
 [422]
 See text supra at note 416
 
 
 [423]
 See Part III(A), supra
 
 
 [424]
 Texas Eastern Transmission Corp. (Opinion No. 322), supra note 9. See Part I(A), supra
 
 
 [425]
 Public Serv. Comm'n v. FPC, supra note 22. See Part I(B), supra
 
 
 [426]
 Texas Eastern Transmission Corp. (Opinion No. 378), supra note 31, 29 F.P.C. at 252-57. See Part I(C), supra
 
 
 [427]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 382-95. See Part III(D), supra
 
 
 [428]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1087-88. See Part III(E), supra
 
 
 [429]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 387. See text supra at notes 205-10
 
 
 [430]
 In United Gas Improvement Co. v. Callery Properties, supra note 151, the court stated:
 While the Commission "has no power to make reparation orders," Federal Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 618 [64 S.Ct. 281, 295, 88 L.Ed. 333], its power to fix rates under Sec. 5 being prospective only, Atlantic Refining Co. v. Public Service Comm'n, supra, 360 U.S. at 389 [79 S.Ct. 1246 at 1254] it is not so restricted where its order, which never became final, has been overturned by a reviewing court. Here the original certificate orders were subject to judicial review; and judicial review at times results in the return of benefits received under the upset administrative order. See Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 200-201 [67 S.Ct. 1575, 1579-1580, 1760, 91 L.Ed. 1995].
 382 U.S. at 229, 86 S.Ct. at 364.
 
 
 [431]
 United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 229, 86 S.Ct. at 364. See also Democratic Cent. Comm. v. Washington Metropolitan Area Transit Comm'n, 157 U.S.App.D.C. 7, 45-46, 485 F.2d 786, 824-825 (1973); Williams v. Washington Metropolitan Area Transit Comm'n, 134 U.S.App.D.C. 342, 362-363, 415 F.2d 922, 942-943 (1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed. 773 (1969)
 
 
 [432]
 United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 229-230, 86 S.Ct. at 364 (footnote omitted)
 
 
 [433]
 See Part V(A), supra
 
 
 [434]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388, 79 S.Ct. 1246
 
 
 [435]
 FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 36, 88 S.Ct. at 1540
 
 
 [436]
 Id. at 37-40, 88 S.Ct. 1526
 
 
 [437]
 See Part V(A), supra
 
 
 [438]
 We recognize that an initial price may serve both as a ceiling for future transactions and as a floor for refunds on account of the past, and that the price ceiling and the refund floor "conceivably may serve significantly different ends." FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 21-23, 24, 88 S.Ct. at 1534. As an example, that case pointed out that "in some situations a relatively high initial price might be thought desirable to encourage producers to develop new reserves but a lower refund floor might be deemed necessary to protect consumers." Id. at 24 n. 11, 88 S.Ct. at 1534. At no time during this litigation has the Commission suggested that a properly set initial price for the producers' gas would not serve appropriately as the bench mark both for a reduction of rates to be charged and for refunds of excessive rates already paid, and, with the Commission's problem essentially a rectification of the past rather than a formula for the future, we perceive no basis upon which it could have
 
 
 [439]
 United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 229-230, 86 S.Ct. 360. See also FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 37, 88 S.Ct. 1526
 
 
 [440]
 See Part V(D)(1), infra
 
 
 [441]
 FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 22-24, 88 S.Ct. 1526
 
 
 [442]
 Id. at 24, 88 S.Ct. 1526
 
 
 [443]
 E.g., FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 36-40, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 230, 86 S.Ct. 360
 
 
 [444]
 Hunt Oil Co. v. FPC, supra note 398, 424 F.2d at 986; Phillips Petroleum Co. v. FPC, supra note 221, 405 F.2d at 9
 
 
 [445]
 See Part V(A), supra
 
 
 [446]
 Supra note 53. See text supra at notes 69-75
 
 
 [447]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 383-84
 
 
 [448]
 Id. at 384-87
 
 
 [449]
 See text supra at note 355
 
 
 [450]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 385. The Commission added:
 Certificates in this proceeding cannot be issued without doing justice to all parties, including the consumers of gas, and this requires consideration of what has already happened. The first time this proceeding was before us in 1959 we approved the transaction; the second time it was before us after remand in 1963 we condemned its form but afforded the parties opportunity to file new arrangements, and, on rehearing, denied we were requiring the parties to execute any particular kind of contract. In the present proceeding the lease-sale has again been presented to us. By this time a large part of the gas has been delivered and payment made. Various advantages are available to the parties--among others, tax benefits to the Producers, a flexible supply of gas for Texas Eastern, and as provided below, if there is sufficient gas in the Field, a benefit to the consumers in purchase price free gas after the purchase price has been paid and Texas Eastern has been compensated for its outlays of funds. We have been partly responsible for this extended consideration of the lease-sale arrangement. When it first came before us, we might have denied it finally or conditioned it in such a way that our action would have satisfied the Court. Our original failure to consider the problem fully led to the first remand. On review of this history and the present relations of the parties we think it equitable to treat the Producers as though they had been granted a certificate when the delivery of gas commenced at the in-line price of 20 cents per Mcf.
 Id. at 386.
 
 
 [451]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1081, 1087-88
 
 
 [452]
 Id
 
 
 [453]
 Id. at 1087-88
 
 
 [454]
 See Part V(B), supra
 
 
 [455]
 See text supra at note 447. While that holding was superseded by the decision in Opinion No. 565-A to defer all producer refunds, see Part II, supra, it was the only holding open to the Commission under the principles we have discussed. See Part V(C), supra
 
 
 [456]
 See text supra at
 
 
 [457]
 See Part V(B)(2), supra
 
 
 [458]
 See Part (V)(D)(2), infra
 
 
 [459]
 See Part V(D)(1), infra
 
 
 [460]
 See text supra at note 353
 
 
 [461]
 FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 37-38, 40-47, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 226-228, 86 S.Ct. 360
 
 
 [462]
 Supra note 151
 
 
 [463]
 Callery Properties v. FP)C, 335 F.2d 1004, 1018-1020 (5th Cir.1964), cert. denied sub nom., Frankel v. FPC, 382 U.S. 985, 86 S.Ct. 527, 15 L.Ed.2d 474 (1966)
 
 
 [464]
 Quoting FPC v. Tennessee Gas Transmission Co., 371 U.S. 145, 155, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962)
 
 
 [465]
 382 U.S. at 230, 86 S.Ct. at 364
 
 
 [466]
 Compare also FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 154, 83 S.Ct. 211
 
 
 [467]
 FPC v. Tennessee Transmission Co., supra note 464, 371 U.S. at 155, 83 S.Ct. at 216. Accord, FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 37, 88 S.Ct. 1526; United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 230, 86 S.Ct. 360
 
 
 [468]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360, U.S. at 388, 79 S.Ct. at 1253. See also Part V(A), supra
 
 
 [469]
 Texas Eastern Transmission Corp. supra note 43, 42 F.P.C. at 460-61 (examiner's Phase II decision)
 
 
 [470]
 Texas Eastern Transmission Corp. (Opinion No. 565, supra note 16, 42 F.P.C. at 393-405
 
 
 [471]
 See Part VI(G), infra
 
 
 [472]
 See text supra at note 453
 
 
 [473]
 See Part V(B)(2), supra
 
 
 [474]
 See text supra at note 469. There we point out the large excess of payments to producers over the in-line rate. That excess, of course, is even greater in reference to the 18.5-cent just and reasonable area rate
 
 
 [475]
 See text supra at note 453
 
 
 [476]
 See text supra at note 453
 
 
 [477]
 See Part V. (B)(2), supra
 
 
 [478]
 Any inequality of which the Commission speaks is manifestly the result of suspensions of the 18.5-cent just and reasonable rate pending completion of its reexamination of that and other area rates, a course upon which we do not put the stamp of approval. See Part V(B)(2), supra
 
 
 [479]
 United Gas Improvement Co. v. Callery Properties, supra note 151
 
 
 [480]
 See text supra at notes 462-65
 
 
 [482]
 At best, the refunding process is "somewhat illusory in view to the trickling down process necessary to be followed, the incidental cost of which is often borne by the consumer, and in view of the transient nature of our society which often prevents refunds from reaching those to whom they are due". FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 154-155, 83 S.Ct. at 216 (footnote omitted.)
 
 
 [483]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra not 10, 360 U.S. at 338-392, 79 S.Ct. 1246. See Part III(A), supra, and test supra at notes 278-303
 
 
 [484]
 See text supra at notes 462-465
 
 
 [485]
 For the purpose, we assume, without deciding, that so much of Opinion No. 565 was not nullified by the supersession of that opinion by Opinion No. 565-A
 
 
 [486]
 See text supra at notes 446-450
 
 
 [487]
 See Part V(C), supra
 
 
 [488]
 See test supra at note 453
 
 
 [489]
 See text supra at notes 477-78. In Opinion No. 565-A, the Commission recognized as much but erroneously decided that the just and reasonable rate was yet to be finalized. See text supra at note 453
 
 
 [490]
 FPC v. Sunray DX Oil Co, supra note 151, 391 U.S. at 44-46, 88 S.Ct. 1526
 
 
 [491]
 Nor can we accept the Commission's reasoning that the in-line price should operate as the basis for refunds on payments prior to establishment of the just and reasonable rate to avoid "punishing the producers for litigating their" claims. See text supra at note 450 and accompanying note. The difficulty arises, not because the producers engaged in litigation, but because they engaged in field operations before the litigation ended. The hazards of commencing operations on the strength of a contested certification that had not run its course through the court is obvious. See United Gas Improvement Co. v. Callery Properties, supra note 151, 382 U.S. at 225, 229-230, 86 S.ct. 360. Compare FPC v. Sunray DX Oil Co., supra note 151, 391 U.S. at 44-46, 88 S.Ct. 1526; FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 146-147, 83 S.Ct. 211
 
 
 [492]
 See note 552, infra
 
 
 [493]
 The investment consists in unrecovered amounts which Texas Eastern spent to acquire the working interest in Rayne Field pursuant to the lease-sale contract. See Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 461-62 (examiner's Phase II decision). After consummation and certification of the lease-sale transaction in 1959, Texas Eastern treated its payments to producers partly as capital items and partly as expenses as the field produced gas. Id. As of December 31, 1967, Texas Eastern had recorded on its books a gross investment of $76.665.683 and a net investment of $20,882.996 in Rayne Field. Id. at 562. Texas Eastern also asserts that it expended an additional $3,040,821 in connection with the Rayne Field leaseholds for which it has not been reimbursed. Id
 
 
 [494]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 395-402, 405-06
 
 
 [495]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1088-89, 1091
 
 
 [496]
 See Part V. supra
 
 
 [497]
 See Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 464, 467 (examiner's Phase II decision)
 
 
 [498]
 Id. at 464-65, 467
 
 
 [499]
 It will be recalled that the reduction envisioned by the examiner and by the Commission in Opinion No. 565 was to 20 cents per Mcf from the beginning of production until establishment of the initial area rate for Southern Louisiana, and thereafter at the just and reasonable rate for the area, Texas Eastern Transmission Corp., supra not 16, 42 F.P.C. at 447-52 (examiner's initial decision), Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 393-95; and that we have held that, for purposes of computing producer refunds, the reduction should have been to the just and reasonable rate throughout. See Part V, supra
 
 
 [500]
 Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 465-77 (examiner's Phase II decision)
 
 
 [501]
 15 U.S.C. Sec. 717f (1970)
 
 
 [502]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 400
 
 
 [503]
 15 U.S.C. Sec. 717c(a) (1970)
 
 
 [504]
 Texas Eastern Transmission Corp
 
 
 [505]
 Id
 
 
 [506]
 Id. at 400-01
 
 
 [507]
 See note 493, supra
 
 
 [508]
 Texas Eastern Transmission Corp. (Opinion No. 565, supra note 16, 42 F.P.C. at 401
 
 
 [509]
 Texas Eastern Transmission Corp. (Opinion No. 540), 39 F.P.C. 630 (1968), rehearing denied, (Opinion No. 540-A), 40 F.P.C. 61 (1969), aff'd sub nom., Texas Eastern Transmission Corp. v. FPC, 414 F.2d 344 (5th Cir.1969). See also Texas Eastern Transmission Corp. v. FPC, 357 F.2d 232 (5th Cir.1966)
 
 
 [510]
 Texas Eastern Transmission Corp. (Opinion No. 540), supra note 509, 39 F.P.C. at 634-48; Texas Eastern Transmission Corp. (Opinion 540-A), supra note 509, 40 FlP.C. at 63-65
 
 
 [511]
 Previously, on disallowance of a supplier-rate increase, the Commission had permitted pipelines to retain the refunds unless they had increased their own rates in response to supplier increases. In the latter event, the Commission required the pipelines to flow the refund through to customers. See Texas Eastern Transmission Corp. (Opinion No. 540, supra note 509, 39 F.P.C. at 646-47; Texas Eastern Transmission Corp. (Opinion No. 540-A), supra note 509, 40 F.P.C. at 63-64
 
 
 [512]
 Pursuant to Sec. 4(c), (d) of the Act, 15 U.S.C. Sec. 717c(c), (d) (1970)
 
 
 [513]
 Texas Eastern Transmission Corp. (Opinion No. 540), supra note 509, 39 F.P.C. at 638-43
 
 
 [514]
 Texas Eastern Transmission Corp. (Opinion No. 540), supra note 509, 39, F.P.C. at 642-43; Texas Eastern Transmission Corp. (Opinion No. 540-A), supra note 509, 40 F.P.C. at 64
 
 
 [515]
 Texas Eastern Transmission Corp. (Opinion No. 540), supra note 509, 39 F.P.C. at 642-43, 648-49
 
 
 [516]
 Texas Eastern Transmissions Corp. supra note 43, 42 F.P.C. at 463 (examiner's Phase II decision)
 
 
 [517]
 Id
 
 
 [518]
 See note 493, supra
 
 
 [519]
 Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 462-63 (examiner's Phase II decision)
 
 
 [520]
 Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 462-63 (examiner's Phase II decision)
 
 
 [521]
 Id
 
 
 [522]
 The reference her is obviously to "depreciation, depletion and amortization, and certain expenses and taxes." See text supra at note 520
 
 
 [523]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 395. The Commission pointed out, id. at 395-96, that at the beginning of Texas Eastern's Rayne Field operations on July 27, 1959, there were effective settlement rates in Docket No. G-12706, arising from a filing on May 10, 1957, which rates were not, but could have been, supported by Rayne Field costs; that from December 1, 1959,until January 1, 1964, there were in effect rates derived by a settlement in Docket No. G--18841, on the basis of computations which did include Rayne Field costs, of Texas Eastern's rate-increase filing of May 28, 1959, Texas Eastern Transmission Corp., 25 F.P.C. 172 (1961); that on January 1, 1964, there became effective a voluntary rate reduction filed by Texas Eastern in Docket No. FP64-36 to reflect a decrease in corporate income tax; and that still another change in Texas Eastern's rates became effective on June 1, 1965, as a result of conferences with the Commission's staff in Docket No. RP65-59, and Rayne Field costs were again included, see Texas Eastern Transmission Corp., 34 F.P.C. 98, 100 (1965); Texas Eastern Transmission Corp., 34 F.P.C. 732, 733 (1965)
 
 
 [524]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 396
 
 
 [525]
 It will be remembered that in Opinion No. 565 the Commission held that producer refunds should be based on the in-line price of 20 cents per Mcf, a conclusion with which we disagree. See Part V(C), (D)(2), supra
 
 
 [526]
 Texas Eastern Transmission Corp. (Opinion No. 565, supra note 16, 42 FlP.C. at 396-98
 
 
 [527]
 See text supra at notes 469-70
 
 
 [528]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 396-98
 
 
 [529]
 Id
 
 
 [530]
 Id
 
 
 [531]
 Id. at 398. See also note 493, supra
 
 
 [532]
 Id. See also not 538, infra
 
 
 [533]
 See Text supra at notes 516-19
 
 
 [534]
 Texas Eastern Transmission Corp. (Opinion No. 565, supra note 16, 42 F.P.C. at 399-400
 
 
 [535]
 See text supra at notes 516-19
 
 
 [536]
 See Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 460-61 (examiner's Phase II decision)
 
 
 [537]
 Broken down, this figure represents the residue of $8,005.081 in principal and $3,514,629 in interest due form the producers. Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 399
 
 
 [538]
 Id. In addition to the investment balance of $20,882,996, Texas Eastern also sought reimbursement out of producer refunds of $3,040,821 in previously unrecovered and uncapitalized expenditures. Id. at 398. See also note 493, supra. The Commission found that this additional sum "results principally from the facts that amounts expended in connection with the Rayne Field were not included among the costs underlying Texas Eastern's rates prior to December 1, 1959, when the settlement rates in Docket No. G-18841 became effective, [Texas Eastern Transmission Corp., supra note 523,] 25 F.P.C. 172." Id. at 399. To the Commission, it was "clear that Texas Eastern cannot now claim costs that were not covered by rates filed on May 10, 1957, in Docket No. G-13706, effective as its filed rates until December 1, 1959, and eventually covered by the settlement of January 25, 1961 ( [Texas Eastern Transmission Corp., supra note 523,] 25 F.P.C. 172)." Id. See note 523, supra
 
 
 [539]
 On this score the Commission said
 The balance of $9,303,286 brought up-to-date, may remain on Texas Eastern's books if the company desires, but it shall be recorded in other than "rate base" accounts. In some ways this represents a prepayment for gas, and we have allowed pipelines to earn a return on prepayments. See Michigan Wisconsin Pipe Line Company, 27 F.P.C. 449, 455 (1962), cited by Texas Eastern and [Transwestern Pipeline Co9. (Opinion No. 500) ], 36 F.P.C. 176, 216 (1966). However, prepayments ordinarily occur where the pipeline under a conventional contract has taken less than the required quantity of gas. Here we have an uncommon situation involving large payments, as part of the basic transaction calling for such payments in the early years of the contract. We think, therefore, that the cost of Rayne gas which will be reflected in future rates to Texas Eastern's customers should not be increased above the 18.5 cent just and reasonable level by permitting Texas Eastern to add the Rayne Field balances to its rate base and earn a return on them.
 Texas Eastern Transmission Corp. (Opinion no. 565), supra note 16, 42 F.P.C. at 399.
 
 
 [540]
 The Commission elucidated:
 [W]e do not think Texas Eastern should be penalized for entering into this transaction if it can be made whole without loss to its customers. Therefore, it may compute a return on the Rayne Field balances and accumulate it each year. As already discussed, Texas Eastern on the basis of the 18.5 cent price per Mcf shall complete paying the full purchase price of $234,395.700, including the return to the Producers of the refunds they have made ($21,854.000 brought up-to-date). At that point, provided the Field is still productive, we shall require that Texas Eastern use the difference between what it then must pay for gas (royalties, taxes, and other costs less credits) and what it would have to pay under the applicable area price to amortize the balance. Texas Eastern will incur the risk that there will not be enough gas from the field to enable it to completely amortize the balance, but this is a consequence of the lease-sale type of contract. It may be protected, in part, by the Producers' reserve guarantee if the certificate issued by us is satisfactory to the Producers.
 Id. at 399-400.
 
 
 [541]
 See Parts V(B), (D), supra
 
 
 [542]
 The Commission held, moreover, that "it would not now be in the public interest to require Texas Eastern to file new rates to track the producer rate filing here ordered." Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1089. "To require Texas Eastern to make a filing now." the Commission said, "might result in only a temporary reduction to its customers, and thus would bring abut only a condition of instability without commensurate benefits." Id. "However," the Commission added, "in deferring any rate filing by Texas Eastern to track the producer rate filing we shall require the Texas Eastern be subject to refund to the extent its present rates are higher than they would be if they reflected a 20-cent Rayne Field producer rate.... Texas Eastern, of course, would also remain subject to our requiring a flow-through of producer refunds if that should be deemed appropriate." Id
 
 
 [543]
 Id. at 1088
 
 
 [544]
 Id. at 1091-96
 
 
 [545]
 Id. at 108889, 1091
 
 
 [546]
 Texas Eastern Transmission Corp., supra note 99 (order denying rehearing)
 
 
 [547]
 While Texas Eastern has a minuscule group of nonjurisdictional customers of Rayne Field gas, it seems clear that the refunding directives of Opinion No. 565 were not intended to affect them. See Texas Eastern Transmission Corp. (Opinion No. 540), supra note 509, 39 F.P.C. at 643-45: Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 464 (examiner's Phase II decision)
 
 
 [548]
 See Texas Eastern Transmission Corp., supra note 9, 21 F.P.C. at 872-73, 880-81 (examiner's decision); Texas Eastern Transmission Corp. (Opinion No. 540), supra note 509, 39, F.P.C. at 643-45
 
 
 [549]
 See Parts I(B), (C), supra
 
 
 [550]
 Natural Gas Act Secs. 1(b), 2(6)-(7), 15 U.S.C. Secs. 717(b), 717a(6)-(7) (1970). See also FPC v. Amerada Petroleum Corp., 379 U.S. 687, 85 S.Ct. 632, 13 L.Ed.2d 605 (1965); California v. Lo-Vaca Gathering Co., 379 U.S. 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965); FPC v. Interstate Natural Gas. Co., 336 U.S. 577, 580-581, 69 S.Ct. 775, 93 L.Ed. 895 (1949); Illinois Natural Gas Co. v. Central Ill. Pub. Serv. Co., 314 U.S. 498, 502-509, 62 S.Ct. 384, 86 L.Ed. 371 (1948). See also Central States Elec. Co. v. City of Muscatine, 324 U.S. 138, 65 S.Ct. 565, 39 L.Ed. 801 (1945)
 
 
 [551]
 See Parts V(A), (C), supra
 
 
 [552]
 The Commission's authority over flow-through of rate reductions and refunds extends only to those to be made by pipelines to jurisdictional customers. Those to be made by distributor-customers to ultimate customers are matters for state regulation. See FPC c. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 155 no. 9, 83 S.Ct. 211; FPC v. Interstate Natural Gas Co., supra note 550, 336 U.S. at 580-581, 69 S.Ct. 775; Central State Elect. Co. v. City of Muscatine, supra note 550, 324 U.S. at 144-146, 65 S.ct. 565. This the Commission has realized, but if has assumed, properly we think, that state regulatory agencies will discharge their own responsibilities to benefit ultimate consumers. Texas Eastern Transmission Corp. (Opinion 540), supra note 509, 39 F.P.C. at 638. As the Fifth Circuit has stated:
 The Commission's view [is] that it [is] serving the statutory purpose of the Act of benefiting ultimate consumers by placing the refunds within the jurisdiction of the state regulatory authorities so as to place them in position to benefit the ultimate consumers. The Commission could not guarantee benefits for the benefits for the ultimate consumers but absent is new policy there would be no way to benefit the ultimate consumers.... [This is] am approach to effective Federalism within the framework and dictates of the Act.
 Texas Eastern Transmission Corp. v. FPC, supra note 509, 414 F.2d at 350.
 
 
 [553]
 E.g., FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 151-155, 83 S.Ct. 211
 
 
 [554]
 Although Sec. 7, unlike Secs. 4(e) and 5(a), does not expressly confer upon the Commission authority to reduce unjust or unreasonable rates, we have seen that the Commission's power to condition Sec. 7 certificates of public convenience and necessity upon specified maximum rates is well established. See Parts III(A), supra. And an exercise of the conditioning authority with respect to the certificate sought by Texas Eastern was undoubtedly as much the Commission's prerogative as was its exercise with respect to the certificate requested by the producers. E.g., Central Illinois Pub. Serv. Co. v. FPC, 338 F.2d 682 (7th Cir.19640. Similarly, while Sec. 7, like Sec. 5(a) but unlike Sec. 4(a), contains no provision specifically referable to refunds, we are satisfied that that makes the makes no difference. Just as the Commission may, in Sec. 7 proceedings, demand refunds by producers to pipelines, see Part V(C) supra, it may exert the same power against pipelines in favor of their customers. FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 146-47, 154-155, 83 S.ct. 211; Texas Eastern Transmission Corp. v. FPC, 470 F.2d 757, 759-760 (5th Cir.1972); Texas Eastern Transmission Corp. v. FPC, supra note 509, 414 F.2d at 347-349
 The basis of the Commission's Sec. 7 power in each situation--rate reductions and refunds--is its responsibility to foster, through invocation of its authority to condition certificates in the public interest, see note 151, supra, "the overriding purpose of the Natural Gas Act to protect consumers in their purchase of gas to the end of keeping rates as low as possible." Texas Eastern Transmission Corp., v. FPC, supra note 509, 414 F.2d at 347. See also Part (V)(A), supra. "The history of the Natural Gas Act is one interstitial construction," id. at 348, and in no small measure the filing of the interstices within the outer limits of the Act brightens the prospect that it will achieve the goals Congress envisioned. See Phillips Petroleum Co. v. Wisconsin, supra note 6; Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10; FPC v. Sunray DX Oil Co., supra note 151.
 
 
 [555]
 See Parts V(A), (B)(2), (C), (D)(1), supra
 
 
 [556]
 See Parts (V)(C), (D)(1), supra
 
 
 [557]
 See Parts V(C), (D)(2), supra
 
 
 [558]
 See Part V(D)(2), supra
 
 
 [559]
 See text supra at note 426
 
 
 [560]
 See Parts VI(E), (F), (G), infra
 
 
 [561]
 See Parts VI(E), (F), infra
 
 
 [562]
 See Parts VI(E) (F), infra
 
 
 [563]
 See Part V(A), supra
 
 
 [564]
 See text supra at note 363, quoting Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388, 79 S.Ct. at 1253
 
 
 [565]
 See text supra at note 372, quoting 52 Stat. 825 (1938). See also text supra at note 373
 
 
 [566]
 See text supra at note 368, quoting Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 10, 360 U.S. at 388, 79 S.Ct. at 1253
 
 
 [567]
 See text supra at note 370, quoting id. at 389, 79 S.ct. at 1254
 
 
 [568]
 See text supra at note 379, quoting id. at 392, 79 S.Ct. at 1255
 
 
 [569]
 See text supra at notes 365-366
 
 
 [570]
 See text infra at notes 757-578
 
 
 [571]
 See text supra at noted 365-368
 
 
 [572]
 See Part III(A), supra
 
 
 [573]
 See Part III(A), supra
 
 
 [574]
 See Part III(A0, supra
 
 
 [575]
 FPC v. Interstate Natural Gas Co., supra note 550, 336 U.S. at 581, 69 S.Ct. 775
 
 
 [576]
 Id. (citation omitted). See also note 552, supra
 
 
 [577]
 "The rates charged a wholesaler are part of its costs, reflected in its rate base. reduction of those costs normally will lead in due course to reduction in its resale rates, unless we are to assume that the passage of the Natural Gas Act was an exercise in futility. It is of course conceivable that a wholesaler might be warranted in keeping all or a part of the rate reduction under the standards of reasonableness prescribed by the Act. But a court would not be warranted in assuming that the rates which have been charged are so low as to be unreasonable. No such presumption attends rates which have been fixed pursuant to rate orders of the commission. Nor can we make any such presumption as respects rates fixed by the utilities themselves without the compulsion of a rate order. For experience does not indicate that utilities are wont to charge themselves out of business." Id. at 581-582, 69 S.ct. at 778
 
 
 [578]
 Id. at 582, 69 S.ct. 15 778
 
 
 [579]
 See text supra at note 500
 
 
 [580]
 See text supra at notes 501-502
 
 
 [581]
 See text supra at notes 503-505
 
 
 [582]
 See text supra at notes 506-508
 
 
 [583]
 FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 150, 83 S.Ct. 211; FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 583-585, 62 S.ct. 736, 86 L.Ed. 1037 (1942)
 
 
 [584]
 FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 151, 83 S.Ct. 211; FPC v. Natural Gas Pipeline Co., supra note 583, 315 U.S. at 583-585, 62 S.Ct. 736
 
 
 [585]
 FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 150-155, 83 S.Ct. 211
 
 
 [586]
 While the order in question looks rather far into the future, we accept it as the interim measure the Commission says it is--to be continued or superseded according to the outcome of the Section 4 proceeding
 
 
 [587]
 See Part VI(E), supra
 
 
 [588]
 Texas Eastern Transmission Corp. (Order No. 565), supra note 16, 42 F.P.C. at 400
 
 
 [589]
 See Part III(A), supra
 
 
 [590]
 See Part III(A), supra
 
 
 [591]
 FPC v. Interstate Natural Gas Co., supra note 550, 336 U.S. at 583, 584, 69 S.Ct. 775
 
 
 [592]
 See part VI(C), supra
 
 
 [593]
 See note 542, supra
 
 
 [594]
 See note 542, supra
 
 
 [595]
 See Parts III(A), V(B), supra
 
 
 [596]
 See Part V(B)(1), supra
 
 
 [597]
 See text supra at notes 372-373
 
 
 [598]
 See discussion in Parts V(B)(1), (2)
 
 
 [599]
 See FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 154-155, 83 S.Ct. 211
 
 
 [600]
 See the discussion in Texas Eastern Transmission Corp. v. FPC, supra note 509, 414 F.2d at 346-347
 
 
 [601]
 See Part VI(E), supra
 
 
 [602]
 See Part V(B), supra
 
 
 [603]
 Texas Eastern Transmission Corp. (Opinion No. 540), supra note 509, 39 F.P.C. at 638-41
 
 
 [604]
 The new requirement of a tracking rate increase filing was adopted prospectively, and the Commission gave Texas Eastern an opportunity to establish factually its entitlement to the refund. Id. at 641-43
 
 
 [605]
 Texas Eastern Transmission Corp. v. FPC, supra note 509
 
 
 [606]
 414 F.2d at 348
 
 
 [607]
 See text supra at note 520
 
 
 [608]
 See text supra at notes 520
 
 
 [609]
 See text supra at notes 522-524
 
 
 [610]
 See text supra at notes 525-526
 
 
 [611]
 The amount to be flowed through, as to both principal and interest, was to be updated. See text supra at note 529
 
 
 [612]
 See text supra at notes 531-540
 
 
 [613]
 Opinion No. 565 so stated. See text supra at note 520
 
 
 [614]
 The examiner concluded that under the circumstances Texas Eastern could not be permitted to treat any of its Rayne Field expenditures as prepayments. Texas Eastern Transmission Corp., supra note 43, 42 F.P.C. at 462-63 (examiner's Phase Ii decision). A majority of the Commission in Opinion No. 565 concluded similarly, Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 399, see note 539, supra, as did two commissioners in Opinion No. 565-A. Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1088. See Public Serv. Comm'n v. FPC, 151 U.S.App.D.C. 307, 467 F.2d 361 (1972)
 
 
 [615]
 See note 539, supra
 
 
 [616]
 In finding the amount of Rayne Field costs which Texas Eastern had already imposed on its customers, the Commission examined the testimony of three expert witnesses, each of whom had made computations on the basis of the costs of the Rayne Field gas to Texas Eastern. The Commission accepted the testimony on one of the three witnesses who made his calculations on the basis of the costs used to compute Texas Eastern's successive rate settlements, see note 523, supra, an approach which the Commission deemed the most accurate reflection of Rayne Field costs. Texas Eastern Transmission Corp. (Opinion No. 565), supra note 16, 42 F.P.C. at 396-98
 
 
 [617]
 United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535-536, 66 S.Ct. 687, 90 L.Ed. 821 (1946); Rochester Tel. Corp. v. United States, supra note 189, 307 U.S. at 139-140, 59 S.Ct. 754; ICC v. Union Pac. R.R., 222 U.S. 541, 547-548 (1912). See also Mississippi Valley Barge Line Co. v. United States, supra note 189, 292 U.S. at 286-287, 54 S.Ct. 692
 
 
 [618]
 Natural Gas Act Sec. 19(b), 15 U.S.C. Sec. 717r(b) (1970)
 
 
 [619]
 Rochester Tel. Corp. v. United States, supra note 189, 307 U.S. at 146, 59 S.Ct. at 765, quoting Mississippi Valley Barge Line Co. v. United States, supra note 189, 292 U.S. at 288-289, 54 S.Ct. 692; Texas Eastern Transmission Corp. v. FPC, supra note 509, 414 F.2d at 349-350
 
 
 [620]
 FPC v. Hope Natural Gas Co., supra note 229, 320 U.S. at 606-607, 64 S.Ct. 281; FPC v. Natural Gas Pipe Line Co., supra note 583, 315 U.S. at 593, 62 S.Ct. 736; Lindheimer v. illinois Bell Tel. Co., 292 U.S. 151, 168-169, 54 S.Ct. 658, 78 L.Ed. 1182 (1934)
 
 
 [621]
 E.g., Williams v. Washington Metropolitan Area Transit Comm'n, supra note 431, 134 U.S.App.D.C. at 374-376, 415 F.2d at 954-956; Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 125, 188 F.2d 11, 21 (1950), cert. denied 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686 (1951)
 
 
 [622]
 See text supra at note 526
 
 
 [623]
 See text supra at notes 520-523
 
 
 [626]
 See notes 539, 614, supra
 
 
 [625]
 See text supra at notes 520-523
 
 
 [626]
 See Texas Eastern Transmission Corp. v. FPC, supra note 509, 414 F.2d at 348
 
 
 [627]
 See Part VI(D), supra
 
 
 [628]
 Ohio Fuel Gas Co. v. FPC, supra note 7, 111 U.S.App.D.C. at 338, 296 F.2d at 595; Michigan Gas & Electric Co. v. FPC, 110 U.S.App.D.C. 183, 185, 200 F.2d 374, 376, cert. denied, 368 U.S. 897, 82 S.Ct. 177, 7 L.Ed.2d 95 (1961); Battle Creek Gas Co. v. FPC, 108 U.S.App.D.C. 209, 213, 281 F.2d 42, 46 (1960)
 
 
 [629]
 See FPC v. East Ohio Gas Co., 338 U.S. 464, 474-476, 70 S.Ct. 26, 94 L.Ed. 268 (1950): United States v. New York Tel. Co., 326 U.S. 638, 654-655, 66 S.Ct. 393, 90 L.Ed. 371 (1946); Northwestern Elec. Co. v. FPC, 321 U.S. 119, 123-124, 64 S.Ct. 451, 88 L.Ed. 596 (1944): American Tel. & Tel. Co. v. United States, 299 U.S. 232, 236-237, 57 S.Ct. 170, 81 L.Ed. 142 (1936)
 
 
 [630]
 See note 616, supra
 
 
 [631]
 See Part III(A), supra
 
 
 [632]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 68, 44 F.P.C. at 1093 (separate opinion)
 
 
 [633]
 Id
 
 
 [634]
 Id
 
 
 [635]
 See Part VI(C), supra
 
 
 [636]
 See Parts III(A), V(C), (D), supra
 
 
 [637]
 FPC v. Tennessee Gas Transmission Co., supra note 464, 371 U.S. at 155, 83 S.Ct. 211
 
 
 [638]
 See Parts V(D)(1), (2), supra
 
 
 [639]
 See part V(D)(2), supra
 
 
 [640]
 See Part V(D)(2), supra
 
 
 [641]
 The increase in the amount of the refund will result from the difference between the 20-cent in-line price, which the Commission used, and an 18.5-cent just and reasonable rate as the measure of the amount properly payable by Texas Eastern to the producers for the gas delivered
 
 
 [642]
 Southern Louisiana Area Rate Proceeding (Opinion No. 598), 46 F.P.C. 86 (1971), aff'd sub nom., Placid Oil Co. v. FPC, 483 F.2d 880 (5th Cir.1973)
 
 
 [643]
 See Parts V(C), (D) (1), (2), supra
 
 
 [644]
 See Parts VI(E), (G), supra
 
 
 [645]
 Southern Louisiana Area Rate Proceeding (Opinion No. 598), supra note 642, 46 F.P.C. at 142
 
 
 [646]
 See text supra at note 56
 
 
 [647]
 See Part VI(E), supra
 
 
 [648]
 See Parts V(C), (D)(2), supra
 
 
 [649]
 See Part VI(G), supra
 
 
 [650]
 See parts V(A), (B)(2), VI(E), (G), supra
 
 
 [651]
 Supra note 53
 
 
 [652]
 Southern Louisiana Area Rate Proceeding (Opinion No. 598), supra note 642, 46 F.P.C. at 103-10, 153-64
 
 
 [653]
 Id. at 155-60
 
 
 [654]
 Id. at 160-63
 
 
 [655]
 Id. at 103-10
 
 
 [656]
 Id., passim
 
 
 [657]
 Id. at 155
 
 
 [658]
 Id. at 160
 
 
 [659]
 Id. at 140
 
 
 [660]
 Id. at 145. The order specifies the proceedings, by docket references, in which the refunds provided were due, and the proceedings we now review were not included
 
 
 [661]
 See Part II(C), supra
 
 
 [662]
 See Part III(C), supra
 
 
 [663]
 See part IV(C)(1), supra
 
 
 [664]
 See Part IV(C)(2), supra
 
 
 [665]
 See Parts V(B)(1), (2), VII, supra
 
 
 [666]
 See Part V(B)(2), supra
 
 
 [667]
 See Part V(D)(1), supra
 
 
 [668]
 See part VI(F), supra
 
 
 [669]
 See Part VI(G), supra
 
 
 [670]
 See Part VI(G), supra
 
 
 [671]
 See Parts IV(B), (C)(2), supra
 
 
 [672]
 See Parts V(C), (D)(2), VII, supra
 
 
 [673]
 See Part VI(G), supra
 
 
 [674]
 See Parts VI(G), VII, supra
 
 
 [675]
 See Part VII, supra
 
 
 [676]
 See Parts V(B)(2), (D)(1), VI(F), (G), supra. We have also indicated our approval of rate-reduction flow-through, as decided by the Commission in Opinion No. 565. See Part VI(F), supra. New area rates for Southern Louisiana, however, are now in effect, see Part VII, supra, which by force of Opinion No. 565 govern the prices Texas Eastern must pay the producers. See Parts V(A), (B)(1), supra. The Commission will, of course, be guided on remand by the views we have expressed in that connection
 
 
 [1]
 Public Serv. Comm'n v: FPC, No. 24,716, 177 U.S.App.D.C.--, 543 F.2d 757 (1974), hereinafter cited "Op."
 
 
 [2]
 Mobil Oil Corp. v. FPC, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 71 (1974)
 
 
 [3]
 See notes 42, 43, 46, 108, infra
 
 
 [4]
 Supra note 2
 
 
 [5]
 Southern Louisiana Area Rate Proceeding (Opinion No. 598), 46 F.P.C. 86 (1971), on rehearing (Opinion No. 598-A), 46 F.P.C. 633 (1971), aff'd sub nom., Placid Oil Co. v. FPC, 483 F.2d 880 (5th Cir.1973), aff'd sub nom, Mobil Oil Corp. v. FPC, supra note 2
 
 
 [6]
 We have already, in our previous opinion, referred quite extensively to area ratemaking in Southern Louisiana. See Op. text at ns. 69-75 & pts. V(B)(2), VII. See also Mobil Oil Corp. v. FPC, supra note 2, 417 U.S. at 292-300, 94 S.Ct. at 2338-2341, 41 L.Ed.2d at 86-90; Placid Oil Co. v. FPC, supra note 5, 483 F.2d at 885-892
 
 
 [7]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), 40 F.P.C. 530 (1968), on rehearing (Opinion No. 546-A), 41 F.P.C. 301 (1969), aff'd sub nom., Austral Oil Co. v. FPC, 428 F.2d 407 (5th Cir.), on rehearing, 444 F.2d 125, cert. denied, 400 U.S. 950, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970)
 
 
 [8]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 7, 40 F.P.C. at 544, 636, 648
 
 
 [9]
 Id. at 626-628, 652-654. By the end of 1970, the refunds ordered totaled some $375 million. Mobil Oil Corp. v. FPC, supra note 2, 417 U.S. at 293 & n. 8, 94 S.Ct. at 2326 & n. 8, 41 L.Ed.2d at 87 & n. 8
 
 
 [10]
 Southern Louisiana Area Rate Cases (Austral Oil Co. v. FPC), supra note 7
 
 
 [11]
 428 F.2d at 421, 444 F.2d at 126-127. See Op. text at ns. 409-413 and n. 413
 
 
 [12]
 Southern Louisiana Area Rate Proceeding, 44 F.P.C. 1638 (1970) (order reopening and consolidating proceedings.)
 
 
 [13]
 Southern Louisiana Area Rate Proceeding (Opinion No. 598), supra note 5
 
 
 [14]
 Id. at 105, 135-138, 142-143
 
 
 [15]
 Id. at 138-139, 143
 
 
 [16]
 Id. at 140 n. 140
 
 
 [17]
 Id. at 140-141, 145-148
 
 
 [18]
 Placid Oil Co. v. FPC, supra note 5
 
 
 [19]
 Mobil Oil Corp. v. FPC, supra note 2
 
 
 [20]
 See Op. pt. I
 
 
 [21]
 Texas Eastern Transmission Corp. (Opinion No. 565), 42 F.P.C. 376 (1968). See Op. pt.I(D)
 
 
 [22]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 21, 42 F.P.C. at 382-393
 
 
 [23]
 Id. at 383-390, 403
 
 
 [24]
 Id. at 393-398, 404-405
 
 
 [25]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), 44 F.P.C. 1079 (1970)
 
 
 [26]
 Id. at 1081-1085, 1092
 
 
 [27]
 Id. at 1084, 1088, 1097-1107
 
 
 [28]
 Id. at 1087-1088, 1097-1107
 
 
 [29]
 Texas Eastern Transmission Corp., 44 F.P.C. 1471 (1970) (order denying rehearing)
 
 
 [30]
 Op. pt. III
 
 
 [31]
 Op. pts. V(A), (B)
 
 
 [33]
 Op. pt. V(D)(1)
 
 
 [34]
 Op. pts. V(B), (C), (D)(1)
 
 
 [35]
 Op. text at ns. 143-144
 
 
 [36]
 See Atlantic Ref. Co. v. Public Serv. Comm'n, 360 U.S. 378, 388-392, 79 S.Ct. 1246, 1253-1255, 3 L.Ed.2d 1312, 1319-1321 (1959); Op. pt. III(A)
 
 
 [37]
 Act of June 21, 1938, ch. 556, 52 Stat. 824, Sec. 7, as amended, 15 U.S.C. Sec. 717f (1970)
 
 
 [38]
 See Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 36, 360 U.S. at 388-392, 79 S.Ct. at 1253-1255, 3 L.Ed.2d at 1319-1321
 
 
 [39]
 As amended, 15 U.S.C. Secs. 717c, 717d (1970)
 
 
 [40]
 See Southern Louisiana Area Rate Proceeding (Opinion No. 598), supra note 5, 46 F.P.C. at 138-139, 140-141, 142-148
 
 
 [41]
 See Op. text at ns. 646-649
 
 
 [42]
 The Commission asserts that we erred in holding that the doctrine laid down in United Gas Pipeline Co. v. Mobile Gas Serv.Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and FPC v. Sierra Pac. Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), precluded abrogation of the contract limitation of $134 million as the total price which the pipeline was to pay to the producers. We adhere to our earlier discussion and decision of that matter. Op. text at pts. IV(B), (C)(2). The Commission also asserts that we ventured outside the judicial domain when we instructed the Commission to increase the pipeline's payments beyond the $134 million by an amount equal to the time value of the monies called for by the Commission-rearranged payment schedule. Op. text at ns. 341-349. We believe that we do not usurp an administrative prerogative when we direct a step which the Commission is legally bound to take. That is the situation here
 A Commission majority has repeatedly and consistently held that the parties' lease-sale disserved the public interest, and at least twice has held that the transaction should accordingly be conventionalized. Op. text at ns. 345-347 and references in ns. 345-346. As we have explained, "limiting [the pipeline's] financial liability to the contract price and [through conventionalization] spreading its discharge over a longer period of time [ ] would cause the producers to receive less than the quid pro quo for which they had contracted ... because the value to the producers of the money to be paid over the longer time span would be less than its value by the payment schedule embodied in the lease-sale arrangement," Op. text at n. 340; and various members of the Commission have recognized that the producers are entitled to relief. Op. text at n. 344 and references in n. 344. As we have declared "[e]xcept as the exigencies of the public interest demanded, the Commission was no more at liberty to alter the lease-sale contract to the prejudice of the producers than to do so in their favor." Op. text following n. 340. Obviously, such prejudice could be avoided only by awarding the producers the time value of the money due them under the contract, a need which even the pipeline seemingly had recognized, Op. at n. 348, and which even now it does not dispute.
 We realize that a court may not compel an administrative agency to pursue a particular course of action when another is open to it. FPC v. Idaho Power Co., 344 U.S. 17, 20, 73 S.Ct. 85, 86-87, 97 L.Ed. 15, 20 (1952). See also note 108, infra. We have held that the Commission could not solve the problem by extending the pipeline's payments over the life of the field, Op. pts. IV(B), (C)(2), and no one has suggested any other feasible alternative to the one we directed, nor have we been able to conceive of any. Nor can it be realistically argued that the Commission might, as an alternative, have refused to certificate the sale of the gas in question in any form. As far back as 1968, when the Commission first decided to conventionalize the parties' lease-sale, almost half of the estimated volume of recoverable gas in the field had flowed through the pipeline to interstate points, and the Commission made it plain that it was too late in the day to reverse the transaction. Texas Eastern Transmission Corp. (Opinion No. 565), supra note 21, 42 F.P.C. at 383. As we see it, the Commission's well-nigh irrevocable commitment to conventionalization left it no legally available choice than the increase we ordered.
 
 
 [43]
 For this reason, we cannot agree with the producers that they face financial loss in consequence of our decision. They are assured of ultimate receipt of the $134 million price for which they contracted, together with compensation for the rearranged timing in payment. See Op. pts. IV(B), (C)(2). See also note 42, supra
 
 
 [44]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 21, 42 F.P.C. at 390, 403-405. The presiding examiner had found that the producers collected through 1967 $21.8 million--with interest, $31.4 million--more than deliveries at the 20-cent in-line rate would have commanded. Texas Eastern Transmission Corp., 42 F.P.C. 455, 460-461 (1968) (examiner's Phase II decision). The Commission adopted that finding in Opinion No. 565. Texas Eastern Transmission Corp. (Opinion No. 565), supra note 21, 42 F.P.C. at 393-405. The bases of the Commission-directed refunds were the 20-cent in-line rate to October 1, 1968, and the 18.5-cent just and reasonable rate thereafter. Id. at 390, 403-405. Although we disagreed with the first element of that formula, Op. pts. V(B)(1), (C), (D)(2), we found no fault with the Commission's conclusion that refunds were due. Op. pt. V(D)
 
 
 [45]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 25, 44 F.P.C. at 1081, 1087-1088
 
 
 [46]
 Op. text at n. 464. The quotation is from United Gas Improvement Co. v. Callery Properties, 382 U.S. 223, 230, 86 S.Ct. 360, 364, 15 L.Ed.2d 284, 290 (1965), in turn quoting FPC v. Tennessee Gas Transmission Co., 371 U.S. 145, 155, 83 S.Ct. 211, 216-217, 9 L.Ed.2d 199, 206 (1962). Once again we reject the contention that the Commission had no duty, as distinguished from the prerogative, to order refunds in the case at bar. As we said earlier, "[t]he Commission was not merely at liberty to require immediate refunds but, where refunds are due, it also had 'the duty ... to direct their payment at the earliest possible moment consistent with due process.' That duty charts the only course in keeping with the purpose of the Act 'to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges.' " Op. text at ns. 467-468 (footnotes omitted), quoting in turn, FPC v. Tennessee Gas Transmission Co., supra, 371 U.S. at 154, 83 S.Ct. at 216, 9 L.Ed.2d at 205-206, and Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 36, 360 U.S. at 388, 79 S.Ct. at 1253, 3 L.Ed.2d at 1319. See also FPC v. Sunray DX Oil Co., 391 U.S. 9, 37, 88 S.Ct. 1526, 1541, 20 L.Ed.2d 388, 406 (1968); United Gas Improvement Co. v. Callery Properties, supra, 382 U.S. at 230, 86 S.Ct. at 364, 15 L.Ed.2d at 290
 
 
 [47]
 Op. at ns. 462-468. In United Gas Improvement Co. v. Callery Properties, supra note 46, the Supreme Court reversed a judicial holding, practically identical to the Commission's administrative holding here, that refunding of excessive charges following certification should await establishment of the just and reasonable rate. 382 U.S. at 230, 86 S.Ct. at 364, 15 L.Ed.2d at 290
 
 
 [48]
 Op. text at n. 460. That was the course approved in Callery, 382 U.S. at 226-228, 86 S.Ct. at 362-364, 15 L.Ed.2d at 287-289. See also FPC v. Sunray DX Oil Co., supra note 46, 391 U.S. at 37-38, 40-47, 88 S.Ct. at 1540-1541, 1542-1546, 20 L.Ed.2d at 405-406, 407-412. We also concluded that the applicable area rate established by Opinion No. 546 would more properly than the in-line rate have performed that function, Op. pts. V(B)(1), (2), (C), (D)(2), a point we discuss further in Part III hereof
 
 
 [49]
 Supra note 2
 
 
 [51]
 Op. text at ns. 476-484
 
 
 [52]
 See Op. text at ns. 481-482. See also FPC v. Tennessee Gas Transmission Co., supra note 46, 371 U.S. at 154-155, 83 S.Ct. at 216-217, 9 L.Ed.2d at 205-206
 
 
 [53]
 See text infra at note 69
 
 
 [54]
 See Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 36, 360 U.S. at 388-389, 79 S.Ct. at 1253-1254, 3 L.Ed.2d at 1319-1320. Op. text at ns. 369-373
 
 
 [55]
 As we pointed out in our prior opinion, the extent to which the deferral of refunds could promote producer equality "might depend in part upon whether initial prices allowed producers were all fixed at the same level, since those prices established refund floors." Op. at n. 481. See FPC v. Sunray DX Oil Co., supra note 46, 391 U.S. at 21-23, 24, 88 S.Ct. at 1532-1534, 20 L.Ed.2d at 396-399
 
 
 [56]
 The Court found that the refund formula eventually adopted for the Southern Louisiana area impacted producers unequally, but that the differences were justified by other regulatory concerns. 417 U.S. at 321-327, 94 S.Ct. at 2352-2354, 41 L.Ed.2d at 102-105
 
 
 [57]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 21, 42 F.P.C. at 390, 403
 
 
 [58]
 See Texas Eastern Transmission Corp. (Opinion No. 565A), supra note 25, 44 F.P.C. at 1084, 1088
 
 
 [59]
 Op. text at ns. 646-649
 
 
 [60]
 See text supra at notes 16-17
 
 
 [61]
 Op. text pt. VII
 
 
 [62]
 Op. text at n. 657
 
 
 [63]
 Op. text at n. 658
 
 
 [64]
 Op. text at n. 659
 
 
 [65]
 Op. text at n. 660
 
 
 [66]
 Op. text following n. 660
 
 
 [67]
 Op. text following n. 660
 
 
 [68]
 Act of June 21, 1938, ch. 556, 52 Stat. 824, Sec. 7, as amended, 15 U.S.C. Sec. 717f (1970). See Op. pt. III(A)
 
 
 [69]
 Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 36, 360 U.S. at 388, 79 S.Ct. at 1253, 3 L.Ed.2d at 1319. See discussion in Op. text at ns. 369-373
 
 
 [70]
 Natural Gas Act Sec. 4(a), 15 U.S.C. Sec. 717c(a) (1970)
 
 
 [71]
 Id. See also FPC v. Texaco, Inc., 417 U.S. 380, 394-395, 94 S.Ct. 2315, 2324-2325, 41 L.Ed.2d 141, 154-155 (1974)
 
 
 [72]
 See e.g., Permian Basin Area Rate Cases (Continental oil Co. v. FPC), 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Mobil Oil Corp. v. FPC, supra note 2
 
 
 [73]
 See Just and Reasonable National Rates For Sales of Natural Gas From Wells Commenced on Or After January 1, 1973, And New Dedications Of natural Gas To Interstate Commerce On Or After January 1, 1973 (Opinion No. 699),--F.P.C.2d--(June 21, 1974.)
 
 
 [74]
 See FPC v. Sunray DX oil Co., supra note 46, 390 U.S. at 37-38, 40-47, 88 S.Ct. at 1540-1541, 1542-1546, 20 L.Ed.2d at 405-406, 407-412; United Gas Improvement Co. v. Callery Properties, spra note 46, 382 U.S. at 226-228, 88 S.Ct. at 362-364, 15 L.Ed.2d at 288-289. See also Op. text at ns. 388-391
 
 
 [75]
 See Atlantic Ref.Co. v. Public Serv. Comm'n, supra note 36, 360 U.S. at 389-392, 79 S.Ct. at 1253-1256, 3 L.Ed.2d at 1319-1321. See also Op. text at n. 388
 
 
 [76]
 See Atlantic Ref. Co. v. Public Serv. Comm'n, supra note 36, 360 U.S. at 389-392, 79 S.Ct. at 1253-1256, 3 L.Ed.2d at 1319-1321. See also FPC v. Sunray DX Oil Co., supra note 46, 391 U.S. at 18-20, 88 S.Ct. at 1531-1532, 20 L.Ed.2d at 395-396; United Gas Improvement Co. v. Callery Properties, supra note 46, 382 U.S. at 226-228, 86 S.Ct. at 362-364, 15 L.Ed.2d at 288-289; Op. text at n. 389
 
 
 [77]
 See FPC v. Sunray Dx Oil Co., supra note 46, 391 U.S. at 19, 21-22, 25-26, 88 S.Ct. at 1531-1533, 1534-1535, 20 L.Ed.2d at 395-397, 399; United Gas Improvement Co. v. Callery Properties, supra note 46, 382 U.S. at 226-228, 86 S.Ct. at 362-364, 15 L.Ed.2d at 288-289. Op. text at n. 391
 
 
 [78]
 Op. text following n. 391. Compare Hunt Oil Co. v. FPC, 424 F.2d 982, 986 (5th Cir.1970); Phillips Petroleum Co. v. FPC, 405 F.2d 6, 9 (10th Cir.1969)
 
 
 [79]
 See Op. text at ns. 388-391
 
 
 [80]
 Op. text following n. 396
 
 
 [81]
 Op. text at n. 399
 
 
 [82]
 See Hunt oil co. v. FPC, supra note 78, 424 F.2d at 986; Phillips Petroleum Co. v. FPC, supra, note 78, 405 F.2d at 9. See also Permian Basin Area Rate Cases (Continental oil Co. v. FPC), supra note 72, 390 U.S. at 822 n. 114, 88 S.Ct. at 1388-1389 n. 114, 20 L.Ed.2d at 367 n. 114
 
 
 [83]
 Texas Eastern Transmission Corp. (Opinion No. 565), supra note 21, 42 F.P.C. at 383-393, 403-405
 
 
 [84]
 Texas Eastern Transmission Corp. (Opinion No. 565-A), supra note 25, 44 F.P.C. at 1084, 1087-1088
 
 
 [85]
 Id. at 1087-1088
 
 
 [86]
 Id
 
 
 [87]
 Op. text following n. 413
 
 
 [88]
 Op. text at ns. 414-423
 
 
 [89]
 Id
 
 
 [90]
 The history of area ratemaking in Southern Louisiana is adequately summarized in our earlier opinion, text at ns. 69-75 & pts. V(B)(2), VII, and in others. Mobil OilCorp. v. FPC, supra note 2, 417 U.S. at 288-300, 94 S.Ct. at 2326-2341, 41 L.Ed.2d at 84-90; Austral Oil Co. v. FPC, supra note 7, 428 F.2d at 415-421; Placid Oil Co. v. FPC, supra note 5, 483 F.2d at 885-892. Only the status of the rates which the Commission established in the original Southern louisiana area rate proceeding is relevant here
 
 
 [91]
 See Southern Louisiana Area Rate Proceeding, 25 F.P.C. 942 (1961) (order instituting proceeding); Southern Louisiana Area Rate Proceeding (Opinion No. 546), supra note 7
 
 
 [92]
 Southern Louisiana Area Rate Proceeding (Opinion No. 546-A), supra note 7, 41 F.P.C. at 306-309. The Commission felt that the importance of more abundant gas supplies from offshore areas of Southern Louisiana called for a new investigation of the adequacy of price ceilings for offshore gas, id. at 307-308, but that "[t]he reasons for instituting a new proceeding do not apply to the onshore prices at this time." Id. at 308. It was nearly nine months later that he onshore ceilings were brought into the new investigation. See Op. text at ns. 406-408
 
 
 [93]
 See note 92, supra
 
 
 [94]
 Southern Louisiana Area Rate Cases (Austral Oil Co. v. FPC), supra note 7, 428 F.2d at 444
 
 
 [95]
 Id. at 444-445. See also Op. text at ns. 409-413 & n. 413. The court clearly contemplated that these rates remain in effect while the new rate investigation proceeded, for it stated that, "[t]he maximum rates which the Commission has set ... are to remain in effect throughout the new proceeding, which may last for years." 428 F.2d at 421 n. 27. The fact is, however, that by reason of administrative and judicial stays these rates never actually operated. See Mobil Oil Corp. v. FPC, supra note 2, 417 U.S. at 298, 94 S.Ct. at 2340, 41 L.Ed.2d at 89
 
 
 [96]
 Slightly more than two months after announcement of Opinion No. 565-A, the Supreme Court declined to review the Fifth Circuit's decision in the Southern Louisiana Area Rate Case (Austral oil Co. v. FPC), supra note 7,400 U.S. 950, 91 S.Ct. 244, 27 L.Ed.2d 257 (1970) (denying certiorari). It was nearly a year after Opinion No. 565-A, in which the Commission decided to await the outcome of the new investigation, before it issued its decision therein. Southern Louisiana Area Rate Proceeding (Opinion No. 598), supra note 5. Finding the terms of a settlement proposal endorsed by numerous parties to be just and reasonable and supported by substantial evidence in the extensive administrative record amassed, the Commission set new rates, effective August 1, 1971, higher than those fixed in Opinion No. 546. 46 F.P.C. at 103-110, 135-138, 142-143. The Commission also prescribed a formula for refunds consequent upon deliveries of gas prior to that date. Id. at 140-141, 146-148. With that, the Commission declared that Opinions Nos. 546 and 546-A--the original Southern Louisiana area rate prescriptions--"now perform no office." 46 F.P.C. at 102
 
 
 [97]
 Op. text at ns. 414-423
 
 
 [98]
 Op. text at ns. 472-475 & pt. V(D)(2)
 
 
 [99]
 Op. text following n. 423
 
 
 [100]
 See note 95, supra
 
 
 [101]
 See Op. text at n. 44
 
 
 [102]
 Op. text at n. 393, quoting FPC v. Sunray DX Oil Co., supra note 46, 391 U.S. at 25, 88 S.Ct. at 1535, 20 L.Ed.2d at 399
 
 
 [103]
 FPC v. Texaco, inc., supra note 71, 417 U.S. at 397, 94 S.Ct. at 2326, 41 L.Ed.2d at 156
 
 
 [104]
 See Op. text at ns. 460-461
 
 
 [105]
 See text supra at note 70
 
 
 [106]
 See text supra at note 71
 
 
 [107]
 See text supra at note 69
 
 
 [108]
 The Commission requests clarification of our directions regarding flow-through to Texas Eastern's customers of producer refunds accruing to Texas Eastern prior to the effective date of the 1971 area rate. See Op. text at ns. 673-676. In Opinion No. 565, the Commission formulated a flow-through plan which we deemed objectionable only to the extent that it utilized the 20-cent in-line price as the basis for computations for part of the relevant period instead of the 18.5-cent area rate throughout. Op. pt. VI(G). In Opinion No. 565-A, however, the Commission deferred the matter of refund flow-through in its entirety, and we held that it erred in doing so. Op. text at ns. 635-638, 669-670. We said that the Commission must calculate, after due regard for Texas Eastern's Rayne Field investment, the amount to be flowed through on the basis of the 18.5-cent rate, and after updating the computation must order flow-through as soon as practicable. Op. text at ns. 673-676. The Commission asks whether on remand it has discretion to refashion, in some undisclosed manner, the flow-through plan, or whether it must employ the plan it constructed in Opinion No. 565
 It was not our purpose to bind the Commission to the flow-through methodology specified in Opinion No. 565, even as revisable in light of our criticism. We reviewed that methodology because some of the parties attacked it and, since the Commission did not disapprove it in Opinion No. 565--A, because it thus appeared that the Commission might still resort to it eventually. See Op. pt. VI(G). But we took pains to state that we did not proceed "on the broad premise that invalidity of an administrative decision undertaking to change an earlier administrative decision invariably reinstates the earlier decision," but in the realization "that the agency may legally have a choice as to the action it will take in the matter, and that a court may not be able to say that the agency, had it known that the latter decision would not pass judicial muster, would have left the earlier decision as its final action." Op. text following n. 558. See also note 42, supra. We added our recognition "that the refunding aspects of Opinion No. 565 may have lost their vitality by reason of supersession by the suspension provisions of Opinion No. 565-A, notwithstanding the invalidity of the latter." Op. text at n. 627. It is for the Commission, not us, to say whether in properly revised form the Opinion No. 565 flow-through plan survives, and if not just what, within the limitations we imposed, the plan shall be.